IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:15 cv 11 T 17 TBM


OXEBRIDGE QUALITY RESOURCES
INTERNATIONAL, LLC

        Plaintiff,

v.                                    March 16, 2016
                                      9:30 A.M.

MARC TIMOTHY SMITH,
individually and doing business
as Cayman Business Systems


        Defendant.
_____/



TRANSCRIPT OF ORDER TO SHOW CAUSE HEARING
BEFORE THE HONORABLE THOMAS B. MCCOUN
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:


For the Plaintiff:        LEIGHANNE CONNERY BOONE
                          William R. Wohlsifer, PA
                          1100 E Park Ave Ste B
                          Tallahassee, FL 32301-2651




For the Defendant:        MARC SMITH, pro se

Reported By:          Sandra K. Provenzano, RPR
                      Official Court Reporter
                      U.S. District Court
                      801 North Florida Avenue
                      Tampa, FL 33602
                      (813) 301-5699

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

<u>INDEX</u>

<u>WITNESS:</u>                                            <u>PAGE:</u>

  CHRISTOPHER MARK PARIS                          13
      DIRECT EXAMINATION                          13
  BY MS. BOONE
      CROSS-EXAMINATION                           39
  BY MR. SMITH
      REDIRECT EXAMINATION                        45
  BY MS. BOONE
  MARC SMITH                                      50
      DIRECT EXAMINATION                          50
  BY MS. BOONE
  DIRECT TESTIMONY OF MARC SMITH                  71

                          *****


<u>EXHIBITS:</u>                  <u>IDENTIFIED:</u>




<u>EXHIBITS:</u>                  <u>RECEIVED:</u>

  Nos. 1, 2, 3, 4, 5,    23
  6

```
 1                      P R O C E E D I N G

 2              THE COURT:  Good morning.  We're here for an

 3    order to show cause hearing.  And if the clerk will call the

 4    case, please.

 5              COURTROOM DEPUTY CLERK:  Case number 8:16 cv 11 T

 6    17 TBM.  Oxebridge Quality Resources International versus

 7    Smith.

 8              THE COURT:  We're going to record these

 9    proceedings electronically.  We've also got a court reporter

10    present today.  The backup tape feeds off the microphone

11    there in front or you.

12              So my rule of thumb is you can remain seated

13    throughout all the arguments, all the discussions.  Just when

14    you speak, speak into the microphone.  That will help the

15    court reporter to hear you, and it will also help us make a

16    backup tape.

17              If you -- obviously, if you wish to come to the

18    podium you may do so.  And -- but again speak into the

19    microphone if you would.

20              Yes, sir.  Let's have everybody to identify

21    themselves first.  Who's here for the plaintiff?

22              MS. BOONE:  Good morning, Your Honor.  Leighanne

23    Boone for the plaintiff.

24              MS. GRAY:  My name is Marc Smith.  I'm the

25    defendant.  Sir, I'm sorry, but I can hardly hear you when
```

```
 1   you speak.

 2             THE COURT:  All right.  I'll try to speak up.

 3             COURT REPORTER:  You are not coming through the

 4   microphones, Judge.

 5             THE COURT:  Let's try this again.  Because I'm

 6   not sure the mic was on.  If it was on, it as very low.  If

 7   you'll speak into it.

 8             MS. BOONE:  Certainly.  Here we go.  Leanne Boone

 9   for the plaintiff.

10             THE COURT:  All right.  You're Mr. Smith, and,

11   Mr. Smith, I'll try to speak loudly enough to where you can

12   hear me.

13             Plaintiff has filed a verified second notice of

14   defendant's breach of the mediation settlement agreement

15   which we had a hearing on some time back, and I agreed that

16   it was necessary that we have an evidentiary hearing on the

17   matter.

18             In the --  in the order that was entered back on

19   January 13th I indicated that the parties could proceed by

20   way of testimony, affidavits, and documentary exhibits.

21             And as agreed at the hearing the Court would

22   unseal the motion, defendant's response, the mediation

23   settlement agreement, and the joint stipulation at the

24   hearing which shall be placed into public record of the

25   court.
```

1          Is there any reason why we should not follow

2     through with the unsealing of those four matters?

3          MS. BOONE:  No, Your Honor.

4          THE COURT:  All right.  Then I'm going to direct

5     that the plaintiff's verified notice, Mr. Smith's response,

6     the first being Document 59, the second being Document 76,

7     the mediation settlement agreement which is document 60-1 by

8     the copy I've got, and the -- it may be -- -- 60-1 for the

9     mediation settlement agreement at Document 33, which is a

10    joint stipulation on injunction, which I think actually is

11    already in the public record.

12          All of them will be --  will be placed into the

13    public record of the Court.

14          Miss Boone, tell me how you anticipate proceeding

15    today if you would, please.

16          MS. BOONE:  I have two witnesses, Your Honor, Mr.

17    Paris and Mr. Smith.  We were going to proceed with the

18    current violations that are still public, uhm, the joint stip

19    and mediation agreement.

20          THE COURT:  Let's see if we can get some focus

21    here.

22          The pleadings that we've been looking at suggest

23    that there were essentially three violations which were

24    complained of by the plaintiff.

25          The injunction -- the injunction stated or the

1    stipulation for injunction stated that Mr. Smith agreed to

2    refrain from publishing commentary on the personal

3    professional business or other affairs of Paris and

4    Oxebridge.

5            It specifically had some subparagraphs, and 5B

6    said that Smith will remove any online commentary regarding

7    Oxebridge or Paris authored by Smith on any other website,

8    social network, or any other manner of technology or

9    communication now known or later become known.

10           And in paragraph sub5C it says Smith will not

11   publish any new content about Oxebridge or Paris on the

12   Elsmar.com internet forum or any other website and so on.

13           And then there was an agreement as part of the

14   medication settlement agreement which appears to be 2D that

15   Smith would shut down and cease operating www.Elsmar.com and

16   will not operate any similar website relating to the ISO

17   industry.

18           The pleadings also suggest that the plaintiff

19   complains that Mr. Smith has violated the settlement

20   agreement by revealing the contents of the mediation

21   settlement agreement.

22           MS. BOONE:  That's correct, Your Honor.

23           THE COURT:  Is that essentially what we're going

24   to be talking about today, or are there other matters that

25   I'm unaware of or have overlooked?

1          MS. BOONE:  I'm going to consult with my client.

2   Just one second.

3          I believe that's everything, Your Honor.

4          THE COURT:  Okay.

5          MR. SMITH:  Your Honor, one thing that I do want

6   to --  so this is on the record -- the plaintiff's attorney

7   and I --  in fact, I don't recall the date offhand.

8   Unfortunately, even though I'm acting as my own attorney, I'm

9   not afforded the same privileges of being able to bring in a

10  cell phone or anything to go back through notes and things

11  like this.

12          So we had a telephone conversation, and this has

13  to do specifically with the joint stipulation on injunction.

14  And it occurs to me at that time to try and talk with

15  Mr. Wohlsifer.  And I told you at the time I had tried and

16  not received any calls back.  You at that time told him you

17  will get in touch with Mr. Smith.

18          I agreed to try and work this out as well as the

19  case management file with Mr. Wohlsifer on the telephone.

20          At this point my intention is to dispute the

21  joint stipulation on injunction as agreed to because

22  Mr. Wohlsifer told me one thing on the telephone, and the

23  next thing you know he's submitted to the Court a document

24  which was different than what he agreed to on the telephone.

25          Unfortunately, it was a telephone conversation.

1    Neither one of us have any proof, but in addition I also

2    submitted to you -- I'm not sure which document it was --

3    maybe 73 or 4.  I just --  like I say, without being able to

4    bring my computer in to be able to look at my listings and

5    all, I can't come up with document numbers offhand.

6            But there are a number of things in there.  For

7    example, in the joint stipulation on injunction, which are

8    impossible, one of which, for example, is --

9            THE COURT:  Let me interrupt you on two

10   particulars.  If you need your computer or you need your cell

11   phone, we'll make arrangements to allow you to have it here.

12           MR. SMITH:  Here's the deal.  I drove down to

13   Florida.  It took me two days.  By the time I get all that,

14   try and get everything organized, it was my understanding --

15   I checked the Internet.  We left cell phones outside and

16   everything.  I was surprised when --

17           THE COURT:  Okay.  Did you hear what I said?  I

18   said, if you need it, we'll make arrangements to allow you

19   have it.  I'm hearing you say that you don't really need it

20   here apparently.

21           The second think I want to note is I'm aware of

22   the fact there is I think a pending -- a pleading which

23   challenges the joint stipulation on injunction.  And I know

24   that in your response here you, in a couple of 2 or 3, or

25   perhaps even more, instances urged that the joint stipulation

1    on injunction is not a legally binding document.

2         MR. SMITH:  My intention is to challenge that as

3    a legally binding document.

4         THE COURT:  For purposes of this proceeding, it

5    is the operative agreement that we're going to address.

6         MR. SMITH:  Now I understand --

7         THE COURT:  Do me a favor.  Don't interrupt me,

8    and I'll try not to interrupt you.  Okay?

9         MR. SMITH:  Yes, sir.

10         THE COURT:  For purposes of this proceeding it is

11    the operative document.  I am going to consider that it is

12    binding.  If you move forward and convince Judge Kovachevich,

13    who I think is assigned to matter, that it's not a legally

14    binding document, then so be it.

15         But at present that matter has not been resolved.

16    You can make your argument to that effect during the course

17    of your responses and so on here, but understand going

18    forward that I consider it to be one of the binding documents

19    that we are going to look at to see if there's been a breach.

20    Okay.

21         MR. SMITH:  I understand that completely, Your

22    Honor.  My intention here in stating this was to make sure

23    that this is on the public record in the court record.

24         THE COURT:  It is.  Okay.  How do you anticipate

25    proceeding with your case or your response?

1          MR. SMITH:  I don't know how you want to go

2     through it.  What I did was I submitted to the Court last

3     week and sent them a copy.  I can go through line item by

4     line item.

5          THE COURT:  We don't need to do that.  I'm aware

6     of your response.  I haven't looked at all of the attachments

7     that you may have included, but essentially you are going to

8     rely on that document as opposed to trying to introduce

9     separate exhibits today?

10         Plaintiffs have handed up a small exhibit book

11    suggesting they're going to try to introduce a few exhibits

12    in support of their position.

13         MR. SMITH:  These that they gave me?

14         THE COURT:  Right.  Do you have separate exhibits

15    not referenced in your pleadings?  If so, you need to make

16    those available to the Court.

17         If what you are going to argue is based on what

18    you've already filed, that's fine.  We've got it.  We'll look

19    at it.

20         MR. SMITH:  It is, sir.

21         THE COURT:  Okay.

22         MR. SMITH:  All the things --

23         THE COURT:  You can comment on those in a bit.

24    Let's get started here.  All right, Miss Boone, your motion.

25         MS. BOONE:  Thank you, Your Honor.  Today we're

1    here due to Mr. Smith's breach of a Court order on joint

2    stipulation and the mediation settlement agreement.

3            Despite our agreements and the joint stipulation

4    order, Mr. Smith -- for Mr. Smith to refrain from posting

5    further material about Paris and Oxebridge Quality Resources,

6    Mr. Smith continues to post such material across the

7    Internet, which is in turn reposted by endless numbers of

8    people.

9            Mr. Smith breaches of the joint stipulation has

10   permanently harmed my client as the postings have gotten out

11   of control and simply cannot be put back in the bottle.  And

12   the mediation settlement agreement provided that Mr. Smith

13   would exit the ISO industry as you referenced earlier yet he

14   continues to market himself and maintain a presence in the

15   ISO industry.

16           Today we are seeking contempt of court of Mr.

17   Smith for posting sealed documents on the internet.  Actual

18   damages in the amount of $200, sanctions in the amount of

19   $5000 for his failure to comply with two court orders, the

20   joint stipulation on injunction and the endorsed order

21   directing Document 60 to be sealed.

22           And an award of our reasonable attorney's fees as

23   provided in paragraph six of the mediation settlement

24   agreement, as well as an order that would allow us to -- that

25   we could present to certain websites to have them take down

 1   information that has been posted, reposted for Mr. Smith.

 2             And I'd like to call Mr. Paris to the stand.

 3             THE COURT:  All right.  Mr. Paris, come forward

 4   and be sworn in, please, sir.

 5             COURTROOM DEPUTY:  Raise your right hand.

 6             Do you solemnly swear or affirm that the

 7   testimony you shall give in this cause shall be the truth,

 8   the whole truth, and nothing but the truth, so help you God?

 9             THE WITNESS:  I do.

10                  CHRISTOPHER MARK PARIS,

11   a witness, having been duly sworn to tell the truth, the

12   whole truth and nothing but the truth, was examined and

13   testified as follows:

14             MS. BOONE:  I have an exhibit binder that

15   I'd like to present to the witness.

16             THE COURT:  All right.

17             Mr. Smith, before you begin, tell us your full

18   name, please, and where you reside.

19             THE WITNESS:  I'm sorry, I'm Mr. Paris.

20             THE COURT:  Excuse me, Mr. Paris.  Go ahead.

21             THE WITNESS:  Christopher Mark Paris.  I live in

22   Winter Haven, Florida.

23                  <u>DIRECT EXAMINATION</u>

24   BY MS. BOONE:

25   Q.    Good morning, Mr. Paris.  Has Mr. Smith complied with

```
 1    the requirements of the joint stipulation and injunction or
 2    the mediation settlement agreement?
 3    A.      No, he has not.
 4    Q.      And that -- I believe that both the mediation
 5    settlement agreement and now the joint stipulation and
 6    injunction have been unsealed and they're in the record as
 7    exhibits?
 8    A.      Yes.
 9    Q.      Thank you.  Mr. Paris, can you walk us through a time
10    line of the pattern of those breaches?  Anything you need
11    assistance -- Exhibit 6 might be helpful.
12    A.      Sure.  To preface it, if I may, we have to understand
13    that the motivation or the -- during the mediated settlement
14    agreement was that in lieu of Mr. Smith claiming he did not
15    have adequate funds to pay any kind of damages of any sort,
16    we would settle for a very low figure amount of $8,000.
17            In exchange he would close his website down and allow
18    me to open up a site to try to fill that space, potentially
19    monetize it so then it would be my responsibility to try to
20    earn back some money that I might have lost over this 15,
21    16-year period of the defamation -- alleged defamation.
22            We have to understand that.  But unfortunately while
23    that was what we signed, that isn't exactly what happened.
24    He was given 30 days to shut the site down.  And 30 days was
25    also for me to ramp up -- time for me to ramp my site up at
```

1    the same time.

2         And during that 30 days he used that to -- I like to

3    say -- pollute the waters my posting on his website ongoing

4    -- a big banner ad, a giant banner ad at the top of every

5    page of his site that announced the site was being shut down

6    because of this lawsuit.

7         It improperly summarized the case, but it made the

8    argument to the public and to his 2000 plus users that I was

9    shutting the site down out of spite or some other reason.

10        If we look at -- can we look at exhibits?

11   Q.   Certainly, you can look at --

12   A.   For example, in Exhibit 6 there's a copy of the banner

13   ad there that says -- I think we're missing the graphic which

14   said "rest in peace Elsmar.com" attempting to elicit sympathy

15   as if the site was a human being.

16        But then he said, sorry, folks, over -- after over

17   19 years continuously on line, Elsmar.com is now permanently

18   closed due to federal civil case, et cetera, et cetera.

19        That pointed people, of course, to the case and they

20   would see my name Oxebridge and everything.  That

21   announcement did not adequately summarize both the spirit and

22   the letter of the mediation agreement, which was again that

23   he was shutting the site down and he had already -- in fact,

24   he had telegraphed that he was going to shut the site down a

25   year before there was any lawsuit any way.

1          So the site was being shut down anyway, but that he

2    going to shut the site down and give me the space to open up

3    another site of my own in lieu of him having to pay a

4    significant amount of damages.

5          THE COURT:  You would concede that the mediation

6    settlement agreement doesn't say that; correct?

7          THE WITNESS:  I think -- yeah.

8          THE COURT:  It does not reference his low income

9    and lack of ability to pay.

10          THE WITNESS:  Yeah, I would concede that.

11          THE COURT:  And that being the motivation.

12    That's not set forth in the agreement.

13          THE WITNESS:  Right.

14          Then shortly after that -- just to give a sense,

15    that post in one iteration or another, remained on the site

16    up to 30 days after the site had been ordered to be shut down

17    by the Court, which I believe was August 7th or so when the

18    site was finally removed.  He is claiming now on some files

19    that are going to be presented today that this is the

20    equivalent of a door sign hanging on the front of a store.

21          I don't know if the Court really recognizes that,

22    but --  so it not only remained up for most of the month of

23    July while he was shutting the site down; it remained up

24    about 30 days after the Court had ordered him to shut the

25    site down.  It took a tremendous amount of effort on our part

1  between me and my lawyers to communicate with him increasing

2  my legal fees even more to just try to get that announcement

3  taken down.

4          If we look at B -- and I'm going to go through

5  this quickly.  I recognize the Court's time is important.  So

6  I'm not going to go through this in great detail.

7          But I'll just point out a couple highlights.

8          THE COURT:  Let me say this is your one

9  opportunity to convince me of the violations here, so you

10  take as much time as you need.

11          THE WITNESS:  Very good.  I appreciate that.

12  Thank you very much.

13          So on 23 June he then posted on the Elsmar site

14  again that hadn't been shut down yet, but that he was -- a

15  lawsuit settlement was the rationale for his shutting down,

16  which I am not allowed to discuss.  Essentially I have to

17  close down Elsmar.  In short, I have to burn the library,

18  which is how I look at it.

19          Certainly there was nothing in the agreement that

20  said anything about that.  You can see a response there of

21  people chiming in.

22          Mike S chimed in, in sympathy, kind of

23  denigrating the lawsuit, et cetera.  That is just a small

24  example of the probably I would say at least a hundred or so

25  hate mails, messages, that I've gotten that are derogatory

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1     against me as a result.

2          After the site closed though, in what I would say

3     is a fairly extraordinary move, he gave an interview on the

4     closure of the site.  After he had been ordered not to

5     discuss it, he went and gave an interview on a site called --

6     I think the site is called Document Forum or something.

7          But it's Standardsforum.com.  And he gave an

8     interview with the owner of that, and in that article which

9     I'm going to ask my attorney which --

10    Q.     I believe it's Exhibit 3.

11         THE COURT:  Exhibit 3.

12         THE WITNESS:  -- is a copy of that Elsmar's

13    closed, in which the article discusses that it was shut down

14    because of a lawsuit.  Let's see here.

15         As noted on the website's home page, his website,

16    only page, it has been closed as part of a settlement that

17    stems from a civil lawsuit filed in Florida, which is not

18    true.

19         He had already telegraphed he was shutting the

20    site down a year before any lawsuit was announced.  In

21    addition, this exhibit 3 does not indicate it, but the

22    original draft of this or the original publication of this

23    article included a link to a page on reddit.com.

24         And if the Court doesn't know what Reddit is,

25    I'll explain briefly.  Reddit.com is a massive international

1    website, millions and millions and millions of users, and

2    it's unfortunately notorious for doing some pretty shady

3    things.  It's where people go to kind of post nasty stuff.

4              Unfortunately, once something gets on Reddit, it

5    immediately winds up in your search results.  So I had

6    contacted the woman who run this article, and I did get her

7    to remove the link to the Reddit site so that's why it

8    doesn't appear in the exhibit.  But she wouldn't remove the

9    post itself.  I didn't pressure her on it --

10   Q.     Mr. Paris --

11   A.     -- because she's allowed to blog if she likes.

12   Q.     -- Mr. Paris, before you turn away from Exhibit 3,

13   who found that posting?  Who found that posting?  Did you

14   find that posting?

15   A.     I found the posting, yes.

16   Q.     And do you recall when you found it?

17   A.     It must have been fairly soon when it was published.

18   Q.     Okay.

19   A.     I don't remember.

20             MS. BOONE:  Your Honor, I now move for Exhibit 3

21   to be admitted into evidence.

22             THE COURT:  Mr. Clark, is there --  excuse me,

23   Mr. Smith.  I'll get this right eventually.  Is there any

24   objection to any of the exhibits that you have been shown

25   being introduced here?

```
1              MR. SMITH:  I have a number of -- there are a
2      number of things that Mr. Paris is saying --
3              THE COURT:  I am not asking for your counter
4      argument; I'm simply asking do you object to the exhibits
5      that he's showing the --
6              MR. SMITH:  No.
7              THE COURT:  -- being introduced?  Okay.  So far
8      he's identified 3 and 6.
9              MS. BOONE:  Okay.  And 1 and 2 you acknowledged
10     for the mediation settlement agreement and the joint
11     stipulation.
12             THE COURT:  Okay.  And then 4 and 5 would be
13     what?  Four, five and six would be --
14             MS. BOONE:  I believe Mr. Paris is going to get
15     to that soon.
16             THE COURT:  Well, tell me what they are.
17             MS. BOONE:  Other websites that posted on
18     Mr. Smith's material.
19             THE COURT:  Okay.
20             All the exhibits will be --  will be introduced.
21     Let me back up and ask with regards to Exhibit 3, the posting
22     on that was when?
23             That article that you referenced which you say
24     was on --  that ended up on or had the link to Reddit, that
25     article was posted when?
```

1          THE WITNESS:  Looks like the date is July 7,

2     2015.

3          THE COURT:  July 7th?

4          THE WITNESS:  Uh-huh.

5          THE COURT:  Okay.  Thank you.

6          THE WITNESS:  And as I recall that is the

7     accurate date.

8          THE COURT:  Okay.

9          All right.  Go ahead.

10    BY MS. BOONE:

11    Q.     Go ahead, Mr. Paris.

12    A.     And if we look at Exhibit 4, that's the copy --

13    that's just a copy of the front page of the Reddit site, but

14    it shows on the right some of the material --  well, I guess

15    the point I want to make is that when I clicked on the Reddit

16    site after I saw the link, I found that nearly the entire

17    Elsmar site had been cloned, copied.

18         It appears now -- we can go to it right now on

19    Reddit.com.  So the site was not shut down; it was merely

20    moved to Reddit.  So we see an example.

21         This is -- Reddit is a forum.  But we see the Elsmar

22    Cove logo on the top.  We see search the Elsmar Cove.  We see

23    the eulogy.  All of this material was literally copied and

24    pasted from the site which had been removed and moved to

25    Reddit.

1          Now, I know a little bit about web development,

2    and I've done it professionally for a little bit.  And I know

3    there's only two possible ways that happens.  Someone either

4    without Marc's knowledge scraped the site -- they call it

5    scraping which they take all the graphics and everything and

6    they repost it.  However, typically you lose a lot of

7    formatting, and it wouldn't look exactly the way it did

8    before.

9          The other alternative, of course, is that someone

10   gained the original raw files from Marc himself, and granted

11   permission to have this posted.  In my opinion, it looks like

12   the latter is true because of the exact nature of the way the

13   Elsmar site was completely cloned.

14          So right now the Elsmar site that we ordered

15   down, exists on Reddit nearly in its entirety.  But the new

16   forum -- and the forum is live so we don't have it here to

17   look at, but that forum is filled with new defamatory content

18   against me.

19          The problem with Reddit is that it's entirely

20   anonymous.  Anybody can post anything they want, in utter

21   anonymity, and yet it's not going to reveal who's those

22   people are.

23   BY MS. BOONE:

24   Q.    Mr. Paris, looking at Exhibit 4, were you the one who

25   found that posting?

1   A.      I'm sorry?  Can you repeat the question?

2   Q.      Did you find that website?

3   A.      Yes.  As a result of the interview he gave which

4   originally had a link to the Reddit site.  That's how I found

5   it.

6               MS. BOONE:  I move Exhibit 4 into evidence.

7               THE COURT:  All the exhibits have been

8   introduced.  You can have your witness talk about them.

9               (EXHIBIT Nos. 1, 2, 3, 4, 5, 6 ADMITTED INTO

10  EVIDENCE.)

11              MS. BOONE:  Okay.  Thank you.

12              Please continue, Mr. Paris.

13              THE WITNESS:  I probably made the point, but

14  anything that gets posted on Reddit automatically then gets

15  cloned to another site called Reacttant.  Not Reacttant I

16  only learned of recently, and I can't answer too many

17  questions as to what it is.  I don't know.

18              But that means that everything that is appearing

19  -- so now there's a second clone of the Elsmar site on

20  Reacttant.  As near as I can tell, Reacttant is done

21  automatically.  There's not people behind it.  It just copies

22  everything posted on Reddit.  But it basically doubles the

23  exposure.  So it's problematic.

24              We then found out that Mr. Smith granted

25  permission to a gentleman by the name of Andre Bardaden

1   (phonetic spelling), who lives in Russia, to open up a new

2   forum in the ISO space with the name Elsmarforum.com.  We see

3   below an email that I received from Andre.  I asked him how

4   did you open this site up and, B, are you aware that you may

5   not have permission to use the name Elsmar, and he wrote --

6   I'm afraid I don't have the date.

7               MS. BOONE:  Back on exhibit --

8               MR. SMITH:  Which exhibit is this?

9               MS. BOONE:  It's Exhibit 6.

10              THE WITNESS:  Exhibit 6.F.

11              MR. SMITH:  Exhibit 6?

12              THE WITNESS:  And Mr. Bardaden wrote, hello,

13  Chris.  I contacted Mr. Smith and asked him if I could use

14  the word Elsmar in my project.  He said that I could use it.

15  See print screen.

16              And he included a copy of the e-mail that Marc

17  sent to him.  And he says, I do not own a mark on Elsmar.  I

18  assume you can use it if you want to.  Good luck.

19              I want to point out that I believe that one of

20  the exhibits that Mr. Smith is going to be entering today

21  indicates that he has never -- he does not know who Andre

22  Bardaden is, and this e-mail will disprove that in advance.

23              I would also like to point out in the mediated

24  settlement agreement, which is Exhibit --

25              MS. BOONE:  One.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          THE WITNESS:  -- one.  Paragraph -- looks like

2     paragraph 2D, it says the defendant shall retain all

3     ownership and rights relating to www.Elsmar.com, which would

4     seem to contradict what he's saying here that he can use the

5     word "Elsmar" however he likes.  Mr. Smith had the

6     opportunity then to decline, deny the usage of this.  And he

7     did not.

8          Now we have another Elsmar forum in the quality

9     ISO business, profession, operating out of the jurisdiction

10    of this Court in Russia, which is not something anybody in

11    this room I think can take back.

12         He then began -- throughout the period of July

13    and thereafter presumably -- I should note that until

14    recently posts on Linkedin -- Linkedin is the largest, of

15    course, professional social network in the world equivalent

16    to Facebook, but for professionals.  Until recently you were

17    able to see posts made by anybody on Linkedin.  They changed

18    their policy recently.

19         But these were taken at a time when we could see,

20    so I'm not able to see what Marc may be posting now.  But on

21    July 7th immediately on the same day he gave the interview,

22    he then went on Linkedin and posted a link to the document

23    center interview where he says, FYI, word is getting around.

24         He begins to make the case, too, that I am

25    telling people that this is a criminal lawsuit, and I have

1    never made a public statement about that.  I never said

2    anything about this being a criminal lawsuit.  In which he

3    says don't be mislead.  I'm seeing people in another group --

4    again, maybe someone else; I don't know -- who says it was a

5    criminal lawsuit.  It wasn't.  It was a federal civil lawsuit

6    in Florida.

7            But at the end he says, it is a civil lawsuit who

8    its outcome was criminal.  That I agree with.

9            So he's denigrating the Court's decision in that

10   public post, which may as far as I know still be up there.

11   We don't know.  Then on July 25th he went even further.  He

12   said Elsmar was an internet icon.  There was no Linkedin when

13   it started in January of 1996, no Google, no Facebook, or

14   anything like that.

15           Taking Elsmar down was burning down the library

16   by a person who cannot stand criticism and is ordered to

17   taking 19 years of centralized information, opinions,

18   interpretations, friendship, et cetera, off the Internet.

19           I think that fairly well contradicts the letter

20   if not the spirit of the settlement agreement.

21           I wanted to point out Exhibit 5, which is a copy

22   of the home page of the Russian site Elsmarforum, which also

23   includes the tag phrase, people helping people, which is

24   something Marc used on his Elsmar site.  That's in Exhibit 5.

25           Now, what happened next is a little bit strange.

1    We found -- there's a website called Scribd.com where people

2    can post pretty much any document they want.  So it happens

3    to be a little bit of a clearinghouse for people who want to

4    post things that are in violation of somebody's trademark.

5         So if I pay for a document, I can post a

6    document.  Now everybody else in the world can download it

7    for free, and there's no harm in that.

8         We found that a user by the name of Paris

9    Oxebridge posted on November 17th some of the documents -- I

10   believe six in total -- documents from the Court which have

11   then been under seal.

12        MS. BOONE:  That's Exhibit 8.

13        THE WITNESS:  If we look at Exhibit 8, and this

14   is an example of the copy of a document posted to Scribd.com

15   by a user by the name of Paris Oxebridge.  Now, I want to

16   comment on that making sure that the Court knows it's my

17   opinion, the name Paris Oxebridge is something that Marc has

18   used throughout the 15-year-history we're talking about where

19   he refers to me as a single entity called Paris Oxebridge.

20        So I think two things are here, is that, one,

21   that name is not accidental if this is a way Marc refers to

22   me.  In fact, in his recent document I think he filed with

23   the Court he refers to me as Paris Oxebridge.

24        But also there seems to be an attempt to make it

25   look like I posted these documents.  But the six documents in

1   questions are all derogatory and defamatory of me so there

2   would be so reason.  And I wanted to state under oath that I

3   did not post these documents to this website.  In fact, I

4   hadn't even known this website existed.

5   BY MS. BOONE:

6   Q.    Before you move away from Exhibit 8, uhm, is that a

7   correct copy of Document 6 in the docket?

8   A.    No.  So this is a copy of Document 6 originally filed

9   -- docket six for this case, but it includes handwritten

10   annotations by Marc, which is something I want to talk about

11   because they include additional defamatory material

12   indicating to me that we just can't seem to stop the flood of

13   this stuff.

14   Q.    So I understand you to say that those handwritten

15   notes are not on Document 6 in the record?

16   A.    No.

17   Q.    Is there another document that does have them that is

18   in the record that --

19   A.    I believe it was subsequently filed under one of the

20   -- docket 6Ø.  And maybe you can check that.  But he since

21   filed this, I believe, on two occasions as his official

22   filings with the Court using the marked up copy.

23   Q.    And I believe Exhibit 7?

24   A.    Exhibit 7, yes.

25   Q.    Do you recall if this document was sealed at any time?

```
1    A.     Yes.   The document would have been sealed some time
2    around October.  Again, if I can, it's worth pointing out
3    looking at Exhibit 7, just some of the information that was
4    submitted to the Court, and again linked onto the Internet
5    which includes his handwritten notes.  And if we look at --
6              MR. SMITH:  Objection, Your Honor.  We have
7    reached the point here where he's listing all sorts of things
8    here, and he's ascribing to me -- I mean, he's trying to
9    point to me as the cause.  Now, I thought this was --
10             THE COURT:  You are going to get -- you're going
11   to get your opportunity to respond.  This is his version and
12   his beliefs and I consider it as such.  So you will get your
13   opportunity to respond.  If you have a specific objection
14   beyond the fact that he's rendering opinions here, I'll
15   listen.  But I'm going to allow --
16             MR. SMITH:  This is all opinion, Your Honor.
17             THE COURT:  I hear you.  And we'll see where it
18   goes.  Go ahead, sir.
19             THE WITNESS:  I want to make sure the Court
20   understands I know the difference between opinion and
21   defamation, and I'm not challenging Marc on his opinions.
22   But I am challenging him on what I believe, and I believe the
23   Court would agree, is defamation.
24             So I would point to exhibit --
25             THE COURT:  The issue in the case is whether or
```

1    not it's the defendant who is posting these matters.  You are

2    assuming in your testimony here that with regard to these

3    last two exhibits, which apparently reflect on court

4    documents 6 and 7, that he was the one that edited them with

5    the handwritten notes and posted them.  That's one of the

6    fundamental questions we're going to have to resolve here.

7            THE WITNESS:  He has submitted this, Your Honor.

8    He has submitted this under his name as an official document.

9    We would need to check which recent document, but I believe

10   it's somewhere around 60 or so he has submitted this

11   handwritten document under his name, and he acknowledges that

12   he's written these handwritten notes.

13           THE COURT:  All right.  So this is already an

14   official record.

15           MS. BOONE:  61.  Document under seal where he has

16   posted these handwritten comments that were previously

17   written on Document 6.

18           MR. SMITH:  They were in the Court record.  They

19   were submitted to the Court.  They are in your system.  Why

20   would I refuse it?

21           THE COURT:  You'll get your opportunity here.  Go

22   ahead, Mr. Paris.

23           THE WITNESS:  Looking at Exhibit 7, just for

24   example, if we look at -- looks like it's page five, I'm not

25   sure but on the bottom it's page five, paragraph 27.  There's

1    an indication there that says Smith has falsely claimed Paris

2    has threatened him and he writes, he has.

3            That I've -- I'm claiming here in this filing

4    that Smith has falsely claimed Paris has harassed him.  He

5    says, he has.  I'm arguing it's untrue.

6            He then accuses me of deceptive advertising.  But

7    I say Smith has falsely accused Oxebridge of deceptive

8    advertising.  Yes.  40-day wonder.  The term "40-day wonder"

9    is critical because it's a term that he coined first in 2000,

10   and has maintained ever since then, now 16 years.  He calls

11   me the 40-day wonder because I implemented a certain ISO

12   standard and I can do the work over a period of 40 days.

13           And he has alleged that this is impossible.  And

14   yet I have 15 years' experience doing it.  But he calls me

15   the 40-day wonder to make that a derogatory comment.  He

16   again makes the 40-day wonder comment in paragraph 68 of that

17   same exhibit where it says he was only familiar with -- only

18   his 40-day wonder, so again he's using these court filings to

19   actually defame me further.  He indicates in here again --

20   there's an interesting one here.

21           Paragraph 42 of the document F.  The finding --

22   the official document says, the false and misleading conduct

23   that strained Paris's relationship with industry

24   professionals, and he writes --

25           COURT REPORTER:  I have to write what you're

1   reading.  Please slow down.

2                 MR. PARIS:  I'm sorry.

3                 The false and misleading content has strained

4   Paris's relationship with industry professionals.  And he

5   writes in the margin here, many people simply do not like

6   Chris Paris.

7   BY MS. BOONE:

8   Q.     Can you just reiterate this was filed with the Court

9   as document --

10  A.     In paragraph 57 where we indicate that Smith raised

11  the offer --  you have to understand he was attempting to say

12  that if I bought his website for what eventually became a

13  figure of five million dollars, that was the only way I could

14  get him to stop posting this stuff, which I argue is

15  extortion.

16                But he indicated -- we indicated here on May 3, Smith

17  raised the offer to sell Elsmar.com to Paris at that point to

18  $750,000.  And he indicates in the margin, I raised my price

19  to him because he is an ass.

20                These are to me statements made by him as if they're

21  statements of fact.  And they were published in the Court

22  documents.  Then he points to people openly on his website to

23  the Pacer files and, of course, we find these additional

24  documents being posted under the pseudonym Paris Oxebridge,

25  which we don't know if it was him or not.  But it does

1    include this additional defamatory information.

2        At some point in addition the same document appears on

3    a law blog.

4            THE COURT:  Which same document?

5            THE WITNESS:  This handwritten version that had

6    been uploaded to --

7            MS. BOONE:  Exhibit 9.

8            THE WITNESS:  -- Scribd.com.

9            Yeah, we're on Exhibit 9 -- was also uploaded to

10   Scribd.com by a user Catherine Rubino, and she then wrote a

11   defamatory -- well, not defamatory, but a very highly

12   spirited blog article which praised Marc Smith and made some

13   derogatory comments against me in a somewhat humorous

14   fashion, praising him for his aggressive pro se actions.

15           But in the end that was another negative comment

16   from a complete third party that came out of the blue.  I

17   don't know.

18           We have in document number 6, Exhibit 6, my

19   paragraph --  let's see.  Roman numeral III.  Just a list of

20   some other --  just to show how this is spreading.  We don't

21   have to go into these in any detail, but it shows a list of

22   these blogs are now copying this material, for example, the

23   first list there, the first URL from a website called Three

24   Boxes of BS, copies and pastes the RIP, Elsmar RIP notice

25   saying it was shut down because of a lawsuit, etc.

1          So it just shows the Court that this is spreading

2     like wild fire, and there may be no containing it.  Whereas,

3     prior to the mediated settlement I really believed at the

4     time that the settlement agreement was going to be able to

5     stop this.  We came up with a fair deal.  He didn't have to

6     pay a tremendous amount of money, and I might have the

7     ability to try to over time repair my reputation on line.

8          But since the minute he posted that banner ad on

9     his site announcing that it was shut down to the website, it

10    opened this torrent, which now may be beyond the ability of

11    anyone to stop.  There remain multiple Linkedin posts, but we

12    can't see them anymore on Linkedin because of the change in

13    their policy.

14          Then there's two others in my Roman Numeral V and

15    VI.  These are old posts that still remain from Google groups

16    from Quality One Stop, which were subject to the take-down

17    order, the original take-down order under the joint

18    stipulation.  But they still reside today showing that Mr.

19    Smith has failed and refused to do so.

20          And I want to comment that it is entirely within

21    Mr. Smith's ability to take these down.  And in fact Google

22    and Quality One -- Google, anyway, offers a simple page.  You

23    click one link.  You submit a list of the URLs and you

24    indicate a reason for why you need to take them down, and

25    they can be taken down.

1          At this point, however, I would I think we're

2    going to request the Court to be given an order to do that,

3    because we cannot rely on Mr. Smith to do it.  So that just

4    shows additional breaches of the joint stipulation.

5          I think that's all I've got.

6    BY MS. BOONE:

7    Q.      Did you uncover any -- did you have any Google

8    searches that you have done recently?

9    A.      Yes.  Thanks.  I forgot.  If we look to Exhibit 10,

10   and Exhibit 11 -- we'll start with 10 --  you can see the

11   damage.  Now, I need to make it clear that the number one

12   source of sales and referrals from my business and my company

13   is through Google searches.

14         That's how I generate business.  But more importantly

15   when I obtain a potential client and I begin to talk to them,

16   and it looks like they're getting ready to sign a contract,

17   they usually will go through a process of vetting me to find

18   out if I'm legitimate or not.

19         One of the ways that everybody does that, you can go

20   to Google.  So if -- the first exhibit 10 shows Google

21   results filtered for everything prior to 2013, and 2013 was

22   when Mr. Smith was ramping things up, and we were starting to

23   look like we were getting into a lawsuit and got obviously

24   into a lawsuit.  Prior to that, the first page of search

25   results for the term "Paris Oxebridge" shows no negative

1     material whatsoever.

2          There are a few off topic things about Halloween here

3     or something, but all of the material that has to do with me

4     is either neutral or positive.

5          If we look at Exhibit 11, these are the search results

6     just of March 12th, so just the other day.  Now the search

7     for the same term shows up 50 percent of the negative

8     material.  Fifty percent of the first page results are

9     negative defamatory material.

10          And all of them, every single one of those, includes

11     material that was derived either from Marc Smith or posted by

12     Marc Smith or copied and pasted from Marc Smith.  So the

13     first one, the Ripoff Report includes entire sections of

14     content taken from the Elsmar site.

15          The second one, Chris Paris rides again, the full

16     thread is where will the next sucker come from is from 2004.

17     One of the Google group postings that he has refused to take

18     down, and it's still showing up as of March 12th.

19          You see the Scribd.com documents posted by this

20     anonymous person Paris Oxebridge.  We see additional stuff

21     from Reddit.com and other places copied and pasted.  This did

22     not exist prior to this.  The bulk of this has appeared since

23     the settlement agreement.

24     Q.    Mr. Paris, finally how have you been harmed and can

25     you repair this damage or -- from this?

1   A.      Uhm, I kind of can't emphasize the harm without

2   sounding hyperbolic, and I don't want to sound hyperbolic.

3           But the damage has been unbelievable.  Now, understand

4   this began in 2000 -- literally in January of 2000.  So we

5   were already dealing with 15 years of this.  Even at that

6   point prior to the breaches that we're discussing today, it

7   was reparable.  It was probably reparable because there

8   wasn't that big of an impact on Google the way it is as of

9   today.

10          But after these breaches, and specifically after

11  posting that on his website saying this is being shut down

12  because of Oxebridge, and making the posts and the interview

13  and Reddit site and all that, I do not understand now how

14  this can be put back in.  And the results have been

15  disastrous.

16          For the first time in my 16-year career of working

17  this, sales have dropped to zero.  There are no sales coming

18  in at all.  I'm not being requested.  No one is asking me for

19  quotes.  We had a couple -- I had a couple people contact me

20  a few months ago.  Those did not turn into contracts.

21  There's no work coming in at all.  You can directly correlate

22  the decline in my ability to do business with the increase in

23  this negative material showing up on Google.

24          Then, of course, is -- I can probably go on at length

25  of all the personal impact on this, the impact on everything,

1    the stress it's put on my wife who has to deal with this.  My

2    child.  The fact that our income has dropped now.  We have to

3    consider changing schools for my daughter.  The impact has

4    been phenomenal.

5         And I don't know now what could happen to put it back

6    in.  But we had an opportunity, we had a golden opportunity.

7    It wasn't an ideal arrangement.  Everybody walked out of the

8    mediated agreement equally displeased, which I think

9    indicates usually you reached a good agreement, when everyone

10   is equally unhappy.

11        But had it worked, we wouldn't be sitting here now.

12   Now I do not know.  The problems are worse than that even if

13   I were to quit the business, my name follows me.  And this

14   has been successful in targeting my name, so if I were to

15   open up a gas station tomorrow, one of the people involved

16   with Marc Smith and all the people that have been infected by

17   this information on the Internet, will one day figure out

18   that that gas station is owned by Chris Paris.  And then the

19   whole thing comes down again.  And now the gas station is

20   gone.

21        So my professional career is over.  And I don't know

22   how to recover from it.

23        MS. BOONE:  Thank you, Mr. Paris.  That concludes

24   my questioning.

25        THE COURT:  Mr. Smith, you have the right to

1    cross-examine, which is to question Mr. Paris, if you wish.

2            MR. SMITH:  Your Honor, this --  this has been so

3    wandering, the only way I could cross-examine him -- he's

4    made so many misstatements.  He attributes everything that's

5    happening to me --

6            THE COURT:  Do you wish to cross-examine him or

7    not?

8            MR. SMITH:  You know, I'm one little guy.  He

9    goes through and, for example --

10           THE COURT:  Do you wish to cross-examine him?

11           MR. SMITH:  I'm sorry?

12           THE COURT:  Do you wish to question him or not?

13   This is your opportunity to question him.  You are going to

14   have the opportunity to take the stand and tell your side of

15   the story in a bit.  But right now we're at the point where

16   you have the right to question him, to cross-examine his

17   testimony.

18           The question is:  Do you wish to do that?  It's

19   up to you.

20           MR. SMITH:  Okay.

21                     CROSS-EXAMINATION

22   BY MR. SMITH:

23   Q.    I guess we'll start off with --  Exhibit 11.  And he

24   talks about the Ripoff Report.

25           Are you aware that I contacted Reddit and requested

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   them to take that information down?  I think two discussion

2   threads?

3          And are you also aware that -- I think it was your

4   attorney -- was copied on this, and Reddit wrote me back and

5   said hey, no.  And your attorney was copied on that?  I can't

6   do anything about Reddit.

7                THE COURT:  All right.  That's a question.

8                MR. SMITH:  And what --

9                THE COURT:  Mr. Smith?  Mr. Smith?

10               MR. SMITH:  -- do you --

11               THE COURT:  Mr. Smith.  You get to ask questions

12   now.  He gets to answer the question.  So stop.

13               (The Court and Mr. Smith speaking

14   simultaneously).

15               THE COURT:  Mr. Smith, Mr. Smith.  Listen to me.

16   When I'm talking, you will be quiet.  Do you understand that?

17               MR. SMITH:  Yes, sir.

18               THE COURT:  Okay.  He's asking you a question.

19   What's the answer to that question?

20               THE WITNESS:  No.  I'm not aware.

21               THE COURT:  Your lawyer never shared to you the

22   responses by Reddit or his request for a take down?

23               THE WITNESS:  No, I have not seen it.

24               THE COURT:  Okay.  All right.  So he's not aware.

25   What's your next question?

```
 1   BY MR. SMITH:

 2   Q.      What evidence do you have, or -- that points to me

 3   having anything to do with Reddit?

 4   A.      Uhm, again, your copyrighted material is on the site.

 5   I have been in contact with Reddit separately, and they have

 6   confirmed with me that if you file a Digital Millennium

 7   Copyright Act, DMCA, notice, they'll honor those.

 8           And DMCA notices can only be filed by the owner of the

 9   copyrighted and trademarked material.  Since he owns the site

10   for Elsmar, all he needed to do according to the

11   communication I had with Reddit, is to file the DMCA

12   take-down notice, and they would honor that.

13           Now, Reddit, I asked them to take it down, but they

14   said you are not the copyright owner so they would not honor

15   it for me.  Which is why I am here requesting the Court order

16   Reddit to take it down.  So that is the understanding I have.

17           You are the copyright owner, and it is your material.

18   I believe the only way they could have gotten it is if you

19   gave it to them.  And you certainly have the ability to take

20   it down if you chose to.

21               THE COURT:  Next question.

22   BY MR. SMITH:

23   Q.      Okay.  I'll repeat the question I had before.  Are you

24   aware that I did that, and I copied your attorney on it?  Are

25   you aware that --
```

1          MS. BOONE:  Objection.  Asked and asked.

2     BY MR. SMITH:

3     Q.     -- and they told me no, they would not take it down?

4          THE COURT:  Mr. Smith, you asked the question.

5     Your answer is no.

6          THE WITNESS:  My answer remains no.

7          THE COURT:  Next question.

8     BY MR. SMITH:

9     Q.     Okay.  Let's see.  You talked about Scribd.  You

10    attributed to that -- other than conjecture on your part

11    everything that is going on here and everything that is being

12    posted and everything that is being done, is I have something

13    to do with it.

14         Do you have any evidence --  do you have --  I mean,

15    have you communicated with Scribd?  They keep log files.

16    They keep IPs.  They keep e-mail addresses.  Do you have any

17    evidence that I have anything to do with any of this?

18         THE COURT:  Okay.  Good question.

19         Now, you be quiet.  What's the answer?

20         THE WITNESS:  No.  As I made clear during my

21    testimony earlier, I said I believe, but I do not have proof,

22    that the user Paris Oxebridge is Marc Smith.  I made that

23    very clear in my testimony.  It is only my opinion and

24    conjecture.

25         MS. BOONE:  May I ask Mr. Paris a question?

1      THE COURT:  You will get a chance to redirect.

2    Not right now.  Do you have another question?

3    BY MR. SMITH:

4    Q.    I guess we could go on to example two.  They have

5    presented these exhibits, six.  On this exhibit --  Exhibit 6

6    he talks about, for example, I gave permission to launch a

7    new ISO related forum under the name of Elsmar in Russia.

8         Over the years a number of people have contacted --

9         THE COURT:  I don't want to hear your version.

10        MR. SMITH:  Okay.  I'm sorry.

11   BY MR. SMITH:

12   Q.    I think what my problem is that's so meandering that

13   I'm not even sure where to start --

14        THE COURT:  Do you have a --

15        MR. SMITH:  -- except that, you know, I just wish

16   these proceedings were such that when he starts stating

17   stuff, that there would have to be some evidence rather than

18   throwing mud against the wall.

19        I can't --  I'm not a lawyer.  I didn't sit back

20   --  I did go through line item by line item, Your Honor, and

21   refuted this.

22        I just --  my only question to Mr. Paris why is

23   it that I can think of at this point -- why is it that

24   everything that anybody else does -- I mean, Elsmar had a lot

25   of people, I'll grant you that.

1          But you are telling the Court that I -- and you

2     believe, you honestly believe, honestly believe that I, a

3     single guy that got out the ISO business back in 2000, ran a

4     relatively small forum --

5          THE COURT:  Is that a question?

6          MR. SMITH:  -- that you believe that I'm that

7     powerful, and that all of this is happening to you is

8     happening to you because of me?  Do you really believe that?

9          THE WITNESS:  The question is phrased with a

10    series of absolutes and superlatives that I don't even know

11    how I could answer.

12         THE COURT:  Is it your belief that he's

13    responsible for this?  Let's talk about the Russian site.

14    That's where we start.

15         MR. SMITH:  I literally confirmed it with the

16    Russian himself.  I don't know how much more evidence I could

17    have.  Again, I can bring a computer in and show the e-mail,

18    et cetera.  I don't know if we need to go down that.  Yes, I

19    believe.

20         I believe that I have not made claims that

21    Mr. Smith is responsible for every ill thing that ever

22    happened to me in my life.  I wouldn't make that claim.  I

23    made very specific claims.  I think they're well documented.

24    They're not meandering.  And I would stand by the claims we

25    make.

1         THE COURT:  Another question, sir.

2         MR. SMITH:  No.  I have made --  my only question

3    was is the significance--  what -- like I say, I can't

4    believe that he believes that this is all because people

5    found out that --  I mean, that Elsmar was shut down.

6         THE COURT:  I'll hear your version.  I'll hear

7    your version, I guess, in a bit here.

8         Miss Boone, do you have any redirect?

9         MS. BOONE:  Yes, Your Honor.

10                  REDIRECT EXAMINATION

11   BY MS. BOONE:

12   Q.    Would you please turn to Exhibit 8.  Do you have the

13   Scribd listing from November 17?

14   A.    Yeah.  Okay.

15   Q.    Again, there is markings -- do you -- do you believe

16   that those are the markings of a certain individuals on those

17   documents?

18   A.    Yeah, those markings are made by Marc Smith, and I

19   believe earlier in the morning before on the record he

20   admitted that these are his, and that he filed these under

21   docket -- he said he took Document 6, he marked it up by

22   hand, and then filed it as the document, I believe, 60-1.

23   Q.    Do you know how someone's markings on the document

24   after it has been filed with the Court could have gotten in

25   the hands of someone else?

1    A.      Yes.  The person who marked them would have to send

2    them to that person.

3    Q.      Thank you.

4              MS. BOONE:  That's all.

5              THE COURT:  Mr. Smith, on the -- on the point of

6    you being the author of the handwritten additions to

7    documents that were filed in the Court, did you concede that

8    you were the one that added those handwritten notes?

9              MR. SMITH:  I -- yes, I did, Your Honor.  And --

10             THE COURT:  That's all I want to know.  Thank

11   you.  You'll get a chance to explain it down the road.

12             But we identified the author, so that's good.

13   What else, Miss Boone?  Anything?

14             MS. BOONE:  That's it.

15             MR. SMITH:  I submitted that to the Court.

16             THE COURT:  I understand.  It may be entirely

17   appropriate.  I don't now.  I just confirmed that you're the

18   author.  That eliminates one factual dispute that we might

19   have had here.

20             Miss Boone, let me ask you to clarify for me

21   unless you are going to use someone else to do this, this

22   claim that you want damages arising from this proceeding.  I

23   understand he says that the company has been harmed because

24   there are no sales coming in at present.

25             I understand he claims emotional distress to

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    himself and his family.  Your motion articulated some

2    specific damages.  What is it that you are seeking here by

3    way of damages?  As one remedy to the alleged breaches here.

4             MS. BOONE:  We're seeking temporary damages to

5    compensate him for his lack of business that he's received

6    due to Mr. Smith's actions, enough to compensate him to

7    hopefully create a new business for himself that won't -- the

8    defamation will not follow him.

9             THE COURT:  But -- and how is -- how is the

10   Court to calculate the losses?

11            MS. BOONE:  We could propose what his salary is

12   -- is yearly profits --

13            THE COURT:  This is your opportunity here to

14   request relief from the Court to establish the violations.  I

15   read reference to a $200 figure.  I read reference to --

16            MS. BOONE:  The 200 --

17            THE COURT:  -- five thousand dollar figure.  I

18   read references to attorney fees.  And then we seem to be

19   straying into areas of compensatory damages.  I am just

20   questioning what it you are asking the Court to do by way of

21   monetary damages, if any.

22            MS. BOONE:  Today we would like to ask for a

23   certain amount of compensatory damages.  I believe if I can

24   consult with my client for one second.  But he's on the

25   witness stand.  Can I for one second?

1    THE COURT:  Why don't you just ask the question.

2  Start with economic damages.  Is there a claim of economic

3  damages?  That's what I understood your motion to set out.

4    MS. BOONE:  Yes.  I believe so.  Economic damages

5  to cover the amount of time it might take Mr. Paris to

6  recover from this devastating loss to his business.

7    THE WITNESS:  Can I comment?

8  BY MS. BOONE:

9  Q.    Certainly.

10  A.    My understanding of the 5,000 figure was that it was

11  some sort of -- and again I'm not a lawyer so I don't

12  understand.  But I thought it was some kind of relatively

13  routine or a punitive -- penalty, rather, in lieu of

14  Mr. Smith being incarcerated.  That's the way I understood

15  it.

16    Clearly, the damage that I have experienced can't be

17  calculated by $5,000.  I don't know if -- maybe I'm

18  mishearing --

19  Q.    The 5,000 you believe to be punitive.  The 200 was

20  actual for repair of the website and once it was hacked, I

21  believe?

22  A.    Yes, but I thought it was a range of 200 to 5,000.

23  I'm willing to ignore the 200.

24  Q.    I understand.

25    THE COURT:  Are you still blaming Mr. Smith with

1    hacking your website?

2           THE WITNESS:  No.  In fact, I don't believe I

3    ever did blame him, but I think it was a supporter of his.

4    But we have done an internal investigation.  We actually know

5    it was a sympathizer.  But no.  I would say on the record it

6    was not Mr. Smith who hacked that website.

7           THE COURT:  All right.  Miss Boone, anything

8    else?

9           MS. BOONE:  No, thank you.

10          THE COURT:  All right.  Mr. Paris, you can step

11    down, sir.

12          You have another witness?

13          MS. BOONE:  I'd like to call Mr. Smith to the

14    stand.

15          THE COURT:  All right, Mr. Smith.  If you will

16    come forward and be sworn in, please.

17          MR. SMITH:  May I bring my material with me?

18          THE COURT:  Why don't leave it there for the time

19    being.  If she's got exhibits she'll show them to you.  If

20    you need material, I'll allow that.  Let's see what she says

21    first.

22          Do you solemnly swear or affirm that the

23    testimony you shall give in this cause shall be the truth,

24    the whole truth, and nothing but the truth, so help you God?

25          THE WITNESS:  I do.

1              MARC SMITH,

2    a witness, having been duly sworn to tell the truth, the

3    whole truth and nothing but the truth, was examined and

4    testified as follows:

5              THE WITNESS:  I would like to remind the Court

6    that I don't hear very well.

7              THE COURT:  Everybody speak into the microphone,

8    you'll be okay.  Tell us your full name and where you live,

9    sir.

10             THE WITNESS:  My name is Marc Smith, and I live

11   in West Chester, Ohio.

12             THE COURT:  Miss Boone.

13                  DIRECT EXAMINATION

14   BY MS. BOONE:

15   Q.     Good morning, Mr. Smith.  Thank you for coming today.

16   Now, did you attend the mediation between yourself and Mr.

17   Paris on June 5th, 2015?

18   A.     Did I have what?

19   Q.     Did you attend a mediation with yourself and Mr. Paris

20   on June 5th?

21   A.     Yes, I did.

22   Q.     What was your motivation for -- first of all, was

23   there a settlement reached at that mediation?

24   A.     Yes.

25   Q.     What was your motivation for settling?

```
1    A.      Make this all go away.  Make this lawsuit go away.

2    Q.      Can you elaborate any further as to any details.

3    A.      Other than that it was a very flawed mediation

4    agreement.

5    Q.      Okay.  But you agree that you reached that agreement

6    and that you signed that agreement, and it was of your own

7    free will; is that correct?

8    A.      With the understanding that that ended everything,

9    yes.

10   Q.      Thank you.  Can you now turn to Plaintiff's Exhibit 1.

11   It should be in that binder --  did you take the binder?

12             MR. PARIS:  I'm sorry.

13             MS. BOONE:  I'll present to the witness

14   plaintiff's exhibit 1.

15             THE WITNESS:  Yes, that's the mediation

16   settlement agreement.

17   BY MS. BOONE:

18   Q.      And have you complied with those provisions?

19   A.      I believe I have.

20   Q.      How about 2D?  Can you read 2D?

21   A.      Which one?

22   Q.      2D.

23   A.      Two B as in baby?

24   Q.      D as in dog?

25   A.      2D as in dog?  Yes, I believe I shut down Elsmar.com
```

1   as per this agreement.

2   Q.    Would you please turn to exhibit --

3   A.    Exhibit what?

4   Q.    Three?

5   A.    Three.

6   Q.    Three.

7   A.    Yes.

8   Q.    Did you do this interview?

9   A.    Yes, I did.

10  Q.    And was this --  do you consider this being out of the

11  ISO industry?  Do you consider this being out of the ISO

12  industry which is what is required by --

13  A.    Your question makes no sense to me because there is

14  nothing in the mediation agreement that says that I will get

15  out of the ISO industry.

16  Q.    Would you please turn back to the mediation Exhibit 1?

17  A.    Yes.

18  Q.    And read for the Court, please, 1D that you were just

19  looking at?

20        THE COURT:  You don't need to read it.  I have it

21  right here in front me.

22        MS. BOONE:  I'll read it the Court then.

23        THE COURT:  I don't need you to read it either.

24  Ask him a question if you have a question.

25  BY MS. BOONE:

1    Q.    It clearly says here that you will not operate any

2    similar website in the ISO industry in the future.

3    Specifically, to the website as well --  going to the Elsmar,

4    however, shall retain all ownership as to Elsmar.com.

5          Then in Exhibit 6 -- sorry for flipping around here.

6    A.    Okay.  Now, you're jumping around here.  We went back.

7    We now know that the question you asked me was do I consider

8    myself out of the ISO industry.

9          Now, you have come back to the mediation agreement and

10   say that it doesn't say that.  All it says is, it says that I

11   will not operate another, quote, ISO website.  Okay.  So now

12   where are you jumping to and what is your question?

13             THE COURT:  Mr. Smith, she gets to ask the

14   questions.  You can answer them.  I can read the language

15   here.  The question was, do you consider --  the original

16   question was, was this interview connected with the ISO

17   industry.  That's a yes or no.  Was it or not?

18             THE WITNESS:  No, it was not.

19             THE COURT:  Okay.  You also don't think it's a

20   violation of 2D, I understand that.  What's the next

21   question?

22   BY MS. BOONE:

23   Q.    The next question is in Exhibit 6 at the bottom.  In

24   an e-mail you said that you did not have the right to

25   Elsmar.com or the name Elsmar, I believe?  Did you see that?

1  A.     Yes.  In the mediation agreement it says that --  I

2  believe --

3           THE COURT:  It says you shall retain all

4  ownership and rights relating to www.Elsmar.com.  Now, what's

5  the question here?

6           THE WITNESS:  Okay.  What's the question?

7  BY MS. BOONE:

8  Q.     The question is why did you tell -- this email --

9  assuming you agreed that this email is correct -- to Arju

10  Bardaden (phonetic spelling); this is on Exhibit 6F, as in

11  Frank -- that, I do not own a mark on Elsmar.  I assume you

12  can use it if you want.

13  A.     I don't own the copyright or whatever on Elsmar.

14  Anyone who has contacted me over the years and said, hey, may

15  I use Elsmar to do whatever?  Yes, use it.

16  Q.     Do you believe that in the spirit of the mediation

17  agreement that term was meant to be the use of Elsmar in

18  general, that you would not be able to use that name?

19  A.     I don't even recall this Andre Bardaden.

20  Q.     You don't recall this e-mail?

21  A.     I don't recall it.  I can't say that --  ma'am, over

22  the years I have had a lot of people who wanted to use Elsmar

23  in different ways.  And I have always --  it's been the same

24  thing.  You want to use it, I don't claim the copyright on

25  it.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    THE COURT:  You kept that same attitude since the

2  mediation settlement agreement?  If they contact you and say

3  they want to use it, you say fine, for whatever purposes they

4  want to use it?

5    THE WITNESS:  Your Honor, any time anyone

6  contacted me about using Elsmar -- if I had wanted to protect

7  it, I guess I could have done --  I don't know what it is, a

8  copyright or register it or whatever.

9    I --  Your Honor, Elsmar was a word that I found

10  --  well, I didn't find.  It was a street I grew up on in

11  Fort Thomas, Kentucky, and I chose that as a domain name

12  because I had never seen the word anywhere else.  But I

13  didn't copyright it.  Elsmar, my website, was not -- in fact,

14  it started as a hobby.

15    THE COURT:  Did you in response to this inquiry

16  from the gentleman apparently from Russia, did you give him

17  permission to use the Elsmar site?

18    THE WITNESS:  I don't even recall, but --  I

19  would say probably yes.  Now, again, Your Honor, if we go

20  back to the mediation settlement agreement, it only talks

21  about www.Elsmar.com.  Okay.  And it says that I retain the

22  rights to that.

23    Now, this other one it says in Exhibit 6, it says

24  hello, Chris, I contacted Mr. Smith and asked him if I could

25  use the word Elsmar in my project.  He said I can use it.

1    See print screen.

2          Like I say, I don't recall, but as I said my

3    policy has been if someone wants to try and start a competing

4    forum, or they have whatever in this --  it says project, but

5    I don't specifically recall this, but I will say that if --

6    if he did contact me or she --  I'm sure I said yes.

7          THE COURT:  What was the project?  Excuse me.

8    What was his project?

9          THE WITNESS:  What was --  this person talking

10   about?

11         THE COURT:  Yeah, his project.  That's the term

12   you used.

13         THE WITNESS:  It's a term that I'm seeing here in

14   this exhibit.  I have no recollection of this specific

15   e-mail.  Or this specific person.

16   BY MS. BOONE:

17   Q.    Do I understand you are freely giving the name Elsmar

18   to anybody who requested to use it?

19   A.    I'm sorry?

20   Q.    Is it my understanding that your testimony today is

21   that you have freely given the name Elsmar to anyone who has

22   requested to use it?

23   A.    Yes.

24   Q.    Did Mr. Paris request --  my client did request at

25   mediation that he be able to use the name Elsmar?

A.     I don't recall that in the mediation, and there's nothing in the mediation agreement that refers to that.

Q.     So you do not recall denying my client to be able to use the name Elsmar as a part of this mediation?

A.     The only thing that I denied during that mediation agreement was to turn over the website to him.  Now, it started out as a 1 to 2-hour mediation agreement supposedly, which stretched out to something like seven hours.

       The two lawyers sat down and scratched out --  they just wanted to get home for dinner -- scratched out what I considered a --  there it is.  It's right there.  So, yes, I denied --  I wouldn't have given this man Elsmar.com or -- for love nor money.

Q.     So --

A.     Even that for him to buy it.  At one point I gave him an opportunity to buy it lock, stock, and barrel for $450,000.  He turned it down.  And after that I kept raising the price because he kept bothering me so much.

       Now, he calls it extortion, but he had --  I have the e-mails to prove it.  He could have bought it for $450,000. But by the time the mediation agreement came around that meeting no, huh-uh.

Q.     So I understand it's your testimony --

       THE COURT:  You don't need to have him repeat it. I understand.  What's your next question?

1    BY MS. BOONE:

2    Q.      All right.  My next question is turning to Exhibit 8.

3    Have you seen the document that is shown on this website

4    before?

5    A.      You want to know what the purpose of this document is?

6    Is that what you're asking?

7    Q.      First I want to know if you've seen it before?

8    A.      I wrote it.

9    Q.      You wrote it.

10   A.      Well, I marked it up.  This document right here when I

11   was first served with the lawsuit, this document right here

12   was the first thing that I did was I went through and marked

13   it up.

14          And then finally I got to the point where I believe it

15   is court docket document number 17.  I took my marked up

16   comments, put it all into my answer to the Court.

17          When I filed it with the Court again, it was out of

18   frustration being with the judge to consider the original

19   lawsuit because I considered it frivolous and totally

20   maliciously filed.

21   Q.      Do you know who posted this?  This Paris Oxebridge?

22   A.      I have no idea, and I knew nothing about what was

23   posted on Scribd until recently, and I think it was during

24   the telephone conversation that we had with the judge, and I

25   believe you all came up and made a statement, Your Honor, we

1  found documents on Scribd.  So you people were the first one

2  that brought it to my attention.

3  Q.     My question --

4  A.     That it was posted.  Now, after reviewing that and

5  after the phone call, I went and, yes, I saw someone had

6  posted the original lawsuit, if I remember.  And the exhibits

7  maybe and maybe my answer --  I can't remember what --  I

8  went, okay.  But it's there.  But again, I --  you let me

9  know it was there.

10  Q.     How could somebody have gotten ahold of this document

11  with your handwritten annotations on it?

12  A.     Because it was submitted.  I can't --  I can't

13  remember, but I think I submitted it to the Court, and it was

14  probably document number 61 or something where I was pleading

15  with the Court.

16  Q.     Thank you for bringing up number 61.

17  A.     I'd have to look --  again, I not being a lawyer, I

18  don't have my stuff here.

19  Q.     If you look at exhibit --

20  A.     I could look it up.  I filed a motion with the Court

21  to please review --  and I can't remember my exact words, but

22  I think I was saying, will you please re review this lawsuit

23  and --  I mean, and I had that --  that thing handy, scanned

24  it and submitted it the Court.

25         THE COURT:  Okay.  Wait for her question.

1    BY MS. BOONE:

2    Q.      Please turn to Exhibit 7, which I believe is

3    Document 61, exhibit A in the Court record, which is

4    presently --

5    A.      Seven, yes.

6    Q.      Which is presently under seal.

7    A.      Did what?

8    Q.      It's presently under seal this Document 61.  I'm

9    telling you it is.  I know that it is.

10   A.      Is it --

11   Q.      Do you verify this is Document 61?  And that those are

12   your handwritten marks?

13   A.      Okay.  Notice at the top of this --  it gives the case

14   number, but it has two documents filed by the Court.  It has

15   Document 1, which is entered --  the -- January --

16                THE COURT:  Have you got --

17                THE WITNESS: -- and this is --

18                THE COURT:  Mr. Smith, don't ramble here.  Okay?

19   What's your question, ma'am?

20   BY MS. BOONE:

21   Q.      My question that I was getting to -- I first wanted to

22   know if he verified this was the document.  Has he reposted

23   this sealed document somewhere on line?  Have you reposted

24   this document somewhere on line?

25   A.      Reposted it?

1   Q.    Anywhere.  Posted it, shared it?

2   A.    I sent it to the Court.

3   Q.    Okay.

4   A.    I submitted it to the Court.

5   Q.    So it is your testimony that you have not shared this

6   document that's under seal with anyone?

7   A.    I haven't shared documents with anyone.

8   Q.    This particular document.

9   A.    No.

10   Q.    Do you have any idea how Karen Rubino (phonetic) in

11   Exhibit 9 -- sorry to jump around again, but --  could have

12   gotten ahold of that document?

13   A.    Do I have any idea how what now?

14   Q.    How this --  if you look, it says Catherine Rubino.

15   Do you have any idea how she would have gotten ahold of this

16   sealed document?

17   A.    How she --

18   Q.    Would have received a copy of that sealed document and

19   then for it to be posted on line?

20   A.    Well, I'm sorry you have me confused here.  We are

21   starting at Exhibit 7.  Okay.

22   Q.    Uh-huh, yes.

23   A.    Okay.  Now, that was submitted to the Court.  Okay?

24         THE COURT:  Mr. Smith, let me jump in.  The

25   document number 61 is a sealed document, correct, the one you

1    are looking at there?  Docket 61 indicates sealed?

2             THE WITNESS:  I --  if I remember from Pacer, it

3    did --  it didn't specifically mention docket 61.

4             THE COURT:  Let's assume --  let's assume 61,

5    which is your marked up version which you submitted to the

6    Court, let's assume it was filed under seal.  Meaning it was

7    --  it was put into the private record of the court.

8             The question is, if that's the case, can you

9    explain how this woman who authored Exhibit 9 would have been

10   able to obtain that sealed document?

11            THE WITNESS:  A woman on Exhibit 9.  I see

12   Scribd.  And exhibit A.

13            And I don't know who Catherine Rubino is.  I see

14   this was from October 13th, and I have no idea how any --  I

15   mean, I did not release any documents to anyone.

16   BY MS. BOONE:

17   Q.    Thank you, Mr. Smith.

18   A.    Now, whether it came in and was not originally filed

19   under seal and then was filed under seal and someone got it

20   off of Pacer, I don't know.  I did see --  I remember one

21   entry where I went in, and it was a listing of documents on

22   Pacer.

23            THE COURT:  I don't need it.  I don't need it.

24   What's the next question?

25   BY MS. BOONE:

1  Q.      You mentioned earlier about the joint stipulation.

2  Can you please turn to Exhibit 2.  That is a copy of the

3  joint stipulation and read for me paragraph --

4  A.      Exhibit 2?

5  Q.      Yes.  Paragraph ten.  Do you agree with that

6  paragraph?

7  A.      Yes.

8  Q.      And that is your signature at the end of that joint

9  stipulation?

10  A.      You what?

11  Q.      That is your signature at the end of the joint

12  stipulation?

13  A.      Yes, it is.

14  Q.      Thank you.

15         Let me consult with my client.

16  A.      It's not a pen and ink signature.  What it is is a

17  photograph that was posted into a PDF file.  This is a

18  document that --

19  Q.      But that is your signature?

20  A.      -- was submitted prior to it being revised, section

21  six, when Mr. Wohlsifer and I were on the telephone.  Section

22  6 was supposed to reflect the exact same thing as section 5

23  with the aspects of moderating posts on the Elsmar.com forum,

24  which did he not do.

25         He submitted that document differently, and I have

1    explained that in my response to you all in this joint

2    stipulation.

3              THE COURT:  Mr. Smith, the exhibit 2 is in fact

4    the agreement that you executed; right?  You claim there was

5    some other agreement, but this is in fact the agreement that

6    you executed?  You're not denying that; correct?

7              THE WITNESS:  I'm not denying that this is the

8    agreement that he submitted to the Court.

9              THE COURT:  How does it differ from the written

10   agreement that you signed?

11             THE WITNESS:  I never literally signed the

12   agreement.  Mr. Wohlsifer and I --

13             THE COURT:  Page four of four, Marc Smith,

14   signature above, Marc Smith, individually, and doing business

15   as Cayman Business Systems, that's your signature?

16             THE WITNESS:  I'm sorry?

17             THE COURT:  Page four, is that your signature?

18             THE WITNESS:  It's a copy of my signature, yes.

19             THE COURT:  You signed the original; correct?

20             THE WITNESS:  No.

21             THE COURT:  You did not?  Who signed your name to

22   this, sir?

23             THE WITNESS:  This is a picture of my signature.

24   It was pasted into the document.

25             THE COURT:  By whom?

1          THE WITNESS:  Me.

2          THE COURT:  Okay.  So it's your signature.

3  Intended to be your signature; correct?

4          THE WITNESS:  If I understand it, this is a

5  contract that we made up that was submitted to the Court and

6  that legally it's not a binding contract.

7          THE COURT:  You can -- as I said, you can argue

8  that later with Judge Kovachevich, but that is your --  it

9  was added to this document by you to recognize your part of

10  the agreement; correct?

11          THE WITNESS:  With the understanding that Mr.

12  Wohlsifer was going to be revising the PDF per our

13  conversation, which he did not do.

14          THE COURT:  Okay.  I understand your argument

15  there.  All right.  Any other questions, Miss Boone?

16          MS. BOONE:  Yes.  Just two more.

17  BY MS. BOONE:

18  Q.    What's the date on this joint stipulation?  Does it

19  say March 18th?  Is the active date -- effective date

20  March 18, 2015, for the joint stipulation on injunction?

21  A.    Okay.  We're back to the joint stipulation.

22  Q.    Yes.  Exhibit 2.  You have it in front of you already.

23  A.    Yeah, Exhibit 2.

24  Q.    The last page.  What is the date of signature?

25  A.    The date of the signature?

1   Q.      Yes.

2   A.      The date on page four is March 18th of 2015.

3   Q.      Does that appear to be accurate?  Does that sound

4   accurate to you?

5   A.      I assume it is, yes.

6   Q.      Thank you.  Will you please turn to Exhibit 6 again on

7   the second page?  It's G, as in good, is the subsection,

8   second page?

9   A.      Which one?

10   Q.      Exhibit 6.

11   A.      Yes.

12   Q.      Second page, G as in good.  You'll see there is a box

13   from Linkedin?

14   A.      What I wrote on Linkedin on July 25th?  Is that what

15   you're asking about?

16   Q.      July 7th.

17   A.      Was there a what?

18   Q.      Yes.  July 7th.

19   A.      Oh, on July 7th on Linkedin?

20   Q.      Yes.

21   A.      Yes, I posted that.

22   Q.      Do you believe that that's in violation of what the

23   joint stipulation required?

24   A.      That's not my interpretation.

25   Q.      And --

1   A.      Please link it to the joint stipulation paragraph or

2   subparagraph or whatever.

3   Q.      Certainly.  One second.  It's 5C from the joint

4   stipulation, Exhibit 5C.  Smith will not publish any new

5   content about Oxebridge or Paris on the Elsmar.com internet

6   forum or any other website, social network, or any other

7   manner of technology or communication.  And it goes on.

8         However, on July 7th it appears that you again were

9   commenting about Oxebridge and Paris, and specifically about

10  this specific lawsuit.  To me that appears to be a direct

11  violation of that joint stipulation.  This occurred in July.

12  The stipulation was signed in March.

13  A.      The stipulation, the joint stipulation, only says --

14  are you referring to section five, subsection D?

15  Q.      C?

16  A.      C as in Charles?  Okay.  It says, Smith will not

17  publish any new content about Oxebridge or Paris on

18  Elsmar.com, internet forum or any other websites, social

19  network, et cetera et cetera.

20        Whether under his real name, anonymously or sue them

21  anonymously or through collaboration with a third party.

22  This statement here, Smith will not publish any new content

23  about Oxebridge or Paris.  Okay.  What's -- going back to

24  Exhibit 6, what's your question on that?

25              THE COURT:  Is it a statement of new content in

1    violation of the joint stipulation?  That's the question.

2              THE WITNESS:  My question is I don't believe I

3    violated it.

4              THE COURT:  Why not?

5              THE WITNESS:  I don't mention Chris Paris or

6    Oxebridge.  And for Mr. Paris to even begin to say anything

7    about, well, you can't mention the lawsuit for over five

8    months, he had posted on his website all about the lawsuit,

9    among other information and paranoid things like I was

10   collaborating with underwriters laboratories, DMV, all sorts

11   of -- supposedly I was some big ring leader involved with all

12   these other companies as large as underwriters laboratory.

13             I'm sorry.  To me he has paranoid delusions.

14   BY MS. BOONE:

15   Q.     Who are you referring to in these postings if it's not

16   Oxebridge and Paris?

17   A.     I'm sorry?

18   Q.     Who are you referring to in these postings if it's

19   not --

20   A.     Are you talking about July 7th?

21   Q.     Yes.

22   A.     Okay.  I made two comments, and I made them for a

23   specific reason.  It says, if you look here, don't be misled.

24   This was a civil suit, not a criminal lawsuit.  I made that

25   statement because Mr. -- starting in the fall of 2014,

1   Mr. Paris was posting on Twitter, and I have the evidence for

2   it, and on I think Linkedin that he was preparing for a major

3   extortion lawsuit, a criminal lawsuit.

4         He had a page on his website for over five months that

5   was talking about a criminal lawsuit.  He wasn't saying

6   civil.  He was maliciously citing it as a criminal lawsuit.

7   So I felt it was in my, okay, shoot me, send me to jail.  He

8   kept calling a criminal lawsuit.  It was a civil lawsuit.  He

9   was doing it maliciously.

10         So I said, do not be mislead.  This is not a criminal

11   lawsuit; this is a civil lawsuit.

12   Q.    Thank you, Mr. Smith.

13   A.    And everybody knew about the lawsuit from his website.

14   Everybody knew about the lawsuit, not only from his website

15   but from when he started on Twitter in the Fall of 2014

16   talking about, how, boy, he's going to get me.  He's got --

17   law enforcement is engaged now.  I have screen shots.

18   Q.    Mr. Smith?

19   A.    He started this thing.

20         THE COURT:  Mr. Smith.  You got another question,

21   ma'am?

22   BY MS. BOONE:

23   Q.    Basically the same --

24         THE COURT:  No, I don't need it.  He explained

25   why he posted it.  It is what it is.  What else?

1          MS. BOONE:  Just one second.

2    BY MS. BOONE:

3    Q.      And you acknowledge as well on the July 25th posting,

4    the one just below that exhibit, where it says Marc Smith.

5    Again, you are talking about Oxebridge and Paris?

6    A.      Which one now?

7    Q.      The one directly below, the image directly below

8    July 7th.  Now it's July 25.  Marc Timothy Smith.  Elsmar was

9    an Internet icon.  There was no Linkedin.  You are talking

10   about Oxebridge and Paris when you made that posting?

11   A.      I did not use the word Oxebridge, and I did not use

12   the word Paris.

13   Q.      It is your testimony to the Court that because you did

14   not use the words Oxebridge and Paris, that you believe you

15   could say whatever you want as long as you didn't say those

16   words?

17   A.      I believe that everyone knew that Chris Paris was

18   suing me.  I don't doubt --

19   Q.      How did they know?

20   A.      No.  I believe that I was following the letter of what

21   it said.  I'm not mentioning Chris Paris or Oxebridge, and I

22   didn't.  I mentioned the lawsuit that he had been advertising

23   for how long.

24   Q.      Thank you, Mr. Smith.  That's all.

25          THE COURT:  Okay.  Let's take about a ten-minute

1    break here.  Mr. Smith, when we come back you'll have the

2    opportunity to give any additional testimony you want to

3    give.  Okay?  So we'll take a break for ten minutes.

4              COURT SECURITY OFFICER:  All rise.

5              (RECESS IN PROCEEDING).

6              THE COURT:  Mr. Smith, you wish to testify?

7              MR. SMITH:  I would like to --

8              THE COURT:  Simple question:  Do you want to

9    testify?  If that's true, if you are --  get up to the

10   witness stand again.

11             You remain under oath.  Pull up close to that mic

12   and speak directly into it.

13             MR. SMITH:  My name is Marc Smith.  I'm from Olde

14   West Chester, Ohio.

15             First off, I'd like to start off and say that

16   when Mr. Paris was testifying he said that one of the aspects

17   of the mediation settlement agreement was that so we would

18   settle quickly so he could start his own forum, what he

19   called the O'forum (phonetic).

20             The only time the O'forum that he's talking about

21   came up was after the mediation settlement agreement.  That

22   wasn't discussed there.

23             What he wanted was Elsmar.com.  So I'm sorry.  He

24   is just outright lying.  That never came up in the mediation

25   agreement.

1      THE COURT:  Let me tell both parties, I'm going

2  to look at the mediation settlement agreement and the joint

3  stipulation in the plain terms of those, so this discussion

4  about things being omitted or intentions frankly are up for

5  another day.

6      In order to gauge whether or not I think there's

7  a violation, I am looking at those documents as worded.

8      MR. SMITH:  Great.  Because trying to fight some

9  of this is very, very weird.  In their complaint -- I'll go

10  through line item by line item is how I'll identify what I'm

11  referring to.

12      THE COURT:  Let me --  let me -- I do not need

13  you to read your response to me.  I've read your response as

14  you go point by point.

15      MR. SMITH:  The only testimony that I have to

16  give is what -- again, I assume that from what I was hearing

17  earlier that you guys received it.  It's in your system.  I

18  don't know what docket document number.

19      THE COURT:  What is that you are holding up, sir?

20      MR. SMITH:  This one here?

21      THE COURT:  What were you just holding up?

22      MR. SMITH:  It's a document that I submitted last

23  week, and I don't know whether it's in Pacer yet.

24      MS. BOONE:  Your Honor, it's sealed document 69.

25      THE COURT:  69?

1    MR. SMITH:  Those would have been in the 70s.

2    MS. BOONE:  I apologize.  76.

3    THE COURT:  76?  I have the full version of 76.

4    MR. SMITH:  If you have the full version of 76,

5    plus you have what looks like this complaint.  One exhibit's

6    annotated.

7    THE COURT:  If you filed it with Document 76, I

8    have got it.

9    MR. SMITH:  Then that's the only thing that I

10    want to testify as long as this is in the system.  I went

11    through each of the exhibits, and I went through line item by

12    line item and made my representations there.  If you have

13    them, I guess I shouldn't say this, but I just --  I hope

14    that you're going to read them.

15    THE COURT:  Okay.  You are accused basically of

16    three violations here.  Okay?  You are accused of violating

17    the provision that said you would remove any on line

18    commentary regarding Oxebridge or Paris authored by you on

19    any website, social network, or other manner of technology or

20    communication.

21    There was reference to a considerable amount of

22    information, negative information, from their standpoint

23    still up on Google.  What have you done to take down that

24    information?  Which originally comes from your website, as I

25    understand it, or comments made regarding your website.

1      MR. SMITH:  I -- if you -- for example, let me

2  find my main complaint or maybe it was in the exhibits.  Are

3  you referring to the Google groups listing where from 2004 --

4  I know -- I believe it was in Chris Paris's, one of his

5  responses, exhibits he lists, put in a big long list of

6  websites, and the majority of them were a Gmail group.

7      And here it is.  Exhibit I from his complaint

8  that I violated the joint stipulations.

9      There are -- if you look at my marked up copy of

10  the exhibits, I address each one of these.  Reddit.com as I

11  said earlier.  I copied his lawyer on trying to get that

12  removed --  get that stuff removed from Reddit.

13      I have the e-mails.  They got copies of them.  I

14  also copied them on the e-mails Reddit sent to me which

15  basically said, yeah, go ahead and try to sue us or something

16  because it ain't happening.  They even had a special page.

17  There was such and such a website.

18      THE COURT:  I asked you about Google.

19      MR. SMITH:  The Google thing was discussed as I

20  say in my marked up exhibit.  That was --  that was --  it's

21  actually in the mediation agreement, section one, subsection

22  1C.  Okay.  We discussed that, getting rid of those, and I

23  said I can't.  And Mr. Paris's lawyer said no problem.  All

24  we have to do is get you a letter.  You sign the letter, and

25  we'll get that stuff taken right off.  I never received such

1    a letter to sign.

2            THE COURT:  You said earlier in your commentary

3    that you had attempted to get Google to take it down.  I

4    asked you what did you do to take down negative information

5    about plaintiffs on the Google site.

6            MR. SMITH:  On the Google site there's nothing I

7    can do to get them to take it down because if you look at

8    these, what Google did -- and I don't remember much about the

9    group.  We're going back to 2004, Your Honor.  They -- what

10   they would do is they would go in and scrape --

11           THE COURT:  I don't need to go back to 2004.  In

12   the mediation settlement agreement as you just pointed out

13   specifically references Google.com.

14           And it says, sign a letter to be prepared by

15   plaintiffs' counsel, consenting to removal of Elsmar.com

16   postings referencing plaintiffs from the Google.com website.

17   You early on mentioned that you attempted to get Google to do

18   this, and you were unsuccessful.  I'm asking you what did you

19   do to take down the information that obviously was discussed

20   at the mediation on the Google site.

21           MR. SMITH:  It's getting confusing here because

22   again --

23           THE COURT:  I don't think it's confusing at all.

24   Okay?  The specific reference to information on Google.

25   Let's start this way.  Did you ever get a letter from

1    plaintiffs' counsel that they composed requesting Google to

2    take anything down?

3                MR. SMITH:  No.

4                THE COURT:  Okay.  What did you do separate and

5    apart to try to get Google to take the information that

6    originally came from Elsmar.com down from Google?

7                MR. SMITH:  I couldn't do anything.

8                THE COURT:  Why not?

9                MR. SMITH:  Your Honor, have you ever tried to

10   contact Google?  There is no phone call.  There is no e-mail

11   address that you can e-mail.  It takes a court order.  That's

12   why it was discussed.

13               THE COURT:  Let me back up.  I got my questions

14   out of order.  First question is did you attempt to do

15   anything to take it down, the information that Google gives

16   you?

17               MR. SMITH:  My understanding leaving the

18   mediation settlement agreement was that they would sign --

19   that the lawyers --  their lawyer would put together a letter

20   so I personally --  no, there was nothing.  I was waiting --

21               THE COURT:  The joint stipulation, 5B, you will

22   remove any online commentary regarding Oxebridge or Paris

23   authored by you on any other website.  My question is in

24   regards to that particular agreed provision, did you do

25   anything to take information down from Google?

 1          MR. SMITH:  There was --  we're into the realm of

 2    impossibility at this point.

 3          THE COURT:  I'm just asking you what you did to

 4    attempt it.  I'm not asking if it was successful.  What did

 5    you do to take the information down, to try to take the

 6    information down?

 7          MR. SMITH:  There was nothing I could do.  I did

 8    nothing.

 9          THE COURT:  Is that a way of saying you did not

10    do anything to try to take the Google information down?

11          MR. SMITH:  Yes.

12          THE COURT:  Okay.  And as of this day that

13    information that was originally on the Elsmar site remains.

14    If I go on Google and do the right search, it will pull up

15    and I can read it?

16          MR. SMITH:  I assume so.

17          THE COURT:  Okay.  All right.

18          MR. SMITH:  Again, Your Honor, this was discussed

19    at the mediation settlement agreement meeting, and they said

20    they would get me a letter because they knew it was

21    impossible.  It says so right in the mediation settlement

22    agreement.

23          THE COURT:  To the contrary the suggestion that

24    they would propose a letter suggests to me it is possible.

25          MR. SMITH:  They can do it through a court order.

1          THE COURT:  And Mr. Paris says there's some

2     particular form that Google allows you as the author or

3     source of the information to complete that they will honor,

4     and they will take down information.  Do you agree with that?

5          MR. SMITH:  I'm sorry.  Run that past me again.

6          THE COURT:  Mr. Paris says that Google uses a

7     particular form whereby the author or source of information

8     that they post can be taken down.  You fill out the form.

9     You send it into them, and they'll respond by taking it down.

10         Do you agree there is such a procedure with

11    Google?

12         MR. SMITH:  No, not from this --  not from Google

13    groups.

14         THE COURT:  Why do you say that?

15         MR. SMITH:  Because there isn't.

16         THE COURT:  And when you use the term "Google

17    group," what does that mean?

18         MR. SMITH:  It's a Google thing.  Again, this was

19    from 2004.  Basically it's been abandoned.  There are a lot

20    of abandoned websites, web pages, and stuff that are still on

21    the Internet.  Again, this is from 2004.

22         THE COURT:  Let me ask you an even broader

23    question here.

24         In the joint stipulation which was the first

25    agreed upon document, you agreed that you would remove any

1    online commentary regarding Oxebridge or Paris which you

2    authored.

3            Can you point to anything that you did after

4    entering the joint stipulation to attempt to remove or take

5    down online commentary from any website?

6            MR. SMITH:  The -- yes.  For example, uhm, uhm,

7    there is a website that has been up for a long time which

8    indexes or does what they call scrape websites.  I went

9    through and wrote them, and they had caches of my website

10   going back quite a few years.  I believe they called it the

11   Internet archive.  I had to prove to them I was the one who

12   owned the website.

13           After I did that, they took all the information

14   down.  Took it completely away.  Ripoff Report, again, I, you

15   know, wrote them.  His lawyer was copied on it.  Ripoff

16   Report, they're not going to --  I have no -- he says they'll

17   do it if you file a DMCA.  Sir, I respectfully --  no.  The

18   reply I got from them was so sue us.

19           THE COURT:  Where are these replies?  Where are

20   these letters that you claim that exist to prove up what you

21   are saying about your efforts?

22           MR. SMITH:  Again, I -- my understanding is no

23   electronic devices.

24           THE COURT:  We're not going to use that in here.

25   We're not going to use that as an excuse.  I told you at the

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    outset if you need these things, we'll make arrangements to

2    get them.  Okay?

3              We're not going to have that as an excuse down

4    the road that you didn't have an opportunity to present this

5    stuff.  We have had this hearing set for what, about 2 months

6    3 months?  If you need time to go get them, we'll give you

7    time to go get them.  But we're not going to use that as an

8    excuse here.  Understand?

9              MR. SMITH:  I understand.

10             THE COURT:  You want time to go get them?

11             MR. SMITH:  By the time I get everything up here

12   and try to get prepared, it would be tomorrow.

13             THE COURT:  Maybe.  Maybe.  I got all afternoon.

14             MR. SMITH:  May I respectfully request that --

15   that we --  if you want evidence --

16             THE COURT:  Listen, what I'm telling you is

17   you're not going to be able to complain down the road that

18   you weren't given the opportunity to present evidence.  It is

19   your choice what you present.  And we're not going to say,

20   well, they don't let you in with your computer here.  That's

21   not going to be an excuse because I'm telling you we'll get

22   your computer in.

23             We're going to break for lunch here before long,

24   and you can --  you can retrieve whatever you want, and we'll

25   re visit it.

1              Let me ask you, in regards to this removal

2      provision, which is in the joint stipulation, subsequent to

3      that joint stipulation, there's allegations that you didn't

4      comply with it.

5              And that's what leads to the mediated settlement

6      agreement; correct?  As I understand the order of things

7      here?  Is that correct?

8              MR. SMITH:  (Shrugs shoulders.)

9              THE COURT:  After the joint stipulation there was

10     --  they complained you didn't comply with it, and so that

11     ultimately was resolved by way of the mediated --  the

12     mediation settlement agreement.  Is that the order of things?

13             MR. SMITH:  I guess.

14             THE COURT:  Well, the one is -- that you

15     indicated dated in March and the mediated settlement

16     agreement is when?  June.

17             So after the mediation settlement agreement,

18     which as we pointed out specifically mentions Google, what

19     actions did you take to take down negative information that

20     originally was sourced by you that was on either Google,

21     Reddit -- you've explained those two.

22             You basically said you tried but unsuccessfully.

23     Did you take any other actions to take down any of the

24     information that was agreed to in the joint stipulation -- as

25     agreed to in the joint stipulation?

1          MR. SMITH:  I took what actions I could take.

2          THE COURT:  All right.  The 5C provision in the

3     joint --  says that you will not publish any new content

4     about Oxebridge or Paris on Elsmar or any other website,

5     social network, or other manner of communication.  Pretty

6     broadly worded.

7          You did after the agreement -- I think I've heard

8     you say today you did after the agreement give interviews and

9     were responsible for postings that related if nothing else to

10    the lawsuit, which is --  if I understand your testimony, you

11    believe you could --  no?

12         MR. SMITH:  Your Honor, a girl from Document

13    Center called me and asked me what was going on, and I told

14    her I could not discuss anything about the lawsuit, that

15    there had been a settlement.  That was it.  I did not give

16    her or talk to her, or disclose to her any content of the

17    mediation settlement agreement.

18         And they have in their exhibits -- I didn't bring

19    it up with me, the entire interview.  It was basically an

20    interview of, okay, now that Elsmar's gone, what are you

21    going to go and do now.  She was writing it just as, for

22    example, I'm sure people have interviewed you.  And they have

23    come out with certain things that, you know --

24         THE COURT:  Let me get specific here.  Their

25    exhibit A on November 17, 2015, posting of summons and

 1   complaint on Scribd with handwritten commentary.  You agree

 2   you are the one that wrote those handwritten comments on the

 3   complaint, which was a matter of public record.

 4          Do you not think that that is a violation of the

 5   5C where it says you will not publish any new content?

 6          MR. SMITH:  I have no idea how that document got

 7   out.  Because --

 8          THE COURT:  I thought you --

 9          MR. SMITH:  All I thought --

10          THE COURT:  Listen to me.  November 17th, you got

11   the exhibit book up there?  Look at Exhibit 8.  My

12   understanding is that you authored that and you acknowledged

13   that --

14          MR. SMITH:  I'm sorry, which --

15          THE COURT:  Eight.  Eight.  What was your --  let

16   me ask it this way:

17          MR. SMITH:  Pardon?

18          THE COURT:  How did that get on Scribd?  You

19   acknowledged that the edited version there of the complaint

20   is what it is and you added the editing.  How did it get on

21   Scribd?

22          MR. SMITH:  I marked that up in the last week of

23   January, first week of February.  I see that it was filed as

24   Document 6 on 1/9/15.  That document right there as far as I

25   can tell was way before anything was sealed.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1         THE COURT:  Exhibit 8, a November 17, 2015,

2   posting of summons and complaint on Scribd.  It has your

3   handwritten commentary.  This is after the joint stipulation.

4   This is after the mediation settlement agreement this gets

5   posted on Scribd.

6         MR. SMITH:  I don't know, Your Honor.  I can tell

7   you that I believe there was something going on in Pacer

8   because this was also --  if I remember -- in fact, Mr. Paris

9   brought it up in his lawsuit.  There was a law site that

10  cited it and was going on about, well, if --  you know, if

11  you can only file a --  a rebuttal or an answer to a lawsuit

12  or something like that.

13        THE COURT:  How did Scribd get this document with

14  your handwritten notes on it?

15        MR. SMITH:  I don't know.

16        THE COURT:  Okay.  Why would someone send it --

17  other than you -- why would someone send it to Scribed?  What

18  might be the motive there?

19        MR. SMITH:  With your logic anybody who's an

20  enemy of him, I don't think you understand how many people

21  really don't like him.

22        THE COURT:  How about Exhibit 9?  I want you to

23  be very careful on this one.  Okay?  This is an October 13,

24  2015, post on Scribd.  Has handwritten commentary on it.

25  Now, that document was, when filed with the Court, filed

1    under seal, and apparently is still under seal.  So how would

2    it be that this woman, assuming it was a woman, would have

3    access to that sealed document to upload it to or post it on

4    Scribd?

5          MR. SMITH:  I cannot explain that.  As I said the

6    only thing that I can say is that considering Pacer it  was

7    leaked through Pacer.  I didn't leak any documents unless

8    someone hacked into my computer.

9          (Pause).

10          THE COURT:  Now, if I understand what was

11   testified to earlier, on at least two occasions you have

12   allowed others --  since these agreements, you have allowed

13   others to use Elsmar.  You consented apparently to this

14   person in Russia to use www.Elsmar.com.  Although I'm not

15   sure that's the way they do it over there.  RU usually is

16   added somewhere.

17          Did you consent to that person using the website?

18          MR. SMITH:  I consented to two main things with

19   regard to Elsmar.  Number one, it's one of the few or was one

20   of the few websites with no copyright restrictions, was

21   copied free.  That meant you could copy anything from it.  I

22   won't complain.

23          I made it plain to all the posters that if you

24   post something, you can't claim copyright on it.  If someone

25   wants to copy it or paste something from Elsmar, they can do

1    it elsewhere.  I used the same standard with regard to the

2    use of the name Elsmar.

3              If someone contacted me and said, I wanted to --

4    you know, I would like to use the word "Elsmar" in my

5    website, my whatever, fine.

6              THE COURT:  I have heard about two instances

7    today where apparently you did that.  One involves somebody

8    in Russia wanting to use the www.Elsmar.com, and you agreed?

9              MR. SMITH:  Mr. Paris, I would give him

10   permission right now if he wanted --

11             THE COURT:  Just answer my question.  I don't

12   want --  I want you to answer my question.  Did you give this

13   person from Russia permission to use the website?

14             MR. SMITH:  I don't doubt that I did.  But I

15   don't specifically recall.

16             THE COURT:  And then there was apparently

17   somebody wanted to use Elsmar in connection with a project, I

18   think you said.

19             MR. SMITH:  I believe you are referring to the

20   same one.  That's that person in Russia.

21             THE COURT:  Okay.

22             MR. SMITH:  But I don't --

23             THE COURT:  What was his project?

24             MR. SMITH:  Sir?

25             THE COURT:  What was his project?

1          MR. SMITH:  I don't recall.

2          THE COURT:  Was it an ISO related project?

3          MR. SMITH:  I have no idea.  I don't recall.

4          THE COURT:  Have you ever checked to see how he

5    is using www.Elsmar.com in Russia?

6          MR. SMITH:  Have I ever --

7          THE COURT:  Checked to see how he is using that

8    website in Russia?

9          MR. SMITH:  Abused --

10         THE COURT:  Using it.  How he is using it.

11         MR. SMITH:  I'm totally mystified.  The only

12   thing that I had with Elsmar is Elsmar.com, www.Elsmar.com.

13         THE COURT:  Which you apparently -- let's assume

14   this is accurate -- you allowed somebody from Russia to use

15   that?

16         MR. SMITH:  No.

17         THE COURT:  Have you since followed up and seen

18   how he is using that in Russia?

19         MR. SMITH:  Anyone who asked me whether or not

20   they could use the word "Elsmar," I say no problem, use it.

21   I have no copyright on it.  I have no claim it to or on it.

22   If you want to use Elsmar -- and a lot of people did over the

23   years because they felt they could set up a website and get a

24   lot of traffic by getting searches on Elsmar.

25         THE COURT:  Now you want to answer my question?

1    After you granted permission, and let's assume this is

2    accurate.  Let's assume you granted this individual, whoever

3    it is, permission to use www.Elsmar.com for his own purposes.

4    Did you ever follow-up on that and see how that person was

5    using it?

6              MR. SMITH:  No.  I've never followed up on any of

7    that stuff.

8              THE COURT:  Okay.  We're going to break till

9    1:30.  I'm going to give you the opportunity to go to your

10   car.  We're going to notify the front desk that you may bring

11   in a computer and your cell phone.

12             MR. SMITH:  Sir, before I came down here I

13   checked.  It said no computers, no stuff.  If I was going to

14   go through and start trying to get stuff, e-mails and

15   everything, they're all up in Cincinnati on my big computer.

16   I have mainly some court documents and stuff like that on my

17   computer here.

18             The only thing that I could ask of you would be

19   that if you want some sort of proof or something, that you

20   put this thing into continuance, tell me what proof you want,

21   I'll send it to you.  If not, I am at the point now, to be

22   honest with you -- I'm no lawyer.  You know that.

23             THE COURT:  Are you basically --  are you telling

24   me you don't have anything in your car, and I should not take

25   a break --

1          MR. SMITH:  No.  I have an old Compaq computer.

2     It's a portable that I bought probably in 2006, and I don't

3     keep e-mails on -- my e-mails and stuff on it.

4          THE COURT:  You don't have anything useful on

5     this computer that you brought down.  Is that what you're

6     saying?

7          MR. SMITH:  Other than court documents and stuff

8     which I put on a USB stick.

9          THE COURT:  Okay.  All right.

10          MR. SMITH:  I thought I had answered what was

11     necessary by going through the complaint line item by line

12     item telling my story by annotating the exhibits that they

13     put in there.

14          THE COURT:  For instance, if you had proof today

15     that you attempted to contact Reddit in writing, and did so

16     in writing --

17          MR. SMITH:  I'm sorry?

18          THE COURT:  If you had proof today, either

19     through e-mail or written correspondence, that you attempted

20     to get Reddit to take down information, that would be useful

21     to your position.  Surely you should have recognized that.

22          Similarly, if you had any such requests of

23     Google, which I heard you to say earlier you did make the

24     request of Google but to know avail, those would support your

25     position, you know.  And so I am mystified that you would not

1   bring those with you to corroborate your position.

2           Because when we talked about this case earlier,

3   we noted that you could proceed by way of testimony,

4   affidavits, exhibits.  And I required that the exhibits be

5   exchanged, I think, five days prior to hearing or whatever it

6   was.  So I'm mystified that you wouldn't have put that

7   together.

8           They accuse you of not taking steps to take

9   information down.  You are telling me you would have proof

10  that you did.  Where is the proof is my inquiry right now.

11          Because apparently Reddit hasn't taken anything

12  down.  Apparently Google hasn't taken anything down.  Maybe

13  in part it's their fault because they didn't send you a

14  letter to sign off on.  But these are the allegations I'm

15  looking at.  That's the concern that I have.

16          This hearing's been sent for months as we talked

17  about it, and yet you're complaining, well, you left them in

18  Ohio.

19          MR. SMITH:  Well, sir --  I --

20          THE COURT:  We're not making progress having this

21  little tête-à-tête.  What else do you want to testify about?

22          MR. SMITH:  It sounds to me like you made your

23  judgment.

24          THE COURT:  I haven't made a judgment on

25  anything.  I am concerned about the fact that you haven't

1    taking the opportunity to perhaps bolster your case by

2    bringing evidence that would back up your testimony.  I'm

3    mystified that you didn't since you knew what this was about.

4         The effort here is to hold you in contempt and to

5    remedy it with some punitive measures.  So let's go back to

6    your testimony.  What else would you like to say in the face

7    of their allegations?  If anything.

8         MR. SMITH:  There have been so many

9    mischaracterizations and lies that as far as I'm concerned at

10   this point, as I say, I didn't bring a bunch of stuff.  I

11   thought what I submitted to the Court would be sufficient.

12        If you want to come down to it, when I was going

13   through this back when I briefly had a lawyer, and I even

14   marked up, for example, I got back from the mediation

15   agreement --  mediation agreement on Sunday.  I started going

16   down and line item by line item, put the date on it of what I

17   did, and the date I did it.

18        I don't know if I have that with me or not.  I

19   sent a copy to my lawyer to show him I was doing things.

20   There was some things that were hard to get off of a couple

21   of websites, for example, I think Twitter was one.

22        What I started doing was I have a capture program

23   on my home computer, so I would start from capture and it

24   would make a movie.  And I have, I don't know, four or five

25   of them where I went through and you can see me going in and

1    going through the steps of deleting it.

2           Now, I didn't think this hearing was going to be

3    that broad a deal.  I thought what I submitted to you, to the

4    court, was submission --  was sufficient to -- for what was

5    going to happen.

6           THE COURT:  Miss Boone, let me ask you, after the

7    mediation settlement agreement, did your firm submit a letter

8    of request directed toward Google consistent with -- what is

9    it -- exchange of consideration, subparagraph C?

10           MS. BOONE:  I do not recall, Your Honor.  But I

11    could find the answer for you quickly.

12           THE COURT:  What?

13           MS. BOONE:  I do not recall, Your Honor.  As I

14    was not the counsel on the case at that time.  But I could

15    find out quickly.

16           Would you like me to find evidence of that

17    letter?

18           THE COURT:  Yes.  If you requested that he do so,

19    he was obligated to sign off on the letter.  And then I

20    assume once he did so, you would have submitted it to Google,

21    and we wouldn't be concerned about what's still up on Google.

22           MS. BOONE:  I request a break at some point that

23    I can seek that evidence.

24           THE COURT:  Okay.  Mr. Smith, anything else you

25    wish to testify about?

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. SMITH:  No, other than I think you should go

2    ahead and make a decision, charge me with whatever, let me

3    get back to Ohio.  I can see this is going to go nowhere.

4          THE COURT:  When are you planning on returning to

5    Ohio?

6          MR. SMITH:  As soon as I get out of here, unless

7    you send me to jail.

8          THE COURT:  Okay.  Well, you are not going to

9    jail today, sir.

10         I'm going to allow you seven days to submit to

11   the Court any proof that you have written proof of efforts to

12   have Reddit or Google take down information that shouldn't

13   have been there.

14         MR. SMITH:  How do you want videos?  Do you want

15   them on DVD or can they be sent by USB sticks or --

16         THE COURT:  I assume that we're talking about

17   written communication.  I want to see copies of the written

18   communication.  That's what I understood you to say that you

19   did.

20         MR. SMITH:  I have written communication, but,

21   sir, like I said, I went through and took screen caption

22   movies.

23         THE COURT:  I'm mainly interested in right now in

24   Google and Reddit.  You claimed that you've made efforts.  I

25   want to see proof of those efforts.

1          Miss Boone, I'm going to direct that you check

2     your files and see if in fact they reflect a letter as

3     referenced in the mediation settlement agreement was ever

4     prepared by your firm and submitted to this gentleman for his

5     signature.

6          MS. BOONE:   Thank you.

7          THE COURT:   And if so, what happened thereafter?

8          MS. BOONE:   Thank you.   We also request that we

9     be given the same opportunity to present evidence that we

10    have that Mr. Smith did not take steps with Reddit and Google

11    to remove.

12         THE COURT:   What might that look like?

13         MS. BOONE:   I believe we have correspondence

14    between Mr. Paris and Google and Reddit.

15         THE COURT:   You can submit that as well.   Copies

16    of that as well.

17         MS. BOONE:   Thank you.

18         THE COURT:   That's it.

19         MR. SMITH:   I have one last question.   How can I

20    obtain a transcript of this hearing?

21         THE COURT:   Talk to the court reporter.

22         MR. SMITH:   I'm sorry?

23         THE COURT:   You can talk to the court reporter.

24    This nice young lady will give you a price, and you arrange

25    to pay her that, and she'll get you a copy of the transcript.

1     All right.  That's it.  Thank you.  We'll await

2   for this additional information, and you have to do this on

3   an R & R basis.  You should not expect to see anything before

4   April.  We've got a number of things ahead of you on our

5   docket that we need to get out of here.  But we'll get it to

6   you as soon as we can.

7          MS. BOONE:  Thank you, Your Honor.

8              (Proceeding adjourned.)

9          I CERTIFY that the foregoing is a true and

10   accurate transcription of my stenographic notes.

11   Dated:  03/26/2016.

12
                    ___/s/ Sandra K. Provenzano_____
13                  SANDRA K. PROVENZANO, RPR
                    Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25