**EXHIBIT "D"**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE No. 8:15 cv 11 T 17 TBM


OXEBRIDGE QUALITY RESOURCES
INTERNATIONAL, LLC

        Plaintiff,

v.                      March 16, 2016
                            9:30 A.M.

MARC TIMOTHY SMITH,
individually and doing business
as Cayman Business Systems

        Defendant.
_____/


TRANSCRIPT OF ORDER TO SHOW CAUSE HEARING
BEFORE THE HONORABLE THOMAS B. MCCOUN
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


For the Plaintiff:      LEIGHANNE CONNERY BOONE
                         William R. Wohlsifer, PA **Not present.**
                         1100 E Park Ave Ste B
                         Tallahassee, FL 32301-2651


For the Defendant:      MARC SMITH, pro se

```
Reported By:          Sandra K. Provenzano, RPR
                      Official Court Reporter
                      U.S. District Court
                      801 North Florida Avenue
                      Tampa, FL 33602
                      (813) 301-5699
```

STENOGRAPHICALLY REPORTED
COMPUTER-AIDED TRANSCRIPTION

**There appears to be many errors in this transcript. It appears to have been computer generated (not written by a person).**

# INDEX

WITNESS:                                          PAGE:

   CHRISTOPHER MARK PARIS                            13
        DIRECT EXAMINATION                           13
   BY MS. BOONE
        CROSS-EXAMINATION                            39
   BY MR. SMITH
        REDIRECT EXAMINATION                         45
   BY MS. BOONE
   MARC SMITH                                        50
        DIRECT EXAMINATION                           50
   BY MS. BOONE
   DIRECT TESTIMONY OF MARC SMITH                    71

*****

EXHIBITS:                    IDENTIFIED:




EXHIBITS:                    RECEIVED:

   Nos. 1, 2, 3, 4, 5,     23
   6

**Smith was not notified of this "evidence" book as required by the
Magistrate Judge in January. As such, this should not have been allowed
to be used in the hearing. It was an obvious attempt to "blind side"
Smith by Chris Paris' attorney..**

```
1                    P R O C E E D I N G
2              THE COURT:  Good morning.  We're here for an
3   order to show cause hearing.  And if the clerk will call the
4   case, please.
5              COURTROOM DEPUTY CLERK:  Case number 8:16 cv 11 T
6   17 TBM.  Oxebridge Quality Resources International versus
7   Smith.
8              THE COURT:  We're going to record these
9   proceedings electronically.  We've also got a court reporter
10  present today.  The backup tape feeds off the microphone
11  there in front or you.
12             So my rule of thumb is you can remain seated
13  throughout all the arguments, all the discussions.  Just when
14  you speak, speak into the microphone.  That will help the
15  court reporter to hear you, and it will also help us make a
16  backup tape.
17             If you -- obviously, if you wish to come to the
18  podium you may do so.  And -- but again speak into the
19  microphone if you would.
20             Yes, sir.  Let's have everybody to identify
21  themselves first.  Who's here for the plaintiff?
22             MS. BOONE:  Good morning, Your Honor.  Leighanne
23  Boone for the plaintiff.
24             MS. GRAY:? My name is Marc Smith.  I'm the
25  defendant.  Sir, I'm sorry, but I can hardly hear you when
```

1    you speak.

2              THE COURT:  All right.  I'll try to speak up.

3              COURT REPORTER:  You are not coming through the

4    microphones, Judge.

5              THE COURT:  Let's try this again.  Because I'm

6    not sure the mic was on.  If it was on, it as very low.  If

7    you'll speak into it.

8              MS. BOONE:  Certainly.  Here we go.  Leanne Boone

9    for the plaintiff.

10             THE COURT:  All right.  You're Mr. Smith, and,

11   Mr. Smith, I'll try to speak loudly enough to where you can

12   hear me.

13             Plaintiff has filed a verified second notice of

14   defendant's breach of the mediation settlement agreement

15   which we had a hearing on some time back, and I agreed that

**January 12, 2016**

16   it was necessary that we have an evidentiary hearing on the

17   matter.

18             In the --  in the order that was entered back on

19   January 13th I indicated that the parties could proceed by

20   way of testimony, affidavits, and documentary exhibits.

21             And as agreed at the hearing the Court would

22   unseal the motion, defendant's response, the mediation

23   settlement agreement, and the joint stipulation at the

24   hearing which shall be placed into public record of the

25   court.

**Done
(finally in
PACER)
on
approx. 2
August
2016.**

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1       Is there any reason why we should not follow

2   through with the unsealing of those four matters?

3           MS. BOONE:  No, Your Honor.

4           THE COURT:  All right.  Then I'm going to direct

5   that the plaintiff's verified notice, Mr. Smith's response,
                        **Smith Sealed Document (See Docket)**
6   the first being Document 59, the second being Document 76,???

7   the mediation settlement agreement which is document 60-1 by

8   the copy I've got, and the -- it may be -- -- 60-1 for the

9   mediation settlement agreement at Document 33, which is a

10  joint stipulation on injunction, which I think actually is

11  already in the public record.

12          All of them will be -- will be placed into the

13  public record of the Court.

14          Miss Boone, tell me how you anticipate proceeding

15  today if you would, please.

16          MS. BOONE:  I have two witnesses, Your Honor, Mr.

17  Paris and Mr. Smith.  We were going to proceed with the

18  current violations that are still public, uhm, the joint stip

19  and mediation agreement.

20          THE COURT:  Let's see if we can get some focus

21  here.

22          The pleadings that we've been looking at suggest

23  that there were essentially three violations which were

24  complained of by the plaintiff.

25          The injunction -- the injunction stated or the

1   stipulation for injunction stated that Mr. Smith agreed to
2   refrain from publishing commentary on the personal
3   professional business or other affairs of Paris and
4   Oxebridge.
5           It specifically had some subparagraphs, and 5B
6   said that Smith will remove any online commentary regarding
7   Oxebridge or Paris authored by Smith on any other website,
8   social network, or any other manner of technology or
9   communication now known or later become known.
10          And in paragraph sub5C it says Smith will not
11  publish any new content about Oxebridge or Paris on the
12  Elsmar.com internet forum or any other website and so on.
13          And then there was an agreement as part of the
            ???
14  medication settlement agreement which appears to be 2D that
15  Smith would shut down and cease operating www.Elsmar.com and
16  will not operate any similar website relating to the ISO
17  industry.
18          The pleadings also suggest that the plaintiff
19  complains that Mr. Smith has violated the settlement
20  agreement by revealing the contents of the mediation
21  settlement agreement.
22          MS. BOONE:   That's correct, Your Honor.
23          THE COURT:   Is that essentially what we're going
24  to be talking about today, or are there other matters that
25  I'm unaware of or have overlooked?

```
 1              MS. BOONE:  I'm going to consult with my client.
 2   Just one second.
 3              I believe that's everything, Your Honor.
 4              THE COURT:  Okay.
 5              MR. SMITH:  Your Honor, one thing that I do want
 6   to --  so this is on the record -- the plaintiff's attorney
 7   and I --  in fact, I don't recall the date offhand.
 8   Unfortunately, even though I'm acting as my own attorney, I'm
 9   not afforded the same privileges of being able to bring in a
10   cell phone or anything to go back through notes and things
11   like this.
12              So we had a telephone conversation, and this has
13   to do specifically with the joint stipulation on injunction.
```

**This transcript appears to be missing part of the conversation here.**

```
14   And it occurs to me at that time to try and talk with
15   Mr. Wohlsifer.  And I told you at the time I had tried and
16   not received any calls back.  You at that time told him you
17   will get in touch with Mr. Smith.
18              I agreed to try and work this out as well as the
19   case management file with Mr. Wohlsifer on the telephone.
20              At this point my intention is to dispute the
21   joint stipulation on injunction as agreed to because
22   Mr. Wohlsifer told me one thing on the telephone, and the
23   next thing you know he's submitted to the Court a document
24   which was different than what he agreed to on the telephone.
25              Unfortunately, it was a telephone conversation.
```

```
 1   Neither one of us have any proof, but in addition I also
 2   submitted to you -- I'm not sure which document it was --
 3   maybe 73 or 4.  I just --  like I say, without being able to
 4   bring my computer in to be able to look at my listings and
 5   all, I can't come up with document numbers offhand.
 6             But there are a number of things in there.  For
 7   example, in the joint stipulation on injunction, which are
 8   impossible, one of which, for example, is --
 9             THE COURT:  Let me interrupt you on two
10   particulars.  If you need your computer or you need your cell
11   phone, we'll make arrangements to allow you to have it here.
12             MR. SMITH:  Here's the deal.  I drove down to
13   Florida.  It took me two days.  By the time I get all that,
14   try and get everything organized, it was my understanding --
15   I checked the Internet.  We left cell phones outside and
16   everything.  I was surprised when --
17             THE COURT:  Okay.  Did you hear what I said?  I
18   said, if you need it, we'll make arrangements to allow you
19   have it.  I'm hearing you say that you don't really need it
20   here apparently.
21             The second think I want to note is I'm aware of
22   the fact there is I think a pending -- a pleading which
23   challenges the joint stipulation on injunction.  And I know
24   that in your response here you, in a couple of 2 or 3, or
25   perhaps even more, instances urged that the joint stipulation
```

**The hearing should not have been held until it was established whether the Stipulation on Injunction was legal or not.**

1   on injunction is not a legally binding document.

2          MR. SMITH:  My intention is to challenge that as

3   a legally binding document.

4          THE COURT:  For purposes of this proceeding, it

5   is the operative agreement that we're going to address.

6          MR. SMITH:  Now I understand --

7          THE COURT:  Do me a favor.  Don't interrupt me,

8   and I'll try not to interrupt you.  Okay?

9          MR. SMITH:  Yes, sir.

10          THE COURT:  For purposes of this proceeding it is

11   the operative document.  I am going to consider that it is

12   binding.  If you move forward and convince Judge Kovachevich,

13   who I think is assigned to matter, that it's not a legally

14   binding document, then so be it.

15          But at present that matter has not been resolved.

16   You can make your argument to that effect during the course

17   of your responses and so on here, but understand going

18   forward that I consider it to be one of the binding documents

19   that we are going to look at to see if there's been a breach.

20   Okay.

21          MR. SMITH:  I understand that completely, Your

22   Honor.  My intention here in stating this was to make sure

23   that this is on the public record in the court record.

24          THE COURT:  It is.  Okay.  How do you anticipate

25   proceeding with your case or your response?

```
 1              MR. SMITH:  I don't know how you want to go
 2    through it.  What I did was I submitted to the Court last
 3    week and sent them a copy.  I can go through line item by
 4    line item.
 5              THE COURT:  We don't need to do that.  I'm aware
 6    of your response.  I haven't looked at all of the attachments
 7    that you may have included, but essentially you are going to
 8    rely on that document as opposed to trying to introduce
 9    separate exhibits today?
10              Plaintiffs have handed up a small exhibit book
11    suggesting they're going to try to introduce a few exhibits
12    in support of their position.
13              MR. SMITH:  These that they gave me?
14              THE COURT:  Right.  Do you have separate exhibits
15    not referenced in your pleadings?  If so, you need to make
16    those available to the Court.
17              If what you are going to argue is based on what
18    you've already filed, that's fine.  We've got it.  We'll look
19    at it.
20              MR. SMITH:  It is, sir.
21              THE COURT:  Okay.
22              MR. SMITH:  All the things --
23              THE COURT:  You can comment on those in a bit.
24    Let's get started here.  All right, Miss Boone, your motion.
25              MS. BOONE:  Thank you, Your Honor.  Today we're
```

1    here due to Mr. Smith's breach of a Court order on joint

2    stipulation and the mediation settlement agreement.

3           Despite our agreements and the joint stipulation

4    order, Mr. Smith -- for Mr. Smith to refrain from posting

5    further material about Paris and Oxebridge Quality Resources,

6    Mr. Smith continues to post such material across the

7    Internet, which is in turn reposted by endless numbers of

**False.**

8    people.

9           Mr. Smith breaches of the joint stipulation has

10   permanently harmed my client as the postings have gotten out

11   of control and simply cannot be put back in the bottle.  And

12   the mediation settlement agreement provided that Mr. Smith

13   would exit the ISO industry as you referenced earlier yet he

**No - It absolutely did not. Lawyer is lying or totally misinformed.**

14   continues to market himself and maintain a presence in the

15   ISO industry.

16          Today we are seeking contempt of court of Mr.

17   Smith for posting sealed documents on the internet.  Actual

18   damages in the amount of $200, sanctions in the amount of

19   $5000 for his failure to comply with two court orders, the

20   joint stipulation on injunction and the endorsed order

21   directing Document 60 to be sealed.

22          And an award of our reasonable attorney's fees as

23   provided in paragraph six of the mediation settlement

24   agreement, as well as an order that would allow us to -- that

25   we could present to certain websites to have them take down

```
 1    information that has been posted, reposted for Mr. Smith.
 2              And I'd like to call Mr. Paris to the stand.
 3              THE COURT:  All right.  Mr. Paris, come forward
 4    and be sworn in, please, sir.
 5              COURTROOM DEPUTY:  Raise your right hand.
 6              Do you solemnly swear or affirm that the
 7    testimony you shall give in this cause shall be the truth,
 8    the whole truth, and nothing but the truth, so help you God?
 9              THE WITNESS:  I do.
10                   CHRISTOPHER MARK PARIS,
11    a witness, having been duly sworn to tell the truth, the
12    whole truth and nothing but the truth, was examined and
13    testified as follows:
14              MS. BOONE:  I have an exhibit binder that
15    I'd like to present to the witness.
16              THE COURT:  All right.
17              Mr. Smith, before you begin, tell us your full
18    name, please, and where you reside.
19              THE WITNESS:  I'm sorry, I'm Mr. Paris.
20              THE COURT:  Excuse me, Mr. Paris.  Go ahead.
21              THE WITNESS:  Christopher Mark Paris.  I live in
22    Winter Haven, Florida.
23                    DIRECT EXAMINATION
24    BY MS. BOONE:
25    Q.    Good morning, Mr. Paris.  Has Mr. Smith complied with
```

1    the requirements of the joint stipulation and injunction or

2    the mediation settlement agreement?

3    A.      No, he has not.

4    Q.      And that -- I believe that both the mediation

5    settlement agreement and now the joint stipulation and

6    injunction have been unsealed and they're in the record as

7    exhibits?

8    A.      Yes.

9    Q.      Thank you.  Mr. Paris, can you walk us through a time

10   line of the pattern of those breaches?  Anything you need

11   assistance -- Exhibit 6 might be helpful.

12   A.      Sure.  To preface it, if I may, we have to understand

13   that the motivation or the -- during the mediated settlement

14   agreement was that in lieu of Mr. Smith claiming he did not

15   have adequate funds to pay any kind of damages of any sort,

16   we would settle for a very low figure amount of $8,000.

Not true. My attorney was authorized to offer up to US$20,000. He wanted to "bargain" by starting low at approximately US$12,000

17        In exchange he would close his website down and allow

18   me to open up a site to try to fill that space, potentially

19   monetize it so then it would be my responsibility to try to

That was not discussed at all.

20   earn back some money that I might have lost over this 15,

21   16-year period of the defamation -- alleged defamation.

22        We have to understand that.  But unfortunately while

23   that was what we signed, that isn't exactly what happened.

None of this was discusssed.

24   He was given 30 days to shut the site down.  And 30 days was

25   also for me to ramp up -- time for me to ramp my site up at

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  the same time.

2       And during that 30 days he used that to -- I like to

3  say -- pollute the waters my posting on his website ongoing

4  -- a big banner ad, a giant banner ad at the top of every

5  page of his site that <u>announced the site was being shut down</u>

6  <u>because of this lawsuit.</u>

7       It improperly summarized the case, but it made the

8  argument to the public and to his 2000 plus users that I was

9  shutting the site down out of spite or some other reason.

**It did NOT say that.**

10      If we look at -- can we look at exhibits?

11 Q.    Certainly, you can look at --

12 A.    For example, in Exhibit 6 there's a copy of the banner

13 ad there that says -- I think we're missing the graphic which

14 said "rest in peace Elsmar.com" attempting to elicit sympathy

15 as if the site was a human being.

16      But then he said, sorry, folks, over -- after over

17 19 years continuously on line, Elsmar.com is now permanently

18 closed due to <u>federal civil case,</u> et cetera, et cetera.

**It referenced the case for 2 days when the reference was removed.**

19      That pointed people, of course, to the case and they

20 would see my name Oxebridge and everything.  That

21 announcement did not adequately summarize both the spirit and

22 <u>the letter of the mediation agreement</u>, which was again that

**I totally disagree. Elsmar was closed. Details in my rebuttal.**

23 he was shutting the site down and he had already -- in fact,

24 he had telegraphed that he was going to shut the site down a

25 year before there was any lawsuit any way.

**This was AFTER Elsmar closed on 30 June 2015 at 10PM.**

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   So the site was being shut down anyway, but that he

2   going to shut the site down and give me the space to open up

3   another site of my own in lieu of him having to pay a

4   significant amount of damages. **Again, this was not discussed during the meeting.**

5   THE COURT:  You would concede that the mediation

6   settlement agreement doesn't say that; correct?

**So - Chris Paris was lying under oath (see above).**

7   THE WITNESS:  I think -- yeah.

8   THE COURT:  It does not reference his low income

9   and lack of ability to pay.

10   THE WITNESS:  Yeah, I would concede that.

11   THE COURT:  And that being the motivation.

12   That's not set forth in the agreement.

13   THE WITNESS:  Right.

14   Then shortly after that -- just to give a sense,

15   that post in one iteration or another, remained on the site

16   up to 30 days after the site had been ordered to be shut down

17   by the Court, which I believe was August 7th or so when the

**July 20th 2015**

18   site was finally removed.  He is claiming now on some files

**Site Closed "Door Sign"**

19   that are going to be presented today that this is the

20   equivalent of a door sign hanging on the front of a store.

21   I don't know if the Court really recognizes that,

22   but --  so it not only remained up for most of the month of

23   July while he was shutting the site down; it remained up

**Elsmar.com closed on 30 June 2015. No "content" was available after that time.**

24   about 30 days after the Court had ordered him to shut the

25   site down.  It took a tremendous amount of effort on our part

1    between me and my lawyers to communicate with him increasing

2    my legal fees even more to just try to get that announcement

3    taken down.

4              If we look at B -- and I'm going to go through

5    this quickly.  I recognize the Court's time is important.  So

6    I'm not going to go through this in great detail.

7              But I'll just point out a couple highlights.

8              THE COURT:  Let me say this is your one

9    opportunity to convince me of the violations here, so you

10   take as much time as you need.

11             THE WITNESS:  Very good.  I appreciate that.

12   Thank you very much.

13             So on 23 June he then posted on the Elsmar site

     **It was agreed that I had until 5 July to comply in closing Elsmar.com**

14   again that hadn't been shut down yet, but that he was -- a

15   lawsuit settlement was the rationale for his shutting down,

16   which I am not allowed to discuss.  Essentially I have to

17   close down Elsmar.  In short, I have to burn the library,

18   which is how I look at it.

19             Certainly there was nothing in the agreement that

20   said anything about that.  You can see a response there of

21   people chiming in.

22             Mike S chimed in, in sympathy, kind of

23   denigrating the lawsuit, et cetera.  That is just a small

24   example of the probably I would say at least a hundred or so

25   hate mails, messages, that I've gotten that are derogatory

1   against me as a result.

2          After the site closed though, in what I would say

3   is a fairly extraordinary move, he gave an interview on the

4   closure of the site.  After he had been ordered not to

5   discuss it, he went and gave an interview on a site called --

6   I think the site is called Document Forum or something.

7          But it's Standardsforum.com.  And he gave an

8   interview with the owner of that, and in that article which

9   I'm going to ask my attorney which --

10  Q.     I believe it's Exhibit 3.

11         THE COURT:  Exhibit 3.

12         THE WITNESS:  -- is a copy of that Elsmar's

13  closed, in which the article discusses that it was shut down

14  because of a lawsuit.  Let's see here.

15         As noted on the website's home page, his website,

16  only page, it has been closed <u>as part of a settlement</u> that

**Which was/is true and Chris Paris knows it.**

17  stems from a civil lawsuit filed in Florida, <u>which is not</u>

18  <u>true</u>.

19         He had already telegraphed he was shutting the

20  site down a year before any lawsuit was announced.  In

21  addition, this exhibit 3 does not indicate it, but the

22  original draft of this or the original publication of this

23  article included a link to a page on reddit.com.

24         And if the Court doesn't know what Reddit is,

25  I'll explain briefly.  Reddit.com is a massive international

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1   website, millions and millions and millions of users, and
 2   it's unfortunately notorious for doing some pretty shady
 3   things.  It's where people go to kind of post nasty stuff.
 4              Unfortunately, once something gets on Reddit, it
 5   immediately winds up in your search results.  So I had
 6   contacted the woman who run this article, and I did get her
 7   to remove the link to the Reddit site so that's why it
 8   doesn't appear in the exhibit.  But she wouldn't remove the
 9   post itself.  I didn't pressure her on it --
                 There were no grounds for Mr. Paris to do so.
10   Q.    Mr. Paris --
11   A.    -- because she's allowed to blog if she likes.
                 Precisely. Correct.
12   Q.    -- Mr. Paris, before you turn away from Exhibit 3,
13   who found that posting?  Who found that posting?  Did you
14   find that posting? Relevance?
15   A.    I found the posting, yes.
16   Q.    And do you recall when you found it?
17   A.    It must have been fairly soon when it was published.
18   Q.    Okay.
19   A.    I don't remember.
20              MS. BOONE:  Your Honor, I now move for Exhibit 3
21   to be admitted into evidence.
22              THE COURT:  Mr. Clark, is there --  excuse me,
23   Mr. Smith.  I'll get this right eventually.  Is there any
24   objection to any of the exhibits that you have been shown
25   being introduced here?
```

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1           MR. SMITH:  I have a number of --  there are a
2   number of things that Mr. Paris is saying --
3           THE COURT:  I am not asking for your counter
4   argument; I'm simply asking do you object to the exhibits
5   that he's showing the --
6           MR. SMITH:  No.
7           THE COURT:  -- being introduced?  Okay.  So far
8   he's identified 3 and 6.
9           MS. BOONE:  Okay.  And 1 and 2 you acknowledged
10  for the mediation settlement agreement and the joint
11  stipulation.
12          THE COURT:  Okay.  And then 4 and 5 would be
13  what?  Four, five and six would be --
14          MS. BOONE:  I believe Mr. Paris is going to get
15  to that soon.
16          THE COURT:  Well, tell me what they are.
17          MS. BOONE:  Other websites that posted on
18  Mr. Smith's material.
19          THE COURT:  Okay.
20          All the exhibits will be --  will be introduced.
21  Let me back up and ask with regards to Exhibit 3, the posting
22  on that was when?
23          That article that you referenced which you say
24  was on --  that ended up on or had the link to Reddit, that
25  article was posted when?

```
 1              THE WITNESS:  Looks like the date is July 7,
 2     2015.
 3              THE COURT:  July 7th?
 4              THE WITNESS:  Uh-huh.
 5              THE COURT:  Okay.  Thank you.
 6              THE WITNESS:  And as I recall that is the
 7     accurate date.
 8              THE COURT:  Okay.
 9              All right.  Go ahead.
10     BY MS. BOONE:
11     Q.      Go ahead, Mr. Paris.
12     A.      And if we look at Exhibit 4, that's the copy --
13     that's just a copy of the front page of the Reddit site, but
14     it shows on the right some of the material --  well, I guess
15     the point I want to make is that when I clicked on the Reddit
16     site after I saw the link, I found that nearly the entire
17     Elsmar site had been cloned, copied.
18              It appears now -- we can go to it right now on
19     Reddit.com.  So the site was not shut down; it was merely
20     moved to Reddit.  So we see an example.
21     This is -- Reddit is a forum.  But we see the Elsmar
22     Cove logo on the top.  We see search the Elsmar Cove.  We see
23     the eulogy.  All of this material was literally copied and
24     pasted from the site which had been removed and moved to
25     Reddit.
```

Handwritten annotations: "Totally FALSE. None of Elsmar.com was "cloned" anywhere."; "No, it wasn't"; "Which was a "screen shot" graphic which could NOT search Elsmar."; "By who? I (SMITH) had no control over what someone else did."

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

**More perjury - Chris Paris has never done website development professionally.**

1    Now, I know a <u>little</u> bit about web development,

2    and <u>I've done it professionally for a little bit.</u>  And I know

3    there's only two possible ways that happens.  Someone either

4    without Marc's knowledge scraped the site -- they call it

5    scraping which they take all the graphics and everything and

6    they repost it.  <u>However, typically you lose a lot of</u>

7    <u>formatting, and it wouldn't look exactly the way it did</u>

8    <u>before.</u>  **It does when someone takes a "screen shot" and it becomes a graphic (picture)**

9    The other alternative, of course, is that someone

10   gained the original raw files from Marc himself, and granted

11   permission to have this posted.  In my opinion, it looks like

12   the latter is true because of the exact nature of the way the

13   Elsmar site was completely <u>cloned.</u>

**Elsmar.com was NOT "cloned" - Paris keeps bringing this up and it simply isn't true.**

14   So right now the Elsmar site that we ordered

15   down, exists on Reddit <u>nearly in its entirety.</u>  But the new

**Again.... Totally FALSE! This is an outright LIE!**

16   forum -- and the forum is live so we don't have it here to

17   look at, but <u>that forum is filled with new defamatory content</u>

18   <u>against me.</u>  **What forum is he speaking of? It wasn't Elsmar.com and I (Smith) had nothing to do with it, what ever it was.**

19   The problem with Reddit is that it's entirely

20   anonymous.  Anybody can post anything they want, in utter

21   anonymity, and yet it's not going to reveal who's those

22   people are.  **Paris finally admits - He can not get content removed from Reddit any more than Smith can.**

23   BY MS. BOONE:

24   Q.    Mr. Paris, looking at Exhibit 4, were you the one who

25   found that posting?

```
1    A.      I'm sorry?  Can you repeat the question?
2    Q.      Did you find that website?
3    A.      Yes.  As a result of the interview he gave which
4    originally had a link to the Reddit site.  That's how I found
5    it.
6                MS. BOONE:  I move Exhibit 4 into evidence.
7                THE COURT:  All the exhibits have been
8    introduced.  You can have your witness talk about them.
9                (EXHIBIT Nos. 1, 2, 3, 4, 5, 6 ADMITTED INTO
10   EVIDENCE.)
11               MS. BOONE:  Okay.  Thank you.
12               Please continue, Mr. Paris.
13               THE WITNESS:  I probably made the point, but
14   anything that gets posted on Reddit automatically then gets
15   cloned to another site called Reacttant.  Not Reacttant I
16   only learned of recently, and I can't answer too many
17   questions as to what it is.  I don't know.
18               But that means that everything that is appearing
19   -- so now there's a second clone of the Elsmar site on
20   Reacttant.  As near as I can tell, Reacttant is done
21   automatically.  There's not people behind it.  It just copies
22   everything posted on Reddit.  But it basically doubles the
23   exposure.  So it's problematic.
24               We then found out that Mr. Smith granted
25   permission to a gentleman by the name of Andre Bardaden
```

**Again, there is NO "CLONE" of Elsmar.com anywhere.**

1  (phonetic spelling), who lives in Russia, to open up a new

2  forum in the ISO space with the name Elsmarforum.com.  We see

3  below an email that I received from Andre.  I asked him how

4  did you open this site up and, B, are you aware that you may

5  not have permission to use the name Elsmar, and he wrote --

6  I'm afraid I don't have the date.

7        MS. BOONE:  Back on exhibit --

8        MR. SMITH:  Which exhibit is this?

9        MS. BOONE:  It's Exhibit 6.

10       THE WITNESS:  Exhibit 6.F.

11       MR. SMITH:  Exhibit 6?

12       THE WITNESS:  And Mr. Bardaden wrote, hello,

13  Chris.  I contacted Mr. Smith and asked him if I could use

14  the word Elsmar in my project.  He said that I could use it.

15  See print screen.  **This was explained in my previous response to the Court. I have no copyright or other mark on the word Elsmar in a domain name or otherwise.**

16       And he included a copy of the e-mail that Marc

17  sent to him.  And he says, I do not own a mark on Elsmar.  I

18  assume you can use it if you want to.  Good luck.

**True. I found the email exchange on my return and provided a copy to the court.**

19       I want to point out that I believe that one of

20  the exhibits that Mr. Smith is going to be entering today

21  indicates that he has never -- he does not know who Andre

22  Bardaden is, **I did not remember the email exchange at the time of the hearing.** and this e-mail will disprove that in advance.

23       I would also like to point out in the mediated

24  settlement agreement, which is Exhibit --

25       MS. BOONE:  One.

1        THE WITNESS:  -- one.  Paragraph -- looks like

2  paragraph 2D, it says the defendant shall retain all

3  ownership and rights relating to www.Elsmar.com, which would

4  seem to contradict what he's saying here that he can use the

5  word "Elsmar" however he likes.  Mr. Smith had the

**Smith can. It is not prohibited in the MSA or elsewhere.**

6  opportunity then to decline, deny the usage of this.  And he

7  did not.

**He asked to use the WORD "elsmar" - Bardaden was not given permission or rights to a domain name of "elsmar.com"**

8         Now we have another Elsmar forum in the quality

**Which is totally unrelated to www.elsmar.com (aka Elsmar.com)**

9  ISO business, profession, operating out of the jurisdiction

10  of this Court in Russia, which is not something anybody in

11  this room I think can take back.

12        He then began -- throughout the period of July

13  and thereafter presumably -- I should note that until

14  recently posts on Linkedin -- Linkedin is the largest, of

15  course, professional social network in the world equivalent

16  to Facebook, but for professionals.  Until recently you were

17  able to see posts made by anybody on Linkedin.  They changed

18  their policy recently.

19        But these were taken at a time when we could see,

20  so I'm not able to see what Marc may be posting now.  But on

**Just as Marc is unable to see what Paris is posting now on various Linkedin "groups".**

21  July 7th immediately on the same day he gave the interview,

22  he then went on Linkedin and posted a link to the document

23  center interview where he says, FYI, word is getting around.

24        He begins to make the case, too, that I am

25  telling people that this is a criminal lawsuit, and I have

**Paris did, in fact, use the word "criminal" on Twitter and on his own website.**

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   never made a public statement about that.  I never said

**More perjury by Paris.**

2   anything about this being a criminal lawsuit.  In which he

**I have screen shots showing Paris did starting in the fall of 2014 on "Twitter" and on his own website**

3   says don't be mislead.  I'm seeing people in another group --

4   again, maybe someone else; I don't know -- who says it was a

5   criminal lawsuit.  It wasn't.  It was a federal civil lawsuit

**Due to Paris' use of the word "criminal" on his own website,**

6   in Florida.  **Linkedin and Twitter, Smith had to address Paris' use of the word**

**criminal, and did so appropriately.**

7   But at the end he says, it is a civil lawsuit who

8   its outcome was criminal.  That I agree with.

**So does Smith. The lawsuit is totally frivolous and was meant to defame Smith and to frighten others**

9   So he's denigrating the Court's decision in that

10   public post, which may as far as I know still be up there.

11   We don't know.  Then on July 25th he went even further.  He

12   said Elsmar was an internet icon.  There was no Linkedin when

13   it started in January of 1996, no Google, no Facebook, or

14   anything like that.

15   Taking Elsmar down was burning down the library

**It does not**    16   by a person who cannot stand criticism and is ordered to

**contradict**

**the text of**    17   taking 19 years of centralized information, opinions,

**the**

**agreement.**    18   interpretations, friendship, et cetera, off the Internet.

**The "spirit"**

**is no more**    19   I think that fairly well contradicts the letter

**than an**

**opinion and**    20   if not the spirit of the settlement agreement.

**is thus**

**irrelevant.**    21   I wanted to point out Exhibit 5, which is a copy

22   of the home page of the Russian site Elsmarforum, which also

23   includes the tag phrase, people helping people, which is

**Quite a few forums are using that phrase, as are many charities. It is not a unique phrase - Google it.**

24   something Marc used on his Elsmar site.  That's in Exhibit 5.

25   Now, what happened next is a little bit strange.

**All of the documents are publicly available on PACER.**

**I believe Paris himself posted these to implicate me just as he "hacked" his own website to defame me.**

1   We found -- there's a website called Scribd.com where people

2   can post pretty much any document they want.  So it happens

3   to be a little bit of a <u>clearinghouse for people who want to</u>

4   <u>post things that are in violation of somebody's trademark.</u>

**This is total bull. Scribd is totally NOT like that.**

5   So if I pay for a document, I can post a

6   document.  Now everybody else in the world can download it

7   for free, and there's no harm in that.

8   We found then a user by the name of Paris

9   Oxebridge posted on November 17th some of the documents -- I

10   believe six in total -- documents from the Court which have

11   <u>then been under seal.</u>

**As is now evident, NO sealed documents were posted on Scribd, and Paris knew it.**

12   MS. BOONE:   That's Exhibit 8.

13   THE WITNESS:   If we look at Exhibit 8, and this

14   is an example of the copy of a document posted to Scribd.com

15   by a user by the name of Paris Oxebridge.  Now, I want to

16   comment on that making sure that the Court knows it's my

17   <u>opinion</u>, the name Paris Oxebridge is something that <u>Marc has</u>

18   <u>used throughout the 15-year-history</u> we're talking about where

**Not true - Perjury - I only started using that within the past year.**

19   he refers to me as a single entity called Paris Oxebridge.

20   So I think two things are here, is that, one,

21   that name is not <u>accidental if this is a way Marc refers</u> to

**Or if Paris wants to "frame"/implicate Smith.**

22   me.  In fact, in his <u>recent</u> document I think he filed with

23   the Court he refers to me as Paris Oxebridge.

24   But also there seems to be an attempt to make it

25   look like I posted these documents.  <u>But the six documents in</u>

SANDRA K. PROVENZANO, RPR   OFFICIAL UNITED STATES COURT REPORTER

They were publicly available court documents available to the public on PACER and elsewhere.

1    questions are all derogatory and defamatory of me so there

Paris is correct - The lawsuit court documents are defamatory and derogatory to Smith

2    would be so reason.  And I wanted to state under oath that I

3    did not post these documents to this website.  In fact, I

4    hadn't even known this website existed.

5    BY MS. BOONE:

6    Q.     Before you move away from Exhibit 8, uhm, is that a

7    correct copy of Document 6 in the docket?

8    A.     No.  So this is a copy of Document 6 originally filed

9    -- docket six for this case, but it includes handwritten

10   annotations by Marc, which is something I want to talk about

11   because they include additional defamatory material

12   indicating to me that we just can't seem to stop the flood of

13   this stuff.

14   Q.     So I understand you to say that those handwritten

15   notes are not on Document 6 in the record?

16   A.     No.

17   Q.     Is there another document that does have them that is

18   in the record that --

19   A.     I believe it was subsequently filed under one of the

20   -- docket 60.  And maybe you can check that.  But he since

21   filed this, I believe, on two occasions as his official

22   filings with the Court using the marked up copy.

23   Q.     And I believe Exhibit 7?

24   A.     Exhibit 7, yes.

25   Q.     Do you recall if this document was sealed at any time?

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1   A.      Yes.   The document would have been sealed some time

2   around October.   Again, if I can, it's worth pointing out

3   looking at Exhibit 7, just some of the information that was

4   submitted to the Court, and again linked onto the Internet

5   which includes his handwritten notes.   And if we look at --

6            MR. SMITH:   Objection, Your Honor.   We have

7   reached the point here where he's listing all sorts of things

8   here, and he's ascribing to me -- I mean, he's trying to

9   point to me as the cause.   Now, I thought this was --

10           THE COURT:   You are going to get -- you're going

11   to get your opportunity to respond.   This is his version and

12   his beliefs and I consider it as such.   So you will get your

13   opportunity to respond.   If you have a specific objection

14   beyond the fact that he's rendering opinions here, I'll

15   listen.   But I'm going to allow --

16           MR. SMITH:   This is all opinion, Your Honor.

17           THE COURT:   I hear you.   And we'll see where it

18   goes.   Go ahead, sir.

19           THE WITNESS:   I want to make sure the Court

20   understands I know the difference between opinion and

21   defamation, and I'm not challenging Marc on his opinions.

22   But I am challenging him on what I believe, and I believe the

23   Court would agree, is defamation.

24           So I would point to exhibit --

25           THE COURT:   The issue in the case is whether or

1   not it's the defendant who is posting these matters.  You are

2   assuming in your testimony here that with regard to these

3   last two exhibits, which apparently reflect on court

4   documents 6 and 7, that he was the one that edited them with

5   the handwritten notes and posted them.  That's one of the

6   fundamental questions we're going to have to resolve here.

7            THE WITNESS:  He has submitted this, Your Honor.

8   He has submitted this under his name as an official document.

9   We would need to check which recent document, but I believe

10  it's somewhere around 60 or so he has submitted this

11  handwritten document under his name, and he acknowledges that

12  he's written these handwritten notes.

13            THE COURT:  All right.  So this is already an

14  official record.

15            MS. BOONE:  61.  Document under seal where he has

16  posted these handwritten comments that were previously

17  written on <u>Document 6</u>.  **Document 6 was the summons.**

18            MR. SMITH:  They were in the Court record.  They

19  were submitted to the Court.  They are in your system.  Why

20  would I refuse it?

21            THE COURT:  You'll get your opportunity here.  Go

22  ahead, Mr. Paris.

23            THE WITNESS:  Looking at Exhibit 7, just for

24  example, if we look at -- looks like it's page five, I'm not

25  sure but on the bottom it's page five, paragraph 27.  There's

1    an indication there that says Smith has falsely claimed Paris

2    has threatened him and he writes, he has.

3              That I've -- I'm claiming here in this filing

4    that Smith has falsely claimed Paris has harassed him.  He

5    says, he has.  I'm arguing it's untrue. **I have proof, including a witness**

6              He then accuses me of deceptive advertising.  But
     **That is my opinion - First Ammendment.**

7    I say Smith has falsely accused Oxebridge of deceptive

8    advertising.  Yes.  40-day wonder.  The term "40-day wonder"

9    is critical because it's a term that he coined first in 2000,

10   and has maintained ever since then, now 16 years.  He calls
     **Where, since 2001, has Smith used the phrase?**

11   me the 40-day wonder because I implemented a certain ISO

12   standard and I can do the work over a period of 40 days.

13   **More perjury.** And he has alleged that this is impossible.  And
     **I have never said it is "impossible".**

14   yet I have 15 years' experience doing it.  But he calls me

15   the 40-day wonder to make that a derogatory comment.  He

**He is whining ...**

16   again makes the 40-day wonder comment in paragraph 68 of that

17   same exhibit where it says he was only familiar with -- only

18   his 40-day wonder, so again he's using these court filings to

19   actually defame me further.  He indicates in here again --
     **Christopher Paris filed a lawsuit - Did Paris expect love and kisses from Smith?**
20   there's an interesting one here.

21              Paragraph 42 of the document F.  The finding --

22   the official document says, the false and misleading conduct

23   that strained Paris's relationship with industry

24   professionals, and he writes --

25              COURT REPORTER:  I have to write what you're

1    reading.  Please slow down.

2          MR. PARIS:  I'm sorry.

3          The false and misleading content has strained

4    Paris's relationship with industry professionals.  And he

5    writes in the margin here, <u>many people simply do not like</u>

6    <u>Chris Paris</u>.  **Which is true and I have a lot of evidence proving it, most of**
     **which is from people Paris has threatened or defamed publically.**

7    BY MS. BOONE:

8    Q.    Can you just reiterate this was filed with the Court

9    as document --

10   A.    In paragraph 57 where we indicate that Smith raised

11   the offer --  you have to understand he was attempting to say

12   that if I bought his website for what eventually became a

13   figure of five million dollars, that was the only way I could

14   get him to <u>stop posting this stuff,</u> which I argue is

15   extortion.  **Not true - I have submitted the email exchange to the court.**

16         But he indicated -- we indicated here on May 3, Smith

17   raised the offer to sell Elsmar.com to Paris at that point to

18   $750,000.  And he indicates in the margin, I raised my price

19   to him because he is an <u>ass</u>.  **An opinion, not a "statement of fact".**

20         These are to me statements made by him as if they're

21   <u>statements of fact</u>.  And they were published in the Court

22   documents.  Then he points to people openly on his website to

23   the Pacer files and, of course, we find these additional

24   documents being posted under the pseudonym Paris Oxebridge,

25   which we don't know if it was him or not.  But it does

1    include this additional defamatory information.

2          At some point in addition the same document appears on

3    a law blog.

4                THE COURT:  Which same document?

5                THE WITNESS:  This handwritten version that had

6    been uploaded to --

7                MS. BOONE:  Exhibit 9.

8                THE WITNESS:  -- Scribd.com.

9                Yeah, we're on Exhibit 9 -- was also uploaded to

10   Scribd.com by a user Catherine Rubino, and she then wrote a

11   defamatory -- well, not defamatory, but a very highly

12   spirited blog article which praised Marc Smith and made some

13   derogatory comments against me in a somewhat humorous

14   fashion, praising him for his aggressive pro se actions.

15               But in the end that was another negative comment

16   from a complete third party that came out of the blue.  I

17   don't know.

18               We have in document number 6, Exhibit 6, my

19   paragraph --  let's see.  Roman numeral III.  Just a list of

20   some other --  just to show how this is spreading.  We don't

21   have to go into these in any detail, but it shows a list of

22   these blogs are now copying this material, for example, the

23   first list there, the first URL from a website called Three

24   Boxes of BS, copies and pastes the RIP, Elsmar RIP notice

25   saying it was shut down because of a lawsuit, etc.

1      So it just shows the Court that this is spreading

2  like wild fire, and there may be no containing it.  Whereas,

3  prior to the mediated settlement I really believed at the

4  time that the settlement agreement was going to be able to

5  stop this.  We came up with a fair deal.  He didn't have to

6  pay a tremendous amount of money, and I might have the

7  ability to try to over time repair my reputation on line.

8      But since the minute he posted that banner ad on

9  his site announcing that it was shut down to the website, it

10  opened this torrent, which now may be beyond the ability of

11  anyone to stop.  There remain multiple Linkedin posts, but we

12  can't see them anymore on Linkedin because of the change in

13  their policy.  **It wasn't a policy change - Paris was banned from several Linkedin groups.**

14  Then there's two others in my Roman Numeral V and

15  VI.  These are old posts that still remain from Google groups

16  from Quality One Stop, which were subject to the take-down

17  order, the original take-down order under the joint

18  stipulation.  But they still reside today showing that Mr.

19  Smith has failed and refused to do so.

20      And I want to comment that it is entirely within

21  Mr. Smith's ability to take these down.  And in fact Google

22  and Quality One -- Google, anyway, offers a simple page.  You

**Not for Google Groups.**

23  click one link.  You submit a list of the URLs and you

24  indicate a reason for why you need to take them down, and

**This is only available to take specific website pages**

25  they can be taken down.**out of the Google index for DMCA issues. It does NOT remove the website pages.**

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

*This was discussed in the Meditation meeting. They agreed to provide a letter for me to sign.*

*Now they come back and want me to do it, which they know, as was discussed, that I can not do.*

1    At this point, however, <u>I would I think we're</u>

2  <u>going to request the Court to be given an order to do that,</u>

3  <u>because we cannot rely on Mr. Smith to do it.</u>  So that just

4  shows additional breaches of the joint stipulation.

5    I think that's all I've got.

6  BY MS. BOONE:

7  Q.    Did you uncover any -- did you have any Google

8  searches that you have done recently?

9  A.    Yes.  Thanks.  I forgot.  If we look to Exhibit 10,

10  and Exhibit 11 -- we'll start with 10 --  you can see the

11  damage.  Now, I need to make it clear that <u>the number one</u>

12  <u>source of sales and referrals from my business and my company</u>

13  <u>is through Google searches.</u>    **A very risky business model.**

14    <u>That's how I generate business.</u>  But more importantly

15  when I obtain a potential client and I begin to talk to them,

16  and it looks like they're getting ready to sign a contract,

17  they usually will go through a process of vetting me to find

18  out if I'm legitimate or not.

19    One of the ways that everybody does that, you can go

20  to Google.  So if -- the first exhibit 10 shows Google

21  results filtered for everything prior to 2013, and 2013 was

22  <u>when Mr. Smith was ramping things up</u>, and we were starting to

**In what way??? In 2013 there were only email exchanges.**

23  look like we were getting into a lawsuit and got obviously

24  into a lawsuit.  Prior to that, the first page of search

25  results for the term "Paris Oxebridge" shows no negative

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    material whatsoever.

2          There are a few off topic things about Halloween here

3    or something, but all of the material that has to do with me

4    is either neutral or positive.

5          If we look at Exhibit 11, these are the search results

6    just of March 12th, so just the other day.  Now the search

7    for the same term shows up 50 percent of the negative

8    material.  Fifty percent of the first page results are

9    negative defamatory material. **Proof? I seriously doubt that was the case.**

10          And all of them, every single one of those, includes

11   material that was derived either from Marc Smith or posted by

12   Marc Smith or copied and pasted from Marc Smith.  So the

13   first one, the Ripoff Report includes entire sections of

14   content taken from the Elsmar site.

15          The second one, Chris Paris rides again, the full

16   thread is where will the next sucker come from is from 2004.

     **It obviously was not hurting his business over the 10 years it was there.**

17   One of the Google group postings that he has refused to take

18   down, and it's still showing up as of March 12th.

19          You see the Scribd.com documents posted by this

20   anonymous person Paris Oxebridge.  We see additional stuff

21   from Reddit.com and other places copied and pasted.  This did

22   not exist prior to this.  The bulk of this has appeared since

23   the settlement agreement.

24   Q.    Mr. Paris, finally how have you been harmed and can

25   you repair this damage or -- from this?

```
 1   A.      Uhm, I kind of can't emphasize the harm without
 2   sounding hyperbolic, and I don't want to sound hyperbolic.
 3          But the damage has been unbelievable.  Now, understand
 4   this began in 2000 -- literally in January of 2000.  So we
 5   were already dealing with 15 years of this.  Even at that
 6   point prior to the breaches that we're discussing today, it
 7   was reparable.  It was probably reparable because there
 8   wasn't that big of an impact on Google the way it is as of
 9   today.
10          But after these breaches, and specifically after
11   posting that on his website saying this is being shut down
12   because of Oxebridge, and making the posts and the interview
13   and Reddit site and all that, I do not understand now how
14   this can be put back in.  And the results have been
15   disastrous.
16          For the first time in my 16-year career of working
17   this, sales have dropped to zero.  There are no sales coming
18   in at all.  I'm not being requested.  No one is asking me for
19   quotes.  We had a couple -- I had a couple people contact me
20   a few months ago.  Those did not turn into contracts.
21   There's no work coming in at all.  You can directly correlate
22   the decline in my ability to do business with the increase in
23   this negative material showing up on Google.
24          Then, of course, is -- I can probably go on at length
25   of all the personal impact on this, the impact on everything,
```

```
 1    the stress it's put on my wife who has to deal with this.  My
 2    child.  The fact that our income has dropped now.  We have to
 3    consider changing schools for my daughter.  The impact has
      As it has been for Smith, who has had to deal with Paris' lawsuit.
 4    been phenomenal.
 5         And I don't know now what could happen to put it back
 6    in.  But we had an opportunity, we had a golden opportunity.
 7    It wasn't an ideal arrangement.  Everybody walked out of the
 8    mediated agreement equally displeased, which I think
 9    indicates usually you reached a good agreement, when everyone
10    is equally unhappy.
11         But had it worked, we wouldn't be sitting here now.
12    Now I do not know.  The problems are worse than that even if
13    I were to quit the business, my name follows me.  And this
14    has been successful in targeting my name, so if I were to
15    open up a gas station tomorrow, one of the people involved
16    with Marc Smith and all the people that have been infected by
17    this information on the Internet, will one day figure out
18    that that gas station is owned by Chris Paris.  And then the
19    whole thing comes down again.  And now the gas station is
20    gone.
21         So my professional career is over.  And I don't know
22    how to recover from it.
23              MS. BOONE:  Thank you, Mr. Paris.  That concludes
24    my questioning.
25              THE COURT:  Mr. Smith, you have the right to
```

```
 1    cross-examine, which is to question Mr. Paris, if you wish.
 2                MR. SMITH:  Your Honor, this --  this has been so
 3    wandering, the only way I could cross-examine him -- he's
 4    made so many misstatements.  He attributes everything that's
 5    happening to me --
 6                THE COURT:  Do you wish to cross-examine him or
 7    not?
 8                MR. SMITH:  You know, I'm one little guy.  He
 9    goes through and, for example --
10                THE COURT:  Do you wish to cross-examine him?
11                MR. SMITH:  I'm sorry?
12                THE COURT:  Do you wish to question him or not?
13    This is your opportunity to question him.  You are going to
14    have the opportunity to take the stand and tell your side of
15    the story in a bit.  But right now we're at the point where
16    you have the right to question him, to cross-examine his
17    testimony.
18                The question is:  Do you wish to do that?  It's
19    up to you.
20                MR. SMITH:  Okay.
21                         CROSS-EXAMINATION
22    BY MR. SMITH:
23    Q.    I guess we'll start off with --  Exhibit 11.  And he
24    talks about the Ripoff Report.
25                Are you aware that I contacted Reddit and requested
```

```
 1   them to take that information down?  I think two discussion
 2   threads?
 3          And are you also aware that -- I think it was your
 4   attorney -- was copied on this, and Reddit wrote me back and
 5   said hey, no.  And your attorney was copied on that?  I can't
 6   do anything about Reddit.
 7               THE COURT:  All right.  That's a question.
 8               MR. SMITH:  And what --
 9               THE COURT:  Mr. Smith?  Mr. Smith?
10               MR. SMITH:  -- do you --
11               THE COURT:  Mr. Smith.  You get to ask questions
12   now.  He gets to answer the question.  So stop.
13               (The Court and Mr. Smith speaking
14   simultaneously).
15               THE COURT:  Mr. Smith, Mr. Smith.  Listen to me.
16   When I'm talking, you will be quiet.  Do you understand that?
17               MR. SMITH:  Yes, sir.
18               THE COURT:  Okay.  He's asking you a question.
19   What's the answer to that question?
20               THE WITNESS:  No.  I'm not aware.
21               THE COURT:  Your lawyer never shared to you the
22   responses by Reddit or his request for a take down?
23   This speaks   THE WITNESS:  No, I have not seen it.
     for its self.
24               THE COURT:  Okay.  All right.  So he's not aware.
25   What's your next question?
```

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1    BY MR. SMITH:

 2    Q.      What evidence do you have, or -- that points to me

 3    having anything to do with Reddit?

 4    A.      Uhm, again, your copyrighted material is on the site.
```
**I have no copyrighted material - Everything on Elsmar.com was "Copy-Free"**
```
 5    I have been in contact with Reddit separately, and they have

 6    confirmed with me that if you file a Digital Millennium

 7    Copyright Act, DMCA, notice, they'll honor those.
```
**Nothing on Elsmar.com was copyrighted so I had no standing to do so.**
```
 8            And DMCA notices can only be filed by the owner of the

 9    copyrighted and trademarked material.  Since he owns the site

10    for Elsmar, all he needed to do according to the

11    communication I had with Reddit, is to file the DMCA

12    take-down notice, and they would honor that.

13            Now, Reddit, I asked them to take it down, but they

14    said you are not the copyright owner so they would not honor

15    it for me.  Which is why I am here requesting the Court order

16    Reddit to take it down.  So that is the understanding I have.

17            You are the copyright owner, and it is your material.
```
**Smith holds no copyright on anything on Elsmar.com**
```
18    I believe the only way they could have gotten it is if you

19    gave it to them.  And you certainly have the ability to take

20    it down if you chose to.

21            THE COURT:  Next question.

22    BY MR. SMITH:

23    Q.      Okay.  I'll repeat the question I had before.  Are you

24    aware that I did that, and I copied your attorney on it?  Are

25    you aware that --
```

**Smith does not object to that. Try it and see what happens.** (margin note beside lines 14–17)

```
 1                MS. BOONE:  Objection.  Asked and asked.
 2   BY MR. SMITH:
 3   Q.      -- and they told me no, they would not take it down?
 4                THE COURT:  Mr. Smith, you asked the question.
 5   Your answer is no.
 6                THE WITNESS:  My answer remains no.
 7                THE COURT:  Next question.
 8   BY MR. SMITH:
 9   Q.      Okay.  Let's see.  You talked about Scribd.  You
10   attributed to that -- other than conjecture on your part
11   everything that is going on here and everything that is being
12   posted and everything that is being done, is I have something
13   to do with it.
14           Do you have any evidence --  do you have --  I mean,
15   have you communicated with Scribd?  They keep log files.
16   They keep IPs.  They keep e-mail addresses.  Do you have any
17   evidence that I have anything to do with any of this?
18                THE COURT:  Okay.  Good question.
19                Now, you be quiet.  What's the answer?
20                THE WITNESS:  No.  As I made clear during my
21   testimony earlier, I said I believe, but I do not have proof,
22   that the user Paris Oxebridge is Marc Smith.  I made that
23   very clear in my testimony.  It is only my opinion and
24   conjecture.
25                MS. BOONE:  May I ask Mr. Paris a question?
```

```
1          THE COURT:  You will get a chance to redirect.
2   Not right now.  Do you have another question?
3   BY MR. SMITH:
4   Q.    I guess we could go on to example two.  They have
5   presented these exhibits, six.  On this exhibit --  Exhibit 6
6   he talks about, for example, I gave permission to launch a
7   new ISO related forum under the name of Elsmar in Russia.
8          Over the years a number of people have contacted --
9              THE COURT:  I don't want to hear your version.
10             MR. SMITH:  Okay.  I'm sorry.
11  BY MR. SMITH:
12  Q.    I think what my problem is that's so meandering that
13  I'm not even sure where to start --
14             THE COURT:  Do you have a --
15             MR. SMITH:  -- except that, you know, I just wish
16  these proceedings were such that when he starts stating
17  stuff, that there would have to be some evidence rather than
18  throwing mud against the wall.
19             I can't --  I'm not a lawyer.  I didn't sit back
20  --  I did go through line item by line item, Your Honor, and
21  refuted this.
22             I just --  my only question to Mr. Paris why is
23  it that I can think of at this point -- why is it that
24  everything that anybody else does -- I mean, Elsmar had a lot
25  of people, I'll grant you that.
```

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1              But you are telling the Court that I -- and you

 2   believe, you honestly believe, honestly believe that I, a

 3   single guy that got out the ISO business back in 2000, ran a

 4   relatively small forum --

 5              THE COURT:  Is that a question?

 6              MR. SMITH:  -- that you believe that I'm that

 7   powerful, and that all of this is happening to you is

 8   happening to you because of me?  Do you really believe that?

 9              THE WITNESS:  The question is phrased with a

10   series of absolutes and superlatives that I don't even know

11   how I could answer.

12              THE COURT:  Is it your belief that he's

13   responsible for this?  Let's talk about the Russian site.

14   That's where we start.

15              MR. SMITH:  I literally confirmed it with the

16   Russian himself.  I don't know how much more evidence I could

17   have.  Again, I can bring a computer in and show the e-mail,

18   et cetera.  I don't know if we need to go down that.  Yes, I

19   believe.

20              I believe that I have not made claims that

21   Mr. Smith is responsible for every ill thing that ever

22   happened to me in my life.  I wouldn't make that claim.  I

23   made very specific claims.  I think they're well documented.

24   They're not meandering.  And I would stand by the claims we

25   make.
```

**Something is missing here or something. Mr. Smith did not say some of this stuff.**

**Transcript problem?**

SANDRA K. PROVENZANO, RPR   OFFICIAL UNITED STATES COURT REPORTER

```
1              THE COURT:  Another question, sir.
2              MR. SMITH:  No.  I have made -- my only question
3    was is the significance-- what -- like I say, I can't
4    believe that he believes that this is all because people
5    found out that --  I mean, that Elsmar was shut down.
6              THE COURT:  I'll hear your version.  I'll hear
7    your version, I guess, in a bit here.
8              Miss Boone, do you have any redirect?
9              MS. BOONE:  Yes, Your Honor.
10                    REDIRECT EXAMINATION
11   BY MS. BOONE:
12   Q.    Would you please turn to Exhibit 8.  Do you have the
13   Scribd listing from November 17?
14   A.    Yeah.  Okay.
15   Q.    Again, there is markings -- do you -- do you believe
16   that those are the markings of a certain individuals on those
17   documents?
18   A.    Yeah, those markings are made by Marc Smith, and I
19   believe earlier in the morning before on the record he
20   admitted that these are his, and that he filed these under
21   docket -- he said he took Document 6, he marked it up by
22   hand, and then filed it as the document, I believe, 60-1.
23   Q.    Do you know how someone's markings on the document
24   after it has been filed with the Court could have gotten in
25   the hands of someone else?
```

1    A.    Yes.   <u>The person who marked them would have to send</u>

2    <u>them to that person.</u>   **It was sent to the court and was publically available**
                                   **on PACER for at least 7 days before it was ordered**
3    Q.    Thank you.                    **sealed in court docket document 63.**

4              MS. BOONE:   That's all.

5              THE COURT:   Mr. Smith, on the -- on the point of

6    you being the author of the handwritten additions to

7    documents that were filed in the Court, did you concede that

8    you were the one that added those handwritten notes?

9              MR. SMITH:   I -- yes, I did, Your Honor.  And --

10             THE COURT:   That's all I want to know.  Thank

11   you.  You'll get a chance to explain it down the road.

12             But we identified the author, so that's good.

13   What else, Miss Boone?  Anything?

14             MS. BOONE:   That's it.

15             MR. SMITH:   I submitted that to the Court.

16             THE COURT:   I understand.  It may be entirely

17   appropriate.  I don't now.  I just confirmed that you're the

18   author.  That eliminates one factual dispute that we might

19   have had here.

20             Miss Boone, let me ask you to clarify for me

21   unless you are going to use someone else to do this, this

22   claim that you want damages arising from this proceeding.  I

23   understand he says that the company has been harmed because

24   there are no sales coming in at present.

25             I understand he claims emotional distress to

```
 1    himself and his family.  Your motion articulated some
 2    specific damages.  What is it that you are seeking here by
 3    way of damages?  As one remedy to the alleged breaches here.
 4              MS. BOONE:  We're seeking temporary damages to
 5    compensate him for his lack of business that he's received
 6    due to Mr. Smith's actions, enough to compensate him to
 7    hopefully create a new business for himself that won't -- the
 8    defamation will not follow him.
 9              THE COURT:  But -- and how is --  how is the
10    Court to calculate the losses?
11              MS. BOONE:  We could propose what his salary is
12    --  is yearly profits --
13              THE COURT:  This is your opportunity here to
14    request relief from the Court to establish the violations.  I
15    read reference to a $200 figure.  I read reference to --
16              MS. BOONE:  The 200 --
17              THE COURT:  -- five thousand dollar figure.  I
18    read references to attorney fees.  And then we seem to be
19    straying into areas of compensatory damages.  I am just
20    questioning what it you are asking the Court to do by way of
21    monetary damages, if any.
22              MS. BOONE:  Today we would like to ask for a
23    certain amount of compensatory damages.  I believe if I can
24    consult with my client for one second.  But he's on the
25    witness stand.  Can I for one second?
```

```
 1              THE COURT:  Why don't you just ask the question.
 2    Start with economic damages.  Is there a claim of economic
 3    damages?  That's what I understood your motion to set out.
 4              MS. BOONE:  Yes.  I believe so.  Economic damages
 5    to cover the amount of time it might take Mr. Paris to
 6    recover from this devastating loss to his business.
 7              THE WITNESS:  Can I comment?
 8    BY MS. BOONE:
 9    Q.    Certainly.
10    A.    My understanding of the 5,000 figure was that it was
11    some sort of -- and again I'm not a lawyer so I don't
12    understand.  But I thought it was some kind of relatively
13    routine or a punitive -- penalty, rather, in lieu of
14    Mr. Smith being incarcerated.  That's the way I understood
15    it.
16          Clearly, the damage that I have experienced can't be
17    calculated by $5,000.  I don't know if -- maybe I'm
18    mishearing --
19    Q.    The 5,000 you believe to be punitive.  The 200 was
20    actual for repair of the website and once it was hacked, I
21    believe?
22    A.    Yes, but I thought it was a range of 200 to 5,000.
23    I'm willing to ignore the 200.
24    Q.    I understand.
25              THE COURT:  Are you still blaming Mr. Smith with
```

1    hacking your website?

2              THE WITNESS:  No.  In fact, I don't believe I

3    ever did blame him, but I think it was a supporter of his.
           **Paris inferred it.**

4    But we have done an internal investigation.  We actually know

5    it was a sympathizer.  But no.  I would say on the record it
     **And we come to find out Paris "hacked" his own website.**

6    was not Mr. Smith who hacked that website.

7              THE COURT:  All right.  Miss Boone, anything

8    else?

9              MS. BOONE:  No, thank you.

10             THE COURT:  All right.  Mr. Paris, you can step

11   down, sir.

12             You have another witness?

13             MS. BOONE:  I'd like to call Mr. Smith to the

14   stand.

15             THE COURT:  All right, Mr. Smith.  If you will

16   come forward and be sworn in, please.

17             MR. SMITH:  May I bring my material with me?

18             THE COURT:  Why don't leave it there for the time

19   being.  If she's got exhibits she'll show them to you.  If

20   you need material, I'll allow that.  Let's see what she says

21   first.

22             Do you solemnly swear or affirm that the

23   testimony you shall give in this cause shall be the truth,

24   the whole truth, and nothing but the truth, so help you God?

25             THE WITNESS:  I do.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1                      MARC SMITH,
 2   a witness, having been duly sworn to tell the truth, the
 3   whole truth and nothing but the truth, was examined and
 4   testified as follows:
 5              THE WITNESS:  I would like to remind the Court
 6   that I don't hear very well.
 7              THE COURT:  Everybody speak into the microphone,
 8   you'll be okay.  Tell us your full name and where you live,
 9   sir.
10              THE WITNESS:  My name is Marc Smith, and I live
11   in West Chester, Ohio.
12              THE COURT:  Miss Boone.
13                   DIRECT EXAMINATION
14   BY MS. BOONE:
15   Q.     Good morning, Mr. Smith.  Thank you for coming today.
16   Now, did you attend the mediation between yourself and Mr.
17   Paris on June 5th, 2015?
18   A.     Did I have what?
19   Q.     Did you attend a mediation with yourself and Mr. Paris
20   on June 5th?
21   A.     Yes, I did.
22   Q.     What was your motivation for -- first of all, was
23   there a settlement reached at that mediation?
24   A.     Yes.
25   Q.     What was your motivation for settling?
```

```
 1   A.      Make this all go away.  Make this lawsuit go away.

 2   Q.      Can you elaborate any further as to any details.

 3   A.      Other than that it was a very flawed mediation

 4   agreement.

 5   Q.      Okay.  But you agree that you reached that agreement

 6   and that you signed that agreement, and it was of your own

 7   free will; is that correct?

 8   A.      With the understanding that that ended everything,

 9   yes.

10   Q.      Thank you.  Can you now turn to Plaintiff's Exhibit 1.

11   It should be in that binder --  did you take the binder?

12              MR. PARIS:  I'm sorry.  ????

13              MS. BOONE:  I'll present to the witness

14   plaintiff's exhibit 1.

15              THE WITNESS:  Yes, that's the mediation

16   settlement agreement.

17   BY MS. BOONE:

18   Q.      And have you complied with those provisions?

19   A.      I believe I have.

20   Q.      How about 2D?  Can you read 2D?

21   A.      Which one?

22   Q.      2D.

23   A.      Two B as in baby?

24   Q.      D as in dog?

25   A.      2D as in dog?  Yes, I believe I shut down Elsmar.com
```

```
 1    as per this agreement.

 2    Q.      Would you please turn to exhibit --

 3    A.      Exhibit what?

 4    Q.      Three?

 5    A.      Three.

 6    Q.      Three.

 7    A.      Yes.

 8    Q.      Did you do this interview?

 9    A.      Yes, I did.

10    Q.      And was this --  do you consider this being out of the

11    ISO industry?  Do you consider this being out of the ISO

12    industry which is what is required by --

13    A.      Your question makes no sense to me because there is

14    nothing in the mediation agreement that says that I will get

15    out of the ISO industry.

16    Q.      Would you please turn back to the mediation Exhibit 1?

17    A.      Yes.

18    Q.      And read for the Court, please, 1D that you were just

19    looking at?

20            THE COURT:  You don't need to read it.  I have it

21    right here in front me.

22            MS. BOONE:  I'll read it the Court then.

23            THE COURT:  I don't need you to read it either.

24    Ask him a question if you have a question.

25    BY MS. BOONE:
```

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.      It clearly says here that you will not operate any

2    similar website in the ISO industry in the future.

3    Specifically, to the website as well -- going to the Elsmar,

4    however, shall retain all ownership as to Elsmar.com.

5            Then in Exhibit 6 -- sorry for flipping around here.

6    A.      Okay.  Now, you're jumping around here.  We went back.

7    We now know that the question you asked me was do I consider

8    myself out of the ISO industry.

9            Now, you have come back to the mediation agreement and

10   say that it doesn't say that.  All it says is, it says that I

11   will not operate another, quote, ISO website.  Okay.  So now

12   where are you jumping to and what is your question?

13            THE COURT:  Mr. Smith, she gets to ask the

14   questions.  You can answer them.  I can read the language

15   here.  The question was, do you consider -- the original

16   question was, was this interview connected with the ISO

17   industry.  That's a yes or no.  Was it or not?

18            THE WITNESS:  No, it was not.

19            THE COURT:  Okay.  You also don't think it's a

20   violation of 2D, I understand that.  What's the next

21   question?

22   BY MS. BOONE:

23   Q.      The next question is in Exhibit 6 at the bottom.  In

24   an e-mail you said that you did not have the right to

25   Elsmar.com or the name Elsmar, I believe?  Did you see that?

```
 1    A.    Yes.  In the mediation agreement it says that --  I
 2    believe --
 3            THE COURT:  It says you shall retain all
 4    ownership and rights relating to www.Elsmar.com.  Now, what's
 5    the question here?
 6            THE WITNESS:  Okay.  What's the question?
 7    BY MS. BOONE:
 8    Q.    The question is why did you tell -- this email --
 9    assuming you agreed that this email is correct -- to Arju
10    Bardaden (phonetic spelling); this is on Exhibit 6F, as in
11    Frank -- that, I do not own a mark on Elsmar.  I assume you
12    can use it if you want.
13    A.    I don't own the copyright or whatever on Elsmar.
14    Anyone who has contacted me over the years and said, hey, may
15    I use Elsmar to do whatever?  Yes, use it.
16    Q.    Do you believe that in the spirit of the mediation
17    agreement that term was meant to be the use of Elsmar in
18    general, that you would not be able to use that name?
19    A.    I don't even recall this Andre Bardaden.
20    Q.    You don't recall this e-mail?
21    A.    I don't recall it.  I can't say that --  ma'am, over
22    the years I have had a lot of people who wanted to use Elsmar
23    in different ways.  And I have always --  it's been the same
24    thing.  You want to use it, I don't claim the copyright on
25    it.
```

1    THE COURT:  You kept that same attitude since the

2    mediation settlement agreement?  If they contact you and say

3    they want to use it, you say fine, for whatever purposes they

4    want to use it?

5    THE WITNESS:  Your Honor, any time anyone

6    contacted me about using Elsmar -- if I had wanted to protect

7    it, I guess I could have done --  I don't know what it is, a

8    copyright or register it or whatever.

9    I --  Your Honor, Elsmar was a word that I found

10   -- well, I didn't find.  It was a street I grew up on in

11   Fort Thomas, Kentucky, and I chose that as a domain name

12   because I had never seen the word anywhere else.  But I

13   didn't copyright it.  Elsmar, my website, was not -- in fact,

14   it started as a hobby.

15   THE COURT:  Did you in response to this inquiry

16   from the gentleman apparently from Russia, did you give him

17   permission to use the Elsmar site?   **NO - To use the word/name "elsmar" in a domain name or otherwise. NOT the elsmar.com site.**

18   THE WITNESS:  I don't even recall, but --   I

19   would say probably yes.  Now, again, Your Honor, if we go

20   back to the mediation settlement agreement, it only talks

21   about www.Elsmar.com.  Okay.  And it says that I retain the

22   rights to that.

23   Now, this other one it says in Exhibit 6, it says

24   hello, Chris, I contacted Mr. Smith and asked him if I could

25   use the word Elsmar in my project.  He said I can use it.

1    See print screen.

2            Like I say, I don't recall, but as I said my

3    policy has been if someone wants to try and start a competing

4    forum, or they have whatever in this --  it says project, but

5    I don't specifically recall this, but I will say that if --

6    if he did contact me or she --  I'm sure I said yes.

7            THE COURT:  What was the project?  Excuse me.

8    What was his project?

9            THE WITNESS:  What was --  this person talking

10   about?

11           THE COURT:  Yeah, his project.  That's the term

12   you used.

13           THE WITNESS:  It's a term that I'm seeing here in

14   this exhibit.  I have no recollection of this specific

15   e-mail.  Or this specific person.

16   BY MS. BOONE:

17   Q.    <u>Do I understand you are freely giving the name Elsmar</u>

18   <u>to anybody who requested to use it?</u> **How could I refuse? I do not own a**
                                           **trademark on the word/name**
                                                    **"elsmar".**

19   A.    I'm sorry?

20   Q.    Is it my understanding that your testimony today is

21   that you have freely given the name Elsmar to anyone who has

22   requested to use it?

23   A.    Yes.

24   Q.    Did Mr. Paris request --  my client did request at

25   mediation that he be able to use the name Elsmar?

1    A.    I don't recall that in the mediation, and there's

2    nothing in the mediation agreement that refers to that.

3    Q.    So you do not recall denying my client to be able to

4    use the name Elsmar as a part of this mediation?

5    A.    The only thing that I denied during that mediation

6    agreement was to turn over the website to him.  Now, it

7    started out as a 1 to 2-hour mediation agreement supposedly,

8    which stretched out to something like seven hours.

9          The two lawyers sat down and scratched out -- they

10   just wanted to get home for dinner -- scratched out what I

     **Not to mention the mediator...**

11   considered a --  there it is.  It's right there.  So, yes, I

12   denied -- I wouldn't have given this man Elsmar.com or --

13   for love nor money.

14   Q.    So --

15   A.    Even that for him to buy it.  At one point I gave him

16   an opportunity to buy it lock, stock, and barrel for

17   $450,000.  He turned it down.  And after that I kept raising

18   the price because he kept bothering me so much.

19         Now, he calls it extortion, but he had --  I have the

20   e-mails to prove it.  He could have bought it for $450,000.

21   But by the time the mediation agreement came around that

22   meeting no, huh-uh.

23   Q.    So I understand it's your testimony --

24              THE COURT:  You don't need to have him repeat it.

25   I understand.  What's your next question?

```
 1    BY MS. BOONE:
 2    Q.    All right.  My next question is turning to Exhibit 8.
 3    Have you seen the document that is shown on this website
 4    before?
 5    A.    You want to know what the purpose of this document is?
 6    Is that what you're asking?
 7    Q.    First I want to know if you've seen it before?
 8    A.    I wrote it.
 9    Q.    You wrote it.
10    A.    Well, I marked it up.  This document right here when I
11    was first served with the lawsuit, this document right here
12    was the first thing that I did was I went through and marked
13    it up.
14          And then finally I got to the point where I believe it
15    is court docket document number 17.  I took my marked up
16    comments, put it all into my answer to the Court.
17          When I filed it with the Court again, it was out of
18    frustration being with the judge to consider the original
19    lawsuit because I considered it frivolous and totally
20    maliciously filed.
21    Q.    Do you know who posted this?  This Paris Oxebridge?
22    A.    I have no idea, and I knew nothing about what was
23    posted on Scribd until recently, and I think it was during
24    the telephone conversation that we had with the judge, and I
25    believe you all came up and made a statement, Your Honor, we
```

1    found documents on Scribd.  So you people were the first one

2    that brought it to my attention.

3    Q.     My question --

4    A.     That it was posted.  Now, after reviewing that and

5    after the phone call, I went and, yes, I saw someone had

6    posted the original lawsuit, if I remember.  And the exhibits

7    maybe and maybe my answer --  I can't remember what --  I

8    went, okay.  But it's there.  But again, I --  you let me

9    know it was there.

10   Q.     How could somebody have gotten ahold of this document

11   with your handwritten annotations on it?

12   A.     Because it was submitted.  I can't --  I can't

13   remember, but I think I submitted it to the Court, and it was

14   probably document number 61 or something where I was pleading

15   with the Court.

16   Q.     Thank you for bringing up number 61.

17   A.     I'd have to look --  again, I not being a lawyer, I

18   don't have my stuff here.

19   Q.     If you look at exhibit --

20   A.     I could look it up.  I filed a motion with the Court

21   to please review --  and I can't remember my exact words, but

22   I think I was saying, will you please re review this lawsuit

23   and --  I mean, and I had that --  that thing handy, scanned

24   it and submitted it the Court.

25              THE COURT:  Okay.  Wait for her question.

1    BY MS. BOONE:

2    Q.      Please turn to Exhibit 7, which I believe is

3    Document 61, exhibit A in the Court record, which is

4    presently --

5    A.      Seven, yes.

6    Q.      Which is presently under seal.

7    A.      Did what?

8    Q.      It's presently under seal this Document 61.  I'm

9    telling you it is.  I know that it is.

10   A.      Is it --

11   Q.      Do you verify this is Document 61?  And that those are

12   your handwritten marks?

13   A.      Okay.  Notice at the top of this --  it gives the case

14   number, but it has two documents filed by the Court.  It has

15   Document 1, which is entered --  the -- January --

16              THE COURT:  Have you got --

17              THE WITNESS: -- and this is --

18              THE COURT:  Mr. Smith, don't ramble here.  Okay?

19   What's your question, ma'am?

20   BY MS. BOONE:

21   Q.      My question that I was getting to -- I first wanted to

22   know if he verified this was the document.  Has he reposted

23   this sealed document somewhere on line?  Have you reposted

24   this document somewhere on line?

25   A.      Reposted it?

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Anywhere.  Posted it, shared it?

2    A.    I sent it to the Court.

3    Q.    Okay.                   .

4    A.    I submitted it to the Court.

5    Q.    So it is your testimony that you have not shared this

6    document that's under seal with anyone?

7    A.    I haven't shared documents with anyone.

8    Q.    This particular document.

9    A.    No.

10   Q.    Do you have any idea how Karen Rubino (phonetic) in

11   Exhibit 9 -- sorry to jump around again, but --  could have

12   gotten ahold of that document?

13   A.    Do I have any idea how what now?

14   Q.    How this --  if you look, it says Catherine Rubino.

15   Do you have any idea how she would have gotten ahold of this

16   sealed document?

17   A.    How she --

18   Q.    Would have received a copy of that sealed document and

19   then for it to be posted on line?

20   A.    Well, I'm sorry you have me confused here.  We are

21   starting at Exhibit 7.  Okay.

22   Q.    Uh-huh, yes.

23   A.    Okay.  Now, that was submitted to the Court.  Okay?

24         THE COURT:  Mr. Smith, let me jump in.  The

25   document number 61 is a sealed document, correct, the one you

1   are looking at there?  Docket 61 indicates sealed?

2            THE WITNESS:  I -- if I remember from Pacer, it

3   did --  it didn't specifically mention docket 61.

4            THE COURT:  Let's assume --  let's assume 61,

5   which is your marked up version which you submitted to the

6   Court, let's assume it was filed under seal.  Meaning it was

It was NOT filed under seal. It was available in PACER to the public for at least 7 days.

7   --  it was put into the private record of the court.

8            The question is, if that's the case, can you

9   explain how this woman who authored Exhibit 9 would have been

10  able to obtain that sealed document?

11           THE WITNESS:  A woman on Exhibit 9.  I see

12  Scribd.  And exhibit A.

13           And I don't know who Catherine Rubino is.  I see

14  this was from October 13th, and I have no idea how any --  I

15  mean, I did not release any documents to anyone.

16  BY MS. BOONE:

17  Q.    Thank you, Mr. Smith.

18  A.    Now, whether it came in and was not originally filed

19  under seal and then was filed under seal and someone got it

20  off of Pacer, I don't know.  I did see --  I remember one

21  entry where I went in, and it was a listing of documents on

22  Pacer.

23           THE COURT:  I don't need it.  I don't need it.

24  What's the next question?

25  BY MS. BOONE:

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1    Q.     You mentioned earlier about the joint stipulation.
 2    Can you please turn to Exhibit 2.  That is a copy of the
 3    joint stipulation and read for me paragraph --
 4    A.     Exhibit 2?
 5    Q.     Yes.  Paragraph ten.  Do you agree with that
 6    paragraph?
 7    A.     Yes.
 8    Q.     And that is your signature at the end of that joint
 9    stipulation?
10    A.     You what?
11    Q.     That is your signature at the end of the joint
12    stipulation?
13    A.     Yes, it is.
14    Q.     Thank you.
15           Let me consult with my client.
16    A.     It's not a pen and ink signature.  What it is is a
17    photograph that was posted into a PDF file.  This is a
18    document that --
19    Q.     But that is your signature?
20    A.     -- was submitted prior to it being revised, section
21    six, when Mr. Wohlsifer and I were on the telephone.  Section
22    6 was supposed to reflect the exact same thing as section 5
23    with the aspects of moderating posts on the Elsmar.com forum,
24    which did he not do.
25           He submitted that document differently, and I have
```

1    explained that in my response to you all in this joint

2    stipulation.

3              THE COURT:  Mr. Smith, the exhibit 2 is in fact

4    the agreement that you executed; right?  You claim there was

5    some other agreement, but this is in fact the agreement that

6    you executed?  You're not denying that; correct?

7              THE WITNESS:  I'm not denying that this is the

8    agreement that he submitted to the Court.

9              THE COURT:  How does it differ from the written

10   agreement that you signed?

11             THE WITNESS:  I never literally signed the

12   agreement.  Mr. Wohlsifer and I --

13             THE COURT:  Page four of four, Marc Smith,

14   signature above, Marc Smith, individually, and doing business

15   as Cayman Business Systems, that's your signature?

16             THE WITNESS:  I'm sorry?

17             THE COURT:  Page four, is that your signature?

18             THE WITNESS:  It's a copy of my signature, yes.

19             THE COURT:  You signed the original; correct?

20             THE WITNESS:  No.

21             THE COURT:  You did not?  Who signed your name to

22   this, sir?

23             THE WITNESS:  This is a picture of my signature.

24   It was pasted into the document.

25             THE COURT:  By whom?

SANDRA K. PROVENZANO, RPR   OFFICIAL UNITED STATES COURT REPORTER

```
 1                    THE WITNESS:  Me.

 2                    THE COURT:  Okay.  So it's your signature.

 3      Intended to be your signature; correct?

 4                    THE WITNESS:  If I understand it, this is a

 5      contract that we made up that was submitted to the Court and

 6      that legally it's not a binding contract.

 7                    THE COURT:  You can -- as I said, you can argue

 8      that later with Judge Kovachevich, but that is your --  it

 9      was added to this document by you to recognize your part of

10      the agreement; correct?

11                    THE WITNESS:  With the understanding that Mr.

12      Wohlsifer was going to be revising the PDF per our

13      conversation, which he did not do.

14                    THE COURT:  Okay.  I understand your argument

15      there.  All right.  Any other questions, Miss Boone?

16                    MS. BOONE:  Yes.  Just two more.

17      BY MS. BOONE:

18      Q.    What's the date on this joint stipulation?  Does it

19      say March 18th?  Is the active date -- effective date

20      March 18, 2015, for the joint stipulation on injunction?

21      A.    Okay.  We're back to the joint stipulation.

22      Q.    Yes.  Exhibit 2.  You have it in front of you already.

23      A.    Yeah, Exhibit 2.

24      Q.    The last page.  What is the date of signature?

25      A.    The date of the signature?
```

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Q.    Yes.

2    A.    The date on page four is March 18th of 2015.

3    Q.    Does that appear to be accurate?  Does that sound

4    accurate to you?

5    A.    I assume it is, yes.

6    Q.    Thank you.  Will you please turn to Exhibit 6 again on

7    the second page?  It's G, as in good, is the subsection,

8    second page?

9    A.    Which one?

10    Q.    Exhibit 6.

11    A.    Yes.

12    Q.    Second page, G as in good.  You'll see there is a box

13    from Linkedin?

14    A.    What I wrote on Linkedin on July 25th?  Is that what

15    you're asking about?

16    Q.    July 7th.

17    A.    Was there a what?

18    Q.    Yes.  July 7th.

19    A.    Oh, on July 7th on Linkedin?

20    Q.    Yes.

21    A.    Yes, I posted that.

22    Q.    Do you believe that that's in violation of what the

23    joint stipulation required?

24    A.    That's not my interpretation.

25    Q.    And --

1    A.    Please link it to the joint stipulation paragraph or

2    subparagraph or whatever.

3    Q.    Certainly.  One second.  It's 5C from the joint

4    stipulation, Exhibit 5C.  Smith will not publish any new

5    content about Oxebridge or Paris on the Elsmar.com internet

6    forum or any other website, social network, or any other

7    manner of technology or communication.  And it goes on.

8          However, on July 7th it appears that you again were

9    commenting about Oxebridge and Paris, and specifically about

10   this specific lawsuit.  To me that appears to be a direct

11   violation of that joint stipulation.  This occurred in July.

12   The stipulation was signed in March.

13   A.    The stipulation, the joint stipulation, only says --

14   are you referring to section five, subsection D?

15   Q.    C?

16   A.    C as in Charles?  Okay.  It says, Smith will not

17   publish any new content about Oxebridge or Paris on

18   Elsmar.com, internet forum or any other websites, social

19   network, et cetera et cetera.

20          Whether under his real name, anonymously or <u>sue</u> them ???

21   anonymously or through collaboration with a third party.

22   This statement here, Smith will not publish any new content

23   about Oxebridge or Paris.  Okay.  What's -- going back to

24   Exhibit 6, what's your question on that?

25               THE COURT:  Is it a statement of new content in

1    violation of the joint stipulation?  That's the question.

2              THE WITNESS:  My question is I don't believe I

3    violated it.

4              THE COURT:  Why not?

5              THE WITNESS:  I don't mention Chris Paris or

6    Oxebridge.  And for Mr. Paris to even begin to say anything

7    about, well, you can't mention the lawsuit for over five

8    months, he had posted on his website all about the lawsuit,

9    among other information and paranoid things like I was

10   collaborating with underwriters laboratories, DMV, all sorts

11   of -- supposedly I was some big ring leader involved with all

12   these other companies as large as underwriters laboratory.

13             I'm sorry.  To me he has paranoid delusions.

14   BY MS. BOONE:

15   Q.     Who are you referring to in these postings if it's not

16   Oxebridge and Paris?

17   A.     I'm sorry?

18   Q.     Who are you referring to in these postings if it's

19   not --

20   A.     Are you talking about July 7th?

21   Q.     Yes.

22   A.     Okay.  I made two comments, and I made them for a

23   specific reason.  It says, if you look here, don't be misled.

24   This was a civil suit, not a criminal lawsuit.  I made that

25   statement because Mr. -- starting in the fall of 2014,

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    Mr. Paris was posting on Twitter, and I have the evidence for

2    it, and on I think Linkedin that he was preparing for a major

3    extortion lawsuit, a criminal lawsuit.

4           He had a page on his website for over <u>five month</u>s that

5    was talking about a criminal lawsuit.  He wasn't saying

**Actually, over 6 months.**

6    civil.  He was maliciously citing it as a criminal lawsuit.

7    So I felt it was in my, okay, shoot me, send me to jail.  He

8    kept calling a criminal lawsuit.  It was a civil lawsuit.  He

9    was doing it maliciously.

10          So I said, do not be mislead.  This is not a criminal

11   lawsuit; this is a civil lawsuit.

12   Q.     Thank you, Mr. Smith.

13   A.     And everybody knew about the lawsuit from his website.

14   Everybody knew about the lawsuit, <u>not only from his website</u>

15   <u>but from when he started on Twitter in the Fall of 2014</u>

16   talking about, how, boy, he's going to get <u>me.</u>  He's got --

17   <u>law enforcement is engaged now.</u>  I have screen shots.

**(Marc Smith)**

18   Q.     Mr. Smith?

19   A.     He started this thing.

20          THE COURT:  Mr. Smith.  You got another question,

21   ma'am?

22   BY MS. BOONE:

23   Q.     Basically the same --

24          THE COURT:  No, I don't need it.  He explained

25   why he posted it.  It is what it is.  What else?

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MS. BOONE:  Just one second.

2     BY MS. BOONE:

3     Q.     And you acknowledge as well on the July 25th posting,

4     the one just below that exhibit, where it says Marc Smith.

5     Again, you are talking about Oxebridge and Paris?

6     A.     Which one now?

7     Q.     The one directly below, the image directly below

8     July 7th.  Now it's July 25.  Marc Timothy Smith.  Elsmar was

9     an Internet icon.  There was no Linkedin.  You are talking

10    about Oxebridge and Paris when you made that posting?

11    A.     I did not use the word Oxebridge, and I did not use

12    the word Paris.

13    Q.     It is your testimony to the Court that because you did

14    not use the words Oxebridge and Paris, that you believe you

15    could say whatever you want as long as you didn't say those

16    words?

17    A.     I believe that everyone knew that Chris Paris was

18    suing me.  I don't doubt --

19    Q.     How did they know?
      **Paris had been bragging about it since Fall 2014, and then on his website.**

20    A.     No.  I believe that I was following the letter of what

21    it said.  I'm not mentioning Chris Paris or Oxebridge, and I

22    didn't.  I mentioned the lawsuit that he had been advertising

23    for how long.

24    Q.     Thank you, Mr. Smith.  That's all.

25               THE COURT:  Okay.  Let's take about a ten-minute

1    break here.  Mr. Smith, when we come back you'll have the

2    opportunity to give any additional testimony you want to

3    give.  Okay?  So we'll take a break for ten minutes.

4                    COURT SECURITY OFFICER:  All rise.

5                    (RECESS IN PROCEEDING).

6                    THE COURT:  Mr. Smith, you wish to testify?

7                    MR. SMITH:  I would like to --

8                    THE COURT:  Simple question:  Do you want to

9    testify?  If that's true, if you are --  get up to the

10   witness stand again.

11                    You remain under oath.  Pull up close to that mic

12   and speak directly into it.

13                    MR. SMITH:  My name is Marc Smith.  I'm from Olde

14   West Chester, Ohio.

15                    First off, I'd like to start off and say that

16   when Mr. Paris was testifying he said that one of the aspects

17   of the mediation settlement agreement was that so we would

18   settle quickly so he could start his own forum, what he

19   called the O'forum (phonetic).

20                    The only time the O'forum that he's talking about

21   came up was after the mediation settlement agreement.  That

22   wasn't discussed there.

23                    What he wanted was Elsmar.com.  So I'm sorry.  He

24   is just outright lying.  That never came up in the mediation

25   **Aka Perjury**
     agreement.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    THE COURT:  Let me tell both parties, I'm going

2  to look at the mediation settlement agreement and the joint

3  stipulation in the plain terms of those, so this discussion

4  about things being omitted or intentions frankly are up for

5  another day.

6    In order to gauge whether or not I think there's

7  a violation, I am looking at those documents as worded.

8    MR. SMITH:  Great.  Because trying to fight some

9  of this is very, very weird.  In their complaint -- I'll go

10  through line item by line item is how I'll identify what I'm

11  referring to.

12    THE COURT:  Let me --  let me -- I do not need

13  you to read your response to me.  I've read your response as

14  you go point by point.

15    MR. SMITH:  The only testimony that I have to

16  give is what -- again, I assume that from what I was hearing

17  earlier that you guys received it.  It's in your system.  I

18  don't know what docket document number.

19    THE COURT:  What is that you are holding up, sir?

20    MR. SMITH:  This one here?

21    THE COURT:  What were you just holding up?

22    MR. SMITH:  It's a document that I submitted last

23  week, and I don't know whether it's in Pacer yet.

24    MS. BOONE:  Your Honor, it's sealed document 69.

25    THE COURT:  69?

```
1          MR. SMITH:  Those would have been in the 70s.

2          MS. BOONE:  I apologize.  76.

3          THE COURT:  76?  I have the full version of 76.

4          MR. SMITH:  If you have the full version of 76,

5   plus you have what looks like this complaint.  One exhibit's

6   annotated.

7          THE COURT:  If you filed it with Document 76, I

8   have got it.

9          MR. SMITH:  Then that's the only thing that I

10  want to testify as long as this is in the system.  I went

11  through each of the exhibits, and I went through line item by

12  line item and made my ~~representations~~ **responses** there.  If you have

13  them, I guess I shouldn't say this, but I just --  I hope

14  that you're going to read them.

15         THE COURT:  Okay.  You are accused basically of

16  three violations here.  Okay?  You are accused of violating

17  the provision that said you would remove any on line

18  commentary regarding Oxebridge or Paris authored by you on

19  any website, social network, or other manner of technology or

20  communication.

21         There was reference to a considerable amount of

22  information, negative information, from their standpoint

23  still up on Google.  What have you done to take down that

24  information?  Which originally comes from your website, as I

25  understand it, or comments made regarding your website.
```

1          MR. SMITH:  I -- if you -- for example, let me

2   find my main complaint or maybe it was in the exhibits.  Are

3   you referring to the Google groups listing where from 2004 --

4   I know -- I believe it was in Chris Paris's, one of his

5   responses, exhibits he lists, put in a big long list of

6   websites, and the majority of them were a Gmail group.

7          And here it is.  Exhibit I from his complaint

8   that I violated the joint stipulations.

9          There are -- if you look at my marked up copy of

10  the exhibits, I address each one of these.  Reddit.com as I

11  said earlier.  I copied his lawyer on trying to get that

12  removed --  get that stuff removed from Reddit.

13         I have the e-mails.  They got copies of them.  I

14  also copied them on the e-mails Reddit sent to me which

15  basically said, yeah, go ahead and try to sue us or something

16  because it ain't happening.  They even had a special page.

17  There was such and such a website.

18         THE COURT:  I asked you about Google.

19         MR. SMITH:  The Google thing was discussed as I

20  say in my marked up exhibit.  That was --  that was --  it's

21  actually in the mediation agreement, section one, subsection

22  1C.  Okay.  We discussed that, getting rid of those, and I

23  said I can't.  And Mr. Paris's lawyer said no problem.  All

24  we have to do is get you a letter.  You sign the letter, and

25  we'll get that stuff taken right off.  I never received such

1 a letter to sign.

2   THE COURT:  You said earlier in your commentary

3 that you had attempted to get Google to take it down.  I

4 asked you what did you do to take down negative information

5 about plaintiffs on the Google site.

6   MR. SMITH:  On the Google site there's nothing I

7 can do to get them to take it down because if you look at

8 these, what Google did -- and I don't remember much about the

9 group.  We're going back to 2004, Your Honor.  They -- what

10 they would do is they would go in and scrape --

11   THE COURT:  I don't need to go back to 2004.  In

12 the mediation settlement agreement as you just pointed out

13 specifically references Google.com.

14   And it says, sign a letter to be prepared by

15 plaintiffs' counsel, consenting to removal of Elsmar.com

16 postings referencing plaintiffs from the Google.com website.

17 You early on mentioned that you attempted to get Google to do

18 this, and you were unsuccessful.  I'm asking you what did you

19 do to take down the information that obviously was discussed

20 at the mediation on the Google site.

21   MR. SMITH:  It's getting confusing here because

22 again --

23   THE COURT:  I don't think it's confusing at all.

24 Okay?  The specific reference to information on Google.

25 Let's start this way.  Did you ever get a letter from

*[Handwritten margin note beside lines 2–4:] I did not! It was in the MSA that Paris' lawyer would take care of it.*

*[Handwritten note over line 16:] Which they still have not done.*

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

```
 1    plaintiffs' counsel that they composed requesting Google to
 2    take anything down?  Not as of 3 August 2016.
 3              MR. SMITH:  No.
 4              THE COURT:  Okay.  What did you do separate and
 5    apart to try to get Google to take the information that
 6    originally came from Elsmar.com down from Google?
 7              MR. SMITH:  I couldn't do anything.
 8              THE COURT:  Why not?
 9              MR. SMITH:  Your Honor, have you ever tried to
10    contact Google?  There is no phone call.  There is no e-mail
11    address that you can e-mail.  It takes a court order.  That's
12    why it was discussed.
13              THE COURT:  Let me back up.  I got my questions
14    out of order.  First question is did you attempt to do
15    anything to take it down, the information that Google gives
16    you?
17              MR. SMITH:  My understanding leaving the
18    mediation settlement agreement was that they would sign --
19    that the lawyers --  their lawyer would put together a letter
20    so I personally --  no, there was nothing.  I was waiting --
21              THE COURT:  The joint stipulation, 5B, you will
22    remove any online commentary regarding Oxebridge or Paris
23    authored by you on any other website.  My question is in
24    regards to that particular agreed provision, did you do
25    anything to take information down from Google?
```

```
 1              MR. SMITH:  There was --  we're into the realm of

 2    impossibility at this point.

 3              THE COURT:  I'm just asking you what you did to

 4    attempt it.  I'm not asking if it was successful.  What did

 5    you do to take the information down, to try to take the

 6    information down?

 7              MR. SMITH:  There was nothing I could do.  I did

 8    nothing.

 9              THE COURT:  Is that a way of saying you did not

10    do anything to try to take the Google information down?

11              MR. SMITH:  Yes.

12              THE COURT:  Okay.  And as of this day that

13    information that was originally on the Elsmar site remains.

14    If I go on Google and do the right search, it will pull up

15    and I can read it?

16              MR. SMITH:  I assume so.

17              THE COURT:  Okay.  All right.

18              MR. SMITH:  Again, Your Honor, this was discussed

19    at the mediation settlement agreement meeting, and they said

20    they would get me a letter because they knew it was

21    impossible.  It says so right in the mediation settlement

22    agreement.

23              THE COURT:  To the contrary the suggestion that

24    they would propose a letter suggests to me it is possible.

25              MR. SMITH:  They can do it through a court order.
```

**None of it was originally on Elsmar.com - It was from USENET.**

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

**No - It was on USENET. and ere is no way for me to ask/make Google take it down.**

 1          THE COURT:  And Mr. Paris says there's some

 2    particular form that Google allows you as the author or

 3    source of the information to complete that they will honor,

 4    and they will take down information.  Do you agree with that?

 5          MR. SMITH:  I'm sorry.  Run that past me again.

 6          THE COURT:  Mr. Paris says that Google uses a

 7    particular form whereby the author or source of information

 8    that they post can be taken down.  You fill out the form.

 9    You send it into them, and they'll respond by taking it down.

10          Do you agree there is such a procedure with

11    Google?

12          MR. SMITH:  No, not from this -- not from Google

13    groups.

14          THE COURT:  Why do you say that?

15          MR. SMITH:  Because there isn't.

16          THE COURT:  And when you use the term "Google

17    group," what does that mean?

18          MR. SMITH:  It's a Google thing.  Again, this was

19    from 2004.  Basically it's been abandoned.  There are a lot

20    of abandoned websites, web pages, and stuff that are still on

21    the Internet.  Again, this is from 2004.

22          THE COURT:  Let me ask you an even broader

23    question here.

24          In the joint stipulation which was the first

25    agreed upon document, you agreed that you would remove any

1    online commentary regarding Oxebridge or Paris which you

2    authored.

3         Can you point to anything that you did after

4    entering the joint stipulation to attempt to remove or take

5    down online commentary from any website?

6         MR. SMITH:  The -- yes.  For example, uhm, uhm,

7    there is a website that has been up for a long time which

8    indexes or does what they call scrape websites.  I went

9    through and wrote them, and they had caches of my website

10   going back quite a few years.  I believe they called it the

11   Internet archive.  I had to prove to them I was the one who

12   owned the website.

13        After I did that, they took all the information

14   down.  Took it completely away.  Ripoff Report, again, I, you

15   know, wrote them.  His lawyer was copied on it.  Ripoff

16   Report, they're not going to --  I have no -- he says they'll

17   do it if you file a DMCA.  Sir, I respectfully --  no.  The

18   reply I got from them was so sue us.

19        THE COURT:  Where are these replies?  Where are

20   these letters that you claim that exist to prove up what you

21   are saying about your efforts?

22        MR. SMITH:  Again, I -- my understanding is no

23   electronic devices.

24        THE COURT:  We're not going to use that in here.

25   We're not going to use that as an excuse.  I told you at the

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1    outset if you need these things, we'll make arrangements to

2    get them.  Okay?

3             We're not going to have that as an excuse down

4    the road that you didn't have an opportunity to present this

5    stuff.  We have had this hearing set for what, about 2 months

6    3 months?  If you need time to go get them, we'll give you

7    time to go get them.  But we're not going to use that as an

8    excuse here.  Understand?
         **How was I to know I would need all this information?**
9             MR. SMITH:  I understand.

10            THE COURT:  You want time to go get them?

11            MR. SMITH:  By the time I get everything up here

12   and try to get prepared, it would be tomorrow.

13            THE COURT:  Maybe.  Maybe.  I got all afternoon.

14            MR. SMITH:  May I respectfully request that --

15   that we --  if you want evidence --

16            THE COURT:  Listen, what I'm telling you is

17   you're not going to be able to complain down the road that

18   you weren't given the opportunity to present evidence.  It is

19   your choice what you present.  And we're not going to say,

20   well, they don't let you in with your computer here.  That's

21   not going to be an excuse because I'm telling you we'll get

22   your computer in.

23            We're going to break for lunch here before long,

24   and you can --  you can retrieve whatever you want, and we'll

25   re visit it.

```
 1              Let me ask you, in regards to this removal
 2   provision, which is in the joint stipulation, subsequent to
 3   that joint stipulation, there's allegations that you didn't
 4   comply with it.
 5              And that's what leads to the mediated settlement
 6   agreement; correct?  As I understand the order of things
 7   here?  Is that correct?
 8              MR. SMITH:  (Shrugs shoulders.)
 9              THE COURT:  After the joint stipulation there was
10   --  they complained you didn't comply with it, and so that
11   ultimately was resolved by way of the mediated --  the
12   mediation settlement agreement.  Is that the order of things?
13              MR. SMITH:  I guess.
14              THE COURT:  Well, the one is -- that you
15   indicated dated in March and the mediated settlement
16   agreement is when?  June.
17              So after the mediation settlement agreement,
18   which as we pointed out specifically mentions Google, what
19   actions did you take to take down negative information that
20   originally was sourced by you that was on either Google,
21   Reddit -- you've explained those two.
22              You basically said you tried but unsuccessfully.
23   Did you take any other actions to take down any of the
24   information that was agreed to in the joint stipulation -- as
25   agreed to in the joint stipulation?
```

1           MR. SMITH:  I took what actions I could take.

2           THE COURT:  All right.  The 5C provision in the

3    joint -- says that you will not publish any new content

4    about Oxebridge or Paris on Elsmar or any other website,

5    social network, or other manner of communication.  Pretty

6    broadly worded.

7           You did after the agreement -- I think I've heard

8    you say today you did after the agreement give interviews and

9    were responsible for postings that related if nothing else to
     **One interview.**

10   the lawsuit, which is -- if I understand your testimony, you

11   believe you could --  no?

12          MR. SMITH:  Your Honor, a girl from Document

13   Center called me and asked me what was going on, and I told

14   her I could not discuss anything about the lawsuit, that

15   there had been a settlement.  That was it.  I did not give

16   her or talk to her, or disclose to her any content of the

17   mediation settlement agreement.

18          And they have in their exhibits -- I didn't bring

19   it up with me, the entire interview.  It was basically an

20   interview of, okay, now that Elsmar's gone, what are you

21   going to go and do now.  She was writing it just as, for

22   example, I'm sure people have interviewed you.  And they have

23   come out with certain things that, you know --

24          THE COURT:  Let me get specific here.  Their

25   exhibit A on November 17, 2015, posting of summons and

**Were this true, I could not submit any document to the court.**

1  complaint on Scribd with handwritten commentary.  You agree

2  you are the one that wrote those handwritten comments on the

3  complaint, which was a matter of public record.

4        <u>Do you not think that that is a violation of the</u>

5  <u>5C where it says you will not publish any new content?</u>

6        MR. SMITH:  I have no idea how that document got

7  out.  Because --

8        THE COURT:  I thought you --

9        MR. SMITH:  All I thought --

10       THE COURT:  Listen to me.  November 17th, you got

11  the exhibit book up there?  Look at Exhibit 8.  My

12  understanding is that you authored that and you acknowledged

13  that --

14       MR. SMITH:  I'm sorry, which --

15       THE COURT:  Eight.  Eight.  What was your --  let

16  me ask it this way:

17       MR. SMITH:  Pardon?

18       THE COURT:  How did that get on Scribd?  You

19  acknowledged that the edited version there of the complaint

20  is what it is and you added the editing.  <u>How did it get on</u>

21  <u>Scribd?</u>  **Already extensively discussed herein and elsewhere.**

22       MR. SMITH:  I marked that up in the last week of

23  January, first week of February.  I see that it was filed as

24  Document 6 on 1/9/15.  That document right there as far as I

25  can tell was way before anything was sealed.

1    THE COURT:  Exhibit 8, a November 17, 2015,

2  posting of summons and complaint on Scribd.  It has your

3  handwritten commentary.  This is after the joint stipulation.

4  This is after the mediation settlement agreement this gets

5  posted on Scribd.

6        MR. SMITH:  I don't know, Your Honor.  I can tell

7  you that I believe there was something going on in Pacer

8  because this was also --  if I remember -- in fact, Mr. Paris

9  brought it up in his lawsuit.  There was a law site that

10  cited it and was going on about, well, if --  you know, if

11  you can only file a --  a rebuttal or an answer to a lawsuit

12  or something like that.

13        THE COURT:  How did Scribd get this document with

14  your handwritten notes on it?

15        MR. SMITH:  I don't know.

16        THE COURT:  Okay.  <u>Why would someone send it</u> --

17  <u>other than you -- why would someone send it to Scribed?  What</u>

Chris paris has many enemies, or mayby Chris

18  <u>might be the motive there?</u>    paris posted it himself to be able to accuse me

just as he defaced his own website.

19        MR. SMITH:  With your logic anybody who's an

20  enemy of him, I don't think you understand how many people

21  really don't like him.

22        THE COURT:  How about Exhibit 9?  I want you to

23  be very careful on this one.  Okay?  This is an October 13,

24  2015, post on Scribd.  Has handwritten commentary on it.

25  Now, that document was, <u>when filed with the Court, filed</u>

1   under seal, and apparently is still under seal.  So how would

**As stated earlier it WAS NOT filed under seal.**

2   it be that this woman, assuming it was a woman, would have

3   access to that sealed document to upload it to or post it on

4   Scribd?

5              MR. SMITH:  I cannot explain that.  As I said the

6   only thing that I can say is that considering Pacer it  was

7   leaked through Pacer.  I didn't leak any documents unless

8   someone hacked into my computer.

9              (Pause).

10             THE COURT:  Now, if I understand what was

11  testified to earlier, on at least two occasions you have

12  allowed others -- since these agreements, you have allowed

13  others to use Elsmar.  You consented apparently to this

**Clarification - Use of the WORD elsmar.**

14  person in Russia to use www.Elsmar.com.  Although I'm not

**As discussed earlier, I did NOT!**

15  sure that's the way they do it over there.  RU usually is

16  added somewhere.

17             Did you consent to that person using the website?

18             MR. SMITH:  I consented to two main things with

19  regard to Elsmar.  Number one, it's one of the few or was one

20  of the few websites with no copyright restrictions, was

21  copied free.  That meant you could copy anything from it.  I

22  won't complain.

23             I made it plain to all the posters that if you

24  post something, you can't claim copyright on it.  If someone

25  wants to copy it or paste something from Elsmar, they can do

```
 1    it elsewhere.  I used the same standard with regard to the

 2    use of the name Elsmar.

 3                 If someone contacted me and said, I wanted to --

 4    you know, I would like to use the word "Elsmar" in my

 5    website, my whatever, fine.

 6                 THE COURT:  I have heard about two instances

 7    today where apparently you did that.  One involves somebody

 8    in Russia wanting to use the www.Elsmar.com, and you agreed?
```
**I didn't. He would need me to transfer the domain name to him.**
```
 9                 MR. SMITH:  Mr. Paris, I would give him

10    permission right now if he wanted --

11                 THE COURT:  Just answer my question.  I don't

12    want --  I want you to answer my question.  Did you give this

13    person from Russia permission to use the website?
```
**Discussed - NO.**
```
14                 MR. SMITH:  I don't doubt that I did.  But I

15    don't specifically recall.
```
**The judge was hammering me so hard at this point that I was totally confused.**
```
16                 THE COURT:  And then there was apparently

17    somebody wanted to use Elsmar in connection with a project, I

18    think you said.

19                 MR. SMITH:  I believe you are referring to the

20    same one.  That's that person in Russia.

21                 THE COURT:  Okay.

22                 MR. SMITH:  But I don't --

23                 THE COURT:  What was his project?

24                 MR. SMITH:  Sir?

25                 THE COURT:  What was his project?
```

1    MR. SMITH:  I don't recall.

2    THE COURT:  Was it an ISO related project?

3    MR. SMITH:  I have no idea.  I don't recall.

4    THE COURT:  Have you ever checked to see <u>how he</u>

5    <u>is using www.Elsmar.com in Russia?</u>

6    MR. SMITH:  Have I ever --

7    THE COURT:  Checked to see how he is using that

**He wasn't using www.elsmar.com! He wanted to start**

8    website in Russia?   **his own website, which he did, which is www.elsmar-forum.com - it's none of my business how he uses it.**

9    MR. SMITH:  Abused --

10   THE COURT:  Using it.  <u>How he is using it.</u>

**Now that I look, it's a general Quality Assurance website.**

11   MR. SMITH:  I'm totally mystified.  The only

12   thing that I had with Elsmar is Elsmar.com, www.Elsmar.com.

13   THE COURT:  Which you apparently -- let's assume

14   this is accurate -- <u>you allowed somebody from Russia to use</u>

15   <u>that?</u>          **"Communist" Dog Whistle Comment...**

16   MR. SMITH:  <u>No.</u>

17   THE COURT:  Have you since followed up and seen

18   how he is using that in Russia? **No - I have not.**

19   MR. SMITH:  Anyone who asked me whether or not

20   they could use the word "Elsmar," I say no problem, use it.

21   <u>I have no copyright on it.</u>  I have no claim it to or on it.

22   If you want to use Elsmar -- and a lot of people did over the

23   years because they felt they could set up a website and get a

24   lot of traffic by getting searches on Elsmar.

25   THE COURT:  <u>Now you want to answer my question?</u>

**I did!**

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  <u>After you granted permission</u>, and let's <u>assume</u> this is

2  accurate.  Let's assume you granted this individual, whoever

3  it is, <u>permission to use www.Elsmar.com for his own purposes.</u>
   **Over discussed - I didn't!**

4  Did you ever follow-up on that and see how that person was

5  using it?

6          MR. SMITH:  No.  I've never followed up on any of

7  that stuff.

8          THE COURT:  Okay.  We're going to break till

9  1:30.  I'm going to give you the opportunity to go to your

10 car.  We're going to notify the front desk that you may bring

11 in a computer and your cell phone.

12         MR. SMITH:  Sir, before I came down here I

13 checked.  It said no computers, no stuff.  If I was going to

14 go through and start trying to get stuff, e-mails and

15 everything, they're all up in Cincinnati on my big computer.

16 I have mainly some court documents and stuff like that on my

17 computer here.

18         The only thing that I could ask of you would be

19 that if you want some sort of proof or something, that you

20 put this thing into continuance, tell me what proof you want,

21 I'll send it to you.  If not, I am at the point now, to be

22 honest with you -- I'm no lawyer.  You know that.

23         THE COURT:  Are you basically --  are you telling

24 me you don't have anything in your car, and I should not take

25 a break --

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          MR. SMITH:  No.  I have an old Compaq computer.

2     It's a portable that I bought probably in 2006, and I don't

3     keep e-mails on -- my e-mails and stuff on it.

4          THE COURT:  You don't have anything useful on

5     this computer that you brought down.  Is that what you're

6     saying?

7          MR. SMITH:  Other than court documents and stuff

8     which I put on a USB stick.

9          THE COURT:  Okay.  All right.

10         MR. SMITH:  I thought I had answered what was

11     necessary by going through the complaint line item by line

12     item telling my story by annotating the exhibits that they

13     put in there.

14         THE COURT:  For instance, if you had proof today

15     that you attempted to contact Reddit in writing, and did so

**The evidence was submitted to PARIS/OXEBRIDGE many months ago.**

16     in writing --

17         MR. SMITH:  I'm sorry?

18         THE COURT:  If you had proof today, either

19     through e-mail or written correspondence, that you attempted

20     to get Reddit to take down information, that would be useful

21     to your position.  Surely you should have recognized that.

22         Similarly, if you had any such requests of

23     Google, which I heard you to say earlier you did make the

24     request of Google but to know avail, those would support your

25     position, you know.  And so I am mystified that you would not

**That was all submitted long ago in documents to the court.**

SANDRA K. PROVENZANO, RPR   OFFICIAL UNITED STATES COURT REPORTER

1   bring those with you to corroborate your position.

2         Because when we talked about this case earlier,

3   we noted that you could proceed by way of testimony,

4   affidavits, exhibits.  And I required that the exhibits be

5   exchanged, I think, five days prior to hearing or whatever it

6   was.  So I'm mystified that you wouldn't have put that

7   together.

8         They accuse you of not taking steps to take

9   information down.  You are telling me you would have proof

10  that you did.  Where is the proof is my inquiry right now.

11        Because apparently Reddit hasn't taken anything

12  down.  Apparently Google hasn't taken anything down.  Maybe

13  in part it's their fault because they didn't send you a

14  letter to sign off on.  But these are the allegations I'm

15  looking at.  That's the concern that I have.

16        This hearing's been sent for months as we talked

17  about it, and yet you're complaining, well, you left them in

18  Ohio.

19             MR. SMITH:  Well, sir --  I --

20             THE COURT:  We're not making progress having this

21  little tête-à-tête.  What else do you want to testify about?

22             MR. SMITH:  It sounds to me like you made your

23  judgment.

24             THE COURT:  I haven't made a judgment on

25  anything.  I am concerned about the fact that you haven't

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1  taking the opportunity to perhaps bolster your case by

2  bringing evidence that would back up your testimony.  I'm

3  mystified that you didn't since you knew what this was about.

4          The effort here is to hold you in contempt and to

5  remedy it with some punitive measures.  So let's go back to

6  your testimony.  What else would you like to say in the face

7  of their allegations?  If anything.

8          MR. SMITH:  There have been so many

9  mischaracterizations and lies that as far as I'm concerned at

10  this point, as I say, I didn't bring a bunch of stuff.  I

11  thought what I submitted to the Court would be sufficient.

12          If you want to come down to it, when I was going

13  through this back when I briefly had a lawyer, and I even

14  marked up, for example, I got back from the mediation

15  agreement --  mediation agreement on Sunday.  I started going

16  down and line item by line item, put the date on it of what I

17  did, and the date I did it.

18          I don't know if I have that with me or not.  I

19  sent a copy to my lawyer to show him I was doing things.

20  There was some things that were hard to get off of a couple

21  of websites, for example, I think Twitter was one.

22          What I started doing was I have a capture program

23  on my home computer, so I would start from capture and it

24  would make a movie.  And I have, I don't know, four or five

25  of them where I went through and you can see me going in and

SANDRA K. PROVENZANO, RPR   OFFICIAL UNITED STATES COURT REPORTER

1    going through the steps of deleting it.

2            Now, I didn't think this hearing was going to be

3    that broad a deal.  I thought what I submitted to you, to the

4    court, was submission --  was sufficient to -- for what was

5    going to happen.

6            THE COURT:  Miss Boone, let me ask you, after the

7    mediation settlement agreement, did your firm submit a letter

8    of request directed toward Google consistent with -- what is

9    it -- exchange of consideration, subparagraph C?

10           MS. BOONE:  I do not recall, Your Honor.  But I

11   could find the answer for you quickly.

12           THE COURT:  What?

13           MS. BOONE:  I do not recall, Your Honor.  As I

14   was not the counsel on the case at that time.  But I could

15   find out quickly.

16           Would you like me to find evidence of that

17   letter?

18           THE COURT:  Yes.  If you requested that he do so,

19   he was obligated to sign off on the letter.  And then I

20   assume once he did so, you would have submitted it to Google,

21   and we wouldn't be concerned about what's still up on Google.

22           MS. BOONE:  I request a break at some point that

23   I can seek that evidence.

24           THE COURT:  Okay.  Mr. Smith, anything else you

25   wish to testify about?

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1        MR. SMITH:  No, other than I think you should go

2   ahead and make a decision, charge me with whatever, let me

3   get back to Ohio.  I can see this is going to go nowhere.

4        THE COURT:  When are you planning on returning to

5   Ohio?

6        MR. SMITH:  As soon as I get out of here, unless

7   you send me to jail.

8        THE COURT:  Okay.  Well, you are not going to

9   jail today, sir.

10       I'm going to allow you seven days to submit to

11   the Court any proof that you have written proof of efforts to

12   have Reddit or Google take down information that shouldn't

13   have been there.  **Which I did.**

14       MR. SMITH:  How do you want videos?  Do you want

15   them on DVD or can they be sent by USB sticks or --

16       THE COURT:  I assume that we're talking about

17   written communication.  I want to see copies of the written

18   communication.  That's what I understood you to say that you

19   did.

20       MR. SMITH:  I have written communication, but,

21   sir, like I said, I went through and took screen caption

22   movies.

23       THE COURT:  I'm mainly interested in right now in

24   Google and Reddit.  You claimed that you've made efforts.  I

25   want to see proof of those efforts.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1              Miss Boone, I'm going to direct that you check
2    your files and see if in fact they reflect a letter as
3    referenced in the mediation settlement agreement was ever
4    prepared by your firm and submitted to this gentleman for his
5    signature.
6              MS. BOONE:  Thank you.
7              THE COURT:  And if so, what happened thereafter?
8              MS. BOONE:  Thank you.  We also request that we
9    be given the same opportunity to present evidence that we
10   have that Mr. Smith did not take steps with Reddit and Google
11   to remove.
12             THE COURT:  What might that look like?
13             MS. BOONE:  I believe we have correspondence
14   between Mr. Paris and Google and Reddit.
15             THE COURT:  You can submit that as well.  Copies
16   of that as well.
17             MS. BOONE:  Thank you.
18             THE COURT:  That's it.
19             MR. SMITH:  I have one last question.  How can I
20   obtain a transcript of this hearing?
21             THE COURT:  Talk to the court reporter.
22             MR. SMITH:  I'm sorry?
23             THE COURT:  You can talk to the court reporter.
24   This nice young lady will give you a price, and you arrange
25   to pay her that, and she'll get you a copy of the transcript.

SANDRA K. PROVENZANO, RPR  OFFICIAL UNITED STATES COURT REPORTER

1          All right.  That's it.  Thank you.  We'll await

2    for this additional information, and you have to do this on

3    an R & R basis.  You should not expect to see anything before

4    April.  We've got a number of things ahead of you on our

5    docket that we need to get out of here.  But we'll get it to

6    you as soon as we can.

7          MS. BOONE:  Thank you, Your Honor.

8               (Proceeding adjourned.)

9          I CERTIFY that the foregoing is a true and

10   accurate transcription of my stenographic notes.

11   Dated:  03/26/2016.

12

13               ___/s/ Sandra K. Provenzano_____
                 SANDRA K. PROVENZANO, RPR
                 Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25