UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| OXEBRIDGE QUALITY RESOURCES INTERNATIONAL, LLC, and CHRISTOPHER PARIS, Individually | CASE 8:15-cv-00011 |
| Plaintiffs v. | |
| MARC SMITH, individually, and d/b/a CAYMAN BUSINESS SYSTEMS | |
| Defendants | |

**MOTION FOR CONTEMPT AND SANCTIONS AGAINST MARC SMITH FOR VIOLATION OF COURT ORDER GRANTING THE AMENDED PRELIMINARY INJUNCTION AND JOINT STIPULATION ON INJUNCTION**

Plaintiffs, Christopher Mark Paris and Oxebridge Quality Resources International, LLC, through undersigned counsel, (collectively herein referred to as "Plaintiffs") and files this MOTION FOR CONTEMPT AND SANCTIONS AGAINST MARC SMITH, D/B/A CAYMAN BUSINESS SYSTEMS FOR VIOLATION OF COURT ORDER GRANTING THE AMENDED PRELIMINARY INJUNCTION AND JOINT STIPULATION ON INJUNCTION (hereinafter "Preliminary Injunction"), and in support thereof states the following:

**INTRODUCTION**

Plaintiffs respectfully request that the Court find Defendant Marc Smith (hereinafter "Smith") in contempt of court, order that Smith comes into immediate compliance with the Court's Order[1], and orders the Defendant to file a status report on

---

[1] At the time of filing, Marc Smith updated infringing website Oxebridgequalitylawsuits.com with hundreds of new documents, which are not included in this Motion, but will be preserved for an Order to Show Cause Hearing.

1

compliance each day until the Defendant is in full compliance with this Court's Preliminary Injunction, and fine Defendants the sum of $1,000 for each day in which Defendant remain out of compliance with this Court's Order. Plaintiffs' motion for civil contempt sanctions is made pursuant to the inherent authority of the Court on the ground that the Defendant is presently violating the Joint Stipulation on Injunction and Order Granting the joint stipulation regarding the Amended Preliminary Injunction ("Preliminary Injunction"), (Dkt. 33) and (Dkt. 35), respectively. *See Stone v. City and County of San Francisco*, 968 F.2d 850, 856 & n.9 (9th Cir. 1992).

## BACKGROUND AND STATEMENT OF FACTS

### i. BACKGROUND

1. This case was first filed in 2015 by Plaintiffs Oxebridge Quality Resources, LLC ("Oxebridge") and Christopher Paris ("Paris").

2. Oxebridge provides quality management systems standards, designed to help organizations ensure that they meet certification standards for third party audits within particular industries, such as aerospace.

3. In addition, Paris acts as watchdog and whistleblower in the aerospace quality field, and has provided reports on waste, fraud and abuse directly to Inspectors General at the US Dept. of Defense, US Federal Aviation Administration, NASA and other government agencies.

4. Paris runs the website www.oxebridge.com, which essentially functions as a media outlet, with news articles and opinion pieces written by Paris and others.

5. The Oxebridge website was launched in 1999.

6. Defendant Marc Smith was a consultant and direct competitor of Paris and

    Oxebridge Quality Resources. Smith operated his consulting firm and his website at www.elsmar.com out of a home office in Ohio.

7. Smith called the Elsmar site the "Cayman Cove" and frequently used an image of a Cayman Islands property to digitally "sign" his publications.

8. In January 2000, Smith began an unprovoked campaign of defamation on the Usenet Newsgroup "Misc.Industry.Quality" which falsely accused Paris at first of spamming and commercial fraud.

9. The Usenet Newsgroups were subsequently purchased by Google, and now appear as "Google Groups," but with the same content. As a result, they continue to appear on the internet, and Smith's original materials still remain published.

10. At the same time, beginning in 2000, Smith cross-posted much of the material on his website at www.elsmar.com, called the "Elsmar Cove," one of the largest forum boards in the ISO and quality industry, of which Smith is the sole administrator and owner.

11. In addition to continuing to publish defamatory material on the Elsmar site, Smith has created a number of new websites solely dedicated to defaming Paris and Oxebridge. These were created both concurrently with the prior Court Orders as well as subsequently to them.

12. Smith claims now to be retired. However, if this is true, he is still churning out defamatory material at a near record pace and has ramped up personal attacks on the Plaintiff despite already having been sanctioned by this Court for doing so (See Dkt. 120).

13. Smith's contention is that he is not involved in the defaming sites. However, as outlined below it is simply an impossibility that he is not personally involved or complicit with other actors in defaming the Plaintiffs in violation of the Joint Stipulation.

## CASE HISTORY

14. On March 23, 2015, The Honorable Court entered an order (Dkt. 35), which approved a joint stipulation (Dkt. 33); the Motion for Preliminary Injunction and Amended Motion for Preliminary Injunction were granted. The Order is attached (EXHIBIT 01). However, Defendant has continued to breach the Court Order:

Paragraph 5(a)-(c) of the Joint Stipulation on Injunction:

5. SMITH agrees to refrain from publishing commentary on the personal, professional, business or other affairs of PARIS and OXEBRIDGE. More specifically:

   a. SMITH will remove all posts, links and other subject matter mentioning OXEBRIDGE or PARIS currently on the Elsmar.com Internet forum. Such removal must be permanent so that the posts, links and other subject matter cannot be retrieved or revived at a later date.

   b. SMITH will remove any online commentary regarding OXEBRIDGE or PARIS authored by SMITH on any other website, social network, or any other manner of technology or communication now known or later to become known.

   c. **SMITH will not publish any new content about OXEBRIDGE or PARIS on the Elsmar.com Internet forum, any other website, social network, or any other manner of technology or communication now known or later to become known, whether under his real name, anonymously or pseudonymously, or through the collaboration of any third party.**

(Dkt. 33)

## SMITH WAS ALREADY SANCTIONED FOR VIOLATING THE PRELMINARY INJUNCTION

15. Smith was previously found in contempt for Violation of the Amended Preliminary Injunction and ordered to pay attorney's fees (Dkt. 120) and a symbolic $1,000 fine.

16. Despite this, Smith has shown no respect for the Court and has continued to openly flout the court's orders, infringing on Plaintiff's trademark, writing libelous content, and cybersquatting on various infringing domains. The Oxebridge trademark is attached (EXHIBIT 02).

17. Since the inception of this lawsuit to the present, Smith has operated multiple websites targeting the Plaintiffs, including www.oxebridge.co, www.osteinfo.com, and www.oxebridgequalitylawsuits.com (See attached EXHIBIT 03, "Declaration of Paris"). The Court has retained the right enforce the terms of the joint stipulation on injunction. This Motion is just now being brought after additional years of flagrant abuse by Smith as highlighted by the following:

### SMITH CREATES OXEBRIDGE.CO WEBSITE TO DEFAME PLAINTIFFS

18. Approximately, eighteen months after the Court entered the Preliminary Injunction, on October 19, 2016, Smith registered the domain name "Oxebridge.co" under the email address peachfarmllc@neomailbox.ch, according to official WhoIs records obtained from Domaintools.com. This site infringed the Plaintiffs' trademark and posted all sorts of defamatory content about the Plaintiffs.

19. The Oxebridge.CO site also infringes on www.oxebridge.COM, which is trademarked (See attached Exhibit 2).

5

20. The official Whois records for Oxebridge.CO show peachfarmllc@neomailbox.ch as the Technical Contact, Registrant and Billing Contact for Oxebridge.co (see EXHIBIT 04). At the same time, Smith used the email address peachfarmllc@neomailbox.ch for technical support issues for his commercial website elsmar.com. See screenshot from Elsmar.com website (EXHIBIT 05).

21. Emails sent to peachfarmllc@neomailbox.ch were personally answered by Smith.

22. On July 6th, 2017, an Elsmar user "QATC101" wrote to the Elsmar tech support email address in order to reset a lost password, sending the email to peachfarmll@neomailbox.ch. The user received a response not from peachfarmllc@mailbox.ch, but instead from Marc Smith's personal email address elsmarmarc@gmail.com (see EXHIBIT 06).

23. Also, the email address elsmarmarc@gmail.com is the same address filed with the Court as Smith's personal email used for electronic service of court filings, and is on record with the Court as such. The address was used personally by Smith to communicate with Paris directly through many emails over a two-decade period (one such example is attached, EXHIBIT 07).

24. A search performed in Google on May 3, 2019, shows the Google user name "elsmarmarc" as belonging to Marc Smith. Google Gmail addresses are formed by joining the Google user name with "@gmail.com," meaning that "elsmarmarc@gmail.com" can only be associated with the Google user name "elsmarmarc" (See EXHIBIT 08 and EXHIBIT 09). Smith's PayPal account is also associated with the email address elsmarmarc@gmail.com (see EXHIBIT 10). Smith used the same email address when registering his Elsmar.com website; see official Whois filing, (see EXHIBIT 11).

25. The evidence herein thus shows Smith as the registrant of the Oxebridge.co

website.

26. The website at Oxebridge.co consisted of dozens of unique pages and hundreds of PDF attachments, all focused on defaming Plaintiffs. The site stated that its purpose was to "expose" Paris. The attached exhibit is included as an example of the defamatory content included on that site (see Exhibit 12). The single page includes multiple false and defamatory statements, presents content originally appearing on the Oxebridge site, and is "signed" by the same graphic of a Cayman Islands property typically used as a signature image on Smith's Elsmar "Cayman Cove" publications. This is simply one example of many.

### SMITH CREATES A MIRROR SITE OF OXEBRIDGE.CO AT OSTEINFO.COM

27. Shortly after Smith registered Oxebridge.co he mirrored the identical information to the site osteinfo.com, which was previously owned by Smith.

28. Material published on Oxebridge.co was simultaneously republished – or "mirrored" – on the Osteinfo.com website, thereby doubling the publication power and reach of the material.

29. The website at Osteinfo.com consisted of dozens of unique pages and hundreds of PDF attachments, all focused on defaming Plaintiffs. The site stated that its purpose was to "expose" Paris. The attached exhibit is one example of defamatory content on that site (See EXHIBIT 13).

30. When creating a website an index file needs to be created and the index file is the root directory of a website; it is the main page that links the rest of the website's pages, frames, creates the Meta header, and defines the default page, and often this page is not seen by viewers,

but rather, it normally runs in the background of a website unless the webmaster defines it otherwise. The back end of this index page which carries the Meta Header information is created by the webmaster. As per a web analysis tool run at [wikiwww.me](wikiwww.me), which runs analytics on traffic, performance, web host and content analysis, the same index file was used to build both websites: Osteinfo.COM and Oxebridge.CO. The webmaster had never changed the Meta Header description (See EXHIBIT 14). It is clear from the attached exhibit that the both websites are identical.

31. Both sites were comprised solely of defamatory material about the Plaintiffs, and had no other purpose for publication, commercial or otherwise.

### SMITH OPENS OXEBRIDGEQUALITYLAWSUITS.COM

32. In July 2018, Smith registered a third website at www.oxebridgequalitylawsuits.com. This site repeated much of the information appearing on the prior sites Oxebridge.co and Osteinfo.com, including identical graphics, but it included new defamatory content. This site also infringes on the registered Oxebridge Trademark.

33. The site undergoes regular updates, approximately once or twice per month, with the site's date changed to reflect the updates. These updates typically include new and increasingly flagrant defamatory information about Paris and Oxebridge.

34. The site at oxebridgequalitylawsuits.com continues to operate as of this filing, with the most recent update being seen as of December, 2019. Currently, much of the defamatory content has been removed from the site.

35. For the registration of www.oxebridgequalitylawsuits.com, Smith was careful not to use any email address traceable back to him. However, on January 31, 2019, Paris wrote a formal cease and desist letter regarding the site, sending the letter to Smith via his email on

Court record at elsmarmarc@gmail.com. Within a few days, the email was republished on the oxebridgequalitylawsuits.com website, indicating Smith either republished it personally or provided it to the owners of the website (see EXHIBIT 15, page 2).

36. Regardless if Smith authored the page or not, Smith is specifically prohibited from colluding with any third party in the publishing of material about Paris, under the terms of the Court Order:

> **SMITH will not publish any new content about OXEBRIDGE or PARIS on the Elsmar.com Internet forum, any other website, social network, or any other manner of technology or communication now known or later to become known, whether under his real name, anonymously or pseudonymously, or through the collaboration of any third party.**
>
> **Dkt. 33**

37. It is therefore abundantly clear that Smith is either collaborating with a third party or posting the content himself on Oxebridgequalitylawsuits.com.

38. Furthermore, the site as it appeared on April 18, 2019, included a claim that an interview with Marc Smith was underway, saying, "Marc Smith's Interview Responses – IN-PROCESS (Expected in July 2019), providing evidence that Smith was personally interacting with, and in contact with, the website's alleged owner (EXHIBIT 16, page 1.)

39. Furthermore, the site included a claim that Smith settled this case "Obviously agreed to by Smith because of COSTS," something that would only be known by Smith himself, personally (EXHIBIT 15, page 5).

40. The site's pages also feature court documents hand-marked by Smith personally (see EXHIBIT 15, pages 4-5.) In addition, the pages include multiple documents promoting Smith personally, including his CV, list of client testimonials and more.

## SMITH CONTINUES TO DEFAME PLAINTIFFS ON ELSMAR.COM

41. The instant lawsuit was prompted by defamatory material published by Smith on his primary commercial website www.elsmar.com dating back to January 2000.

42. Flouting the court orders, Smith has continued to publish defamatory material on the Elsmar.com site, under his own name, and did so during and after the court's rulings.

43. To comply with a mediated settlement agreement in which Smith promised to sell the Elsmar website in order to reduce a damages payout, Smith claimed to have sold the website to "John Peachfarm." This appears to be a pseudonym for Smith in order to comply with those settlement terms; Smith continues to maintain that "Peachfarm" owns and operates his site. Despite this, the content on the Elsmar site is clearly written by Smith, who uses the first person ("I") when writing content. The site furthermore continues to market Smith's consulting services, including one page entitled "Marc Timothy Smith - Accolades - Elsmar Cove" (see EXHIBIT 15); on another page on the Elsmar site, Smith uploaded his personal credentials, all showing his name (see EXHIBIT 18); on yet another page (see EXHIBIT 19), Smith uploaded "specifications" and claimed to be an expert, writing in the first person. As a result, it is clear the Elsmar site is still the sole product of Smith, despite his claims of having sold it.

44. Per the publish postings made on the Elsmar discussion forum, Smith remains the sole Administrator of the website, and sole technical support contract.

45. Smith's site utilizes an internal search engine provided by DuckDuckGo, a competitor to Google. The search feature appears on the Elsmar site including on the home page at www.elsmar.com, where the link reads "Search ALL of the Elsmar Cove."

46. The search engine returns excerpt results from the "moderator-only" forum board which is not visible to the public ordinarily; the search results show an excerpt of the actual content, even though the full content cannot be viewed unless one is logged in. The search excerpts, however, are visible to anyone. A search for "Oxebridge" conducted on April 12, 2019 returned results in excerpts that stated "Note that Christopher Paris of Oxebridge continues to keep truly "Fake News", written in "Tabloid" style, posted" (see EXHIBIT 20). A separate DuckDuckGo search for the term "Oxebridge" on the Elsmar site performed on April 9, 2019 show Marc Smith as the author of several posts about Paris (see EXHIBIT 21). This content would thus have been published since the original Court Order, and not prior to it, showing Smith had been actively defaming Paris on the Elsmar site in spite of the Order.

### ADDITIONAL DEFAMATORY CLAIMS MADE ON OXEBRIDGEQUALITYLAWSUITS.COM

47. The full amount of defamatory material contained on the Oxebridgequalitylawsuits.com website is voluminous, as the site is comprised of over 50 unique HTML pages, including over 200 separate PDF file attachments and hundreds of images. While the Plaintiffs' do not need to prove defamation here, the following is cited merely as an example of the libelous content that is damaging plaintiff's business.

48. On May 3, 2018, screen capture of the Oxebridge Quality Lawsuits website (see EXHIBIT 22), Smith made the claim, "Mr. Paris is a fraudster" and "Mr. Paris is obviously a

pathological liar, at a minimum, in addition to his attention seeking behavior in general." In general, the site falsely accuses Paris of innumerable crimes, fraud, deception, and more, while declaring the site as presenting "facts."

49. The site includes Smith's attempt to continue his original feud with Paris from 2000, by re-publishing Smith's original defamatory materials from the Usenet Newsgroups, in defiance of the Court Order which demanded Smith remove the materials.

## COPYRIGHT INFRINGEMENT ON OXEBRIDGEQUALITYLAWSUITS.COM

50. The oxebridgequalitylawsuits.com website infringes on the copyright of Oxebridge by reproducing material taken without permission from the Oxebridge website. This includes a copy of the Oxebridge Client Reference Pack republished without permission, which includes graphics from Oxebridge clients (including SpaceX, ELG, and New Pig Corp), all without permission as well. This is evidence from a Google search of images on the "oxebridgequalitylawsuits."  If the link below is copied and pasted it reveals hundreds of documents which are licensed and owned exclusively by Oxebridge. (https://www.google.com/search?q=site:oxebridgequalitylawsuits.com&pws=0&gl=us&source=lnms&tbm=isch&sa=X&ved=0ahUKEwiju9XQsNfhAhUIy1kKHdBOC1wQ_AUIDigB&biw=1280&bih=578#imgrc=oPQ9KPW3jnHnGM: )

51. Not only are the documents and images copyrighted to Oxebridge, but the clients did not grant permission to have their contact information nor logos published by Smith on his websites. In addition, the site includes photos of Paris taken from the Oxebridge site without permission (see EXHIBIT 22 and EXHIBIT 23).

52. In an April 15, 2019, in an email from Smith to Paris (see EXHIBIT 24), Smith refused to remove published documents and demanded instead that Paris file a formal request for takedown through the Elsmar site, writing, "All you have to do is use the Report link on the post the file is attached to, or use the Contact Us link and give a specific URL and file name. The file will be removed within 12 hours if you provide proof that the file is, in fact, your material." Smith is aware that Paris is banned by him from the site, and has no access to public posts, much less those made in the moderator-only forum. Being banned, Paris cannot access the "Report" feature Smith referred to, something Smith would have known.

53. Nevertheless, Smith admitted in the same email (EXHIBIT 24), only a few sentences later, that he knew exactly what the infringing file is, saying, "Nothing "leaked" other than part of a file name and the forum it was in. No one other than moderators could actually see the file which was a graphic file, and you know it. Nor could you access the discussion thread to know what it was about."

54. On April 8 2019, Smith wrote to Paris using the email address [legal@oxebridgequalitylawsuits.com](legal@oxebridgequalitylawsuits.com). Since Smith operates the oxebridgequalitylawsuits.com domain, it likewise means he operates the email addresses associated with it. Furthermore, that email was copied to Smith himself at [elsmarmarc@gmail.com](elsmarmarc@gmail.com). That email gave a veiled threat that Smith intended to publish another article about Paris in the future (See EXHIBIT 25).

55. At the same time, on the oxebridgequalitylawsuits.com website, an extortion threat appeared, demanding that Paris publish an apology to Smith or the material would be published, writing, "We will take this website (oxebridgequalitylawsuits.com) down as soon as Mr. Paris complies with the following," after which Smith lists a number of demands (See EXHIBIT 22, page 3).

56. Accordingly, based on the cumulative nature of this material, and since Smith has already been held in contempt by this Court, it is requested that Smith is again held in contempt of court and appropriately sanctioned so as to actually force compliance with the Injunction.

## I. ARGUMENT & AUTHORITIES

### A. Legal Standard

**To prevail on a motion for civil contempt, the movant must show, by clear and convincing evidence (1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order.** *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995)(citing *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)). "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *SEC v. First Fin. Group*, 659 F.2d 660, 669 (5th Cir. 1981). A finding of contempt is not predicated on the willfulness of the contemnor's actions. *See Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir.2000). Rather, the court must examine whether the contemnor actually failed to comply with the court's order. *Id.* In the contempt context, "clear and convincing evidence" is that "weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to truth of the allegations sought to be established, evidence so clear, direct, weighty and convincing as to enable fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir.1995) (internal quotation marks omitted).

Under settled law, this Court's preliminary injunction remains in effect unless it is altered by this Court or an appellate court, or until a final judgment on the merits. ("[T]he very

14

purpose of a preliminary injunction . . . is to preserve the status quo and the rights of the parties until a final judgment issues." (citing Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981))). "The 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.' " Boardman v. Pac. Seafood Grp., 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1023 (9th Cir. 2009)). " 'Status quo ante litem' refers to 'the last uncontested status which preceded the pending controversy.' " Boardman, 822 F.3d at 1024 (quoting GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210 (9th Cir. 2000)). Until then, "neither the plaintiff nor the court should be subjected to the unnecessary burden of re-establishing what has once been decided." Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright, 364 U.S. 642, 647 (1961).

"Courts possess the inherent authority to enforce their own injunctive decrees." Waffenschmidt v. MacKay, 763 F.2d 711, 716 (5th Cir. 1985), cert. denied, 474 U.S. 1056 (1986) (citing United States v. Hall, 472 F.2d 261, 267 (5th Cir. 1972); Berry v. Midtown Serv. Corp., 104 F.2d 107, 110 (2d Cir. 1939)), cited in Reebok Int'l Ltd. v. McLaughlin, 49 F.3d 1387, 1391 (9th Cir. 1995). "[A]n injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." Sys. Fed'n No. 91, 364 U.S. at 647. 'In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded.' " Inst. of Cetacean Research v. Sea Shepherd Conserv. Soc'y, 774 F.3d 935, 949 (9th Cir. 2014) (quoting John B. Stetson Co. v. Stephen L. Stetson Co., 128 F.2d 981, 983 (2d Cir. 1942)). A defendant cannot escape the district court's power to enforce its injunction through procedural mechanisms designed to

insulate its actions from review. See, e.g., Nehmer v. U.S. Dep't of Veterans Affairs, 494 F.3d 846, 860 (9th Cir. 2007) ("[T]he VA cannot usurp the power of a district court to construe the provisions of an order it has issued or divest that court of its authority[.]"); Movers Conference of Am. v. United States, 251 F. Supp. 882, 885 (S.D. Cal. 1966) (holding that federal government should have sought modification of injunction rather than simply adopting revised policy that purported to address court's prior holding).

"Upon a finding of contempt, the district court has broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) (citing *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000)). In civil contempt cases, sanctions may be imposed to coerce compliance with the court's order, compensate for losses sustained as a result of the non-compliance, or both. *Am. Airlines, Inc.*, 228 F.3d at 585, citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303 (1947). Civil contempt sanctions may include a fine (coercive, conditional or compensatory), imprisonment, a combination of a fine and imprisonment, and attorneys' fees incurred in obtaining the finding of contempt. *See S.E.C. v. Amerifirst Funding, Inc.*, 3:09-CV-601-D, 2006 WL 522124, *17 (N.D. Tex. Feb. 1, 2008), aff'd in part and vacated in part, *Whitcraft v. Brown,* 570 F.3d 268 (5th Cir. 2009); *U.S. v. Scott*, 4:03-CV-1410-A, 2004 WL 1068118, *3 (N.D. Tex. Apr. 5, 2004), citing *United Mine Workers v. Bagwell*, 512 U.S. 821, 827-29 (1994).

A. **Fine and Imprisonment**

The primary purpose of a contempt sanction determines whether it is civil or criminal in nature. *Lamar Fin. Corp. v. Adams,* 918 F.2d 564, 566 (5th Cir.1990)). An order is viewed as criminal if intended to punish the contemnor and vindicate the

16

authority of the court, and civil if intended to coerce the contemnor into compliance with a court order. *Id.* Although appropriate for either civil or criminal contempt, imprisonment is civil in nature if conditional and coercive, and criminal in nature if it is backward-looking and unconditional. *Id.* If an order is partly coercive and partly punitive, "the criminal feature of the order is dominant." *Port v. Heard,* 764 F.2d 423, 426 (5th Cir.1985).

B. **<u>Attorneys' Fees</u>**

As noted, courts have "discretion to award reasonable attorney's fees and other expenses necessary to make an innocent party whole" in a civil contempt proceeding. *Dow Chemical Co. v. Chemical Cleaning, Inc.*, 434 F.2d 1212, 1215 (5th Cir. 1970). Because the Defendant violated the injunction and Plaintiffs incurred attorneys' fees in obtaining the finding of contempt, it should be awarded its fees. *See Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977) ("Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt. Discretion, including the discretion to award attorneys' fees, must be left to a court in the enforcement of its decrees.").

B. **Marc Smith Should be Held in Contempt**

Smith's actions and statements clearly violate the Injunction. Accordingly, Smith should be held in contempt of court and that the Court issue appropriate sanctions to cause Smith to comply with the Injunction. In addition to being awarded attorneys' fees the Court should award a coercive fine of $1000 a day until Smith comes into compliance with the Court Order, also providing Smith with the opportunity to purge the daily fine. In addition, Plaintiffs request a compensatory fine in the amount of $20,000.00 due to the extensive damage caused by Smith's

repeated contemptuous conduct by continuous posting new defamatory content online.

## CONCLUSION

It is clear that Smith has posted and/or been complicit with other parties in direct violation of the Court Order. Smith previously found in contempt for Violation of the Amended Preliminary Injunction and ordered to pay attorney's fees (Doc. 120).

<u>Paragraph 5(a)-(c) of the Joint Stipulation on Injunction</u>:

6. SMITH agrees to refrain from publishing commentary on the personal, professional, business or other affairs of PARIS and OXEBRIDGE. More specifically:

   a. SMITH will remove all posts, links and other subject matter mentioning OXEBRIDGE or PARIS currently on the Elsmar.com Internet forum. Such removal must be permanent so that the posts, links and other subject matter cannot be retrieved or revived at a later date.

   b. SMITH will remove any online commentary regarding OXEBRIDGE or PARIS authored by SMITH on any other website, social network, or any other manner of technology or communication now known or later to become known.

   c. **SMITH will not publish any new content about OXEBRIDGE or PARIS on the Elsmar.com Internet forum, any other website, social network, or any other manner of technology or communication now known or later to become known, whether under his real name, anonymously or pseudonymously, or through the collaboration of any third party.**

(Dkt. 33).

On March 23, 2015, The Honorable Court entered an order (Dkt. 35), which approved a joint stipulation (Dkt. 33); the Motion for Preliminary Injunction and Amended Motion for Preliminary Injunction were granted. However, Defendant has continued to breach the Court Order by continuously posting defamatory content on osteinfo.com, oxebridge.co,

Elsmar.com, and oxebridgequalitylawsuits.com.

## PRAYER

WHEREFORE, Plaintiffs respectfully requests:

1. That Smith be ordered to appear and show cause why he should not be held in contempt of Court;

2. That attorneys' fees are awarded to Plaintiffs for the cost of bringing this action.

3. That a coercive daily fine in the amount of $1000 be issued which can be purged if Smith comes into compliance with Dkt. 33 and Dkt. 35, and removes all content about Plaintiffs from osteinfo.com, oxebridge.co, Elsmar.com, and oxebridgequalitylawsuits.com, and does not post any more content regarding Plaintiffs now or in the future.

4. That a compensatory fine in the amount of $20,000.00 and attorney's fees are issued in order to compensate Smith for the extensive damage incurred as a result of the repeated contemptuous conduct.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and complete copy of this document was electronically filed with the clerk of courts in Broward County, Florida on the 20th day of December 2019.

Respectfully submitted,

Shrayer Law Firm, LLC.
912 South Andrews Avenue
Fort Lauderdale, FL 33316
Tel.   (954) 601-3732
Email: ghs@shrayerlaw.com

 /s/Glen H. Shrayer

Glen H. Shrayer, Esq.
Fl Bar No. 57253